## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

**DEC 18 2017**

JAMES N. HATTEN, Clerk
By _Ragen_ Deputy Clerk

JULIE P. WHITCHURCH,                                    :
Plaintiff                                              :     CIVIL ACTION
          v.                                           :     NO.
ELARBEE THOMPSON WILSON & SAPP, LLP,                   :
READ GIGNILLIANT,                                      :     **1:17-CV-5205**
DOUGLAS DUERR,                                         :
REBECCA SHEPHARD,                                      :
POOLE HUFFMAN, LLC,                                    :     **JURY DEMAND**
TODD POOLE,                                            :
VIZANT TECHNOLOGIES, LLC,                              :
JOSEPH N. BIZZARRO,                                    :
LANE WIGGERS,                                          :
DAVID ASKINAS,                                         :
FRANK SEIDMAN,                                         :
CAPITAL SOLUTIONS, INC,                                :
IT ACCELERATION, INC,                                  :
DAVID YARNALL,                                         :
KANG HAGGERTY FETBROYT, LLC                            :
EDWARD T. KANG,                                        :
GREGORY MATHEWS,                                       :
MATTHEW KEOWN,                                         :
M. BLACKWOOD,                                          :
JUDGE HARVEY BARTLE, III,                              :
JUDGE RUSSELL VINEYARD,                                :
DEPARTMENT OF JUSTICE/                                 :
US MARSHALS SERVICE,                                   :
Defendants                                            :

## CIVIL COMPLAINT

Julie P. Whitchurch brings this civil rights, civil racketeering,

federal tort, violations of state law, and/or Bivens action against

1

ELARBEE THOMPSON WILSON & SAPP, Read Gignilliant, Douglas Duerr, Vizant Technologies LLC, Joseph N. Bizzarro, David Askinas, Lane Wiggers, Frank Seidman, Capital Solutions Inc, KANG HAGGERTY & FETBROYT LLC, Edward T. Kang, Gregory Mathews, IT ACCELERATION INC, David Yarnall, POOLE HUFFMAN LLC, Todd Poole, Rebecca Shephard, Judge Russell Vineyard, Judge Harvey Bartle, III, US Marshall Matthew Keown, US Marshall M. Blackwood, and the Department of Justice/US Marshals Service.

The RICO complaint is made against defendants: ELARBEE THOMPSON WILSON & SAPP, LLP (hereafter "ELARBEE"), Read Gignilliant, Douglas Duerr, Vizant Technologies, LLC (hereafter "Vizant" or the "enterprise"), Joseph Bizzarro, Lane Wiggers, David Askinas, Frank Seidman, Capital Solutions, INC (hereafter "Capital Solutions, INC"), Todd Poole, POOLE HUFFMAN, LLC (hereafter "POOLE HUFFMAN"), IT ACCELERATION, INC (hereafter "IT Acceleration"), David Yarnall, KANG HAGGERTY FETBROYT, LLC (hereafter "KANG HAGGERTY"), Gregory Mathews, and Edward Kang.[1]

---

[1] Plaintiff reserves the right to name additional RICO defendants.

2

The federal tort complaint is made against the Department of Justice/US Marshals Service.

The Bivens complaint is made against:  Judge Russel Vineyard, Judge Harvey Bartle, III, US Marshal Matthew Keown, and US Marshal M. Blackwood.

The conspiracy to/and violation of Civil Rights action is brought against *ALL* named defendants.

## I. PRELIMINARY STATEMENT, NATURE OF THE ACTION, JURISDICTION, and VENUE

1.   The primary cause(s) of this action are: 1) to seek a remedy from the defendants' misconduct, illegal acts, and widespread organized criminal enterprise, which has been engaged in a pattern of racketeering activity across state lines; 2) to seek a remedy, by way of a Bivens action, for the violations of my Fourth, Fifth, Eighth, and Fourteen Amendment rights; 3) to seek a remedy from Ms. Shephard's fraud, neglect, and civil rights violations; and 4) to seek a remedy for the injuries caused by the wrongful acts of the US Marshals and Department of Justice.  The plaintiff seeks

injunctive relief; 1) enjoining defendants from managing,
overseeing, investing, participating in/or conducting the affairs of
the enterprise; 2) an order of disgorgement (without
compensation) of the ill-gotten proceeds, gained by KANG
HAGGERTY, Capital Solutions, Inc., POOLE HUFFMAN, LLC,
Frank Seidman, Joseph N. Bizzarro, Lane Wiggers, David
Askinas, IT Acceleration, David Yarnall, ELARBEE THOMPSON
SAPP & WILSON, Todd Poole, Edward T. Kang, Gregory
Mathews, Read Gignilliant, Douglas Duerr, and their employees
for racketeering acts committed in furtherance, and on behalf, of
the enterprise.

2. The primary objective(s) of the racketeering enterprise and the
"persons" associated therewith, has been: 1)  to defraud
employees, partners, and vendors of monies owed for services
rendered and work performed through deceptive employment and
business practices, fraud, and theft; 2) to deceive customers with
inflated projected savings and defraud customers with overbilling
and deceptive contractual agreements; 3)  to coerce and/or extort
civil litigation settlements, from their adversaries, by way of

bribing witnesses, manufacturing evidence, and/or extortion; 4) to inflict severe and sustained damages on the plaintiff with the intent of oppressing Whitchurch's allegation that Capital Solutions, INC is/was running a PONZI like scheme through Vizant Technologies, LLC.

3. The defendants' violations of the Racketeering Influenced and Corrupt Organization Act, hereafter "RICO", include over *fifty* (50) RICO predicate offenses, during the past four (4) years, to include, but not limited to: obstruction of justice, fraud, theft, tampering with and retaliation against a witness, bribery of a witness, extortion, and kidnapping.

4. The defendants' conspired to violate federal and state law, acted in concert, and participated in a pattern of obstruction of justice and a gross abuse of the civil litigation process, with the willful and successful intent of violating the plaintiff's First, Fourth, Fifth, Sixth, Seventh, Eight, and Fourteenth Amendment rights.

5. The violation of Georgia state law claims alleged herein center around fraud, theft, defamation, false arrest, kidnapping, invasion

of privacy, malicious prosecution, and intentional infliction of emotional distress.

6.    The Pennsylvania state law claims herein center around abuse of process.[2]

7.    This civil complaint arises out of, among other things, a Bivens action, the Racketeer Influenced and Corrupt Organizations Act (the "RICO"), 18 U.S.C. § 1961, et seq., Civil Rights violations, a Federal Tort claim, and numerous PA and GA state law violations. This Court has subject matter jurisdiction over the RICO claims pursuant to 18 U.S.C. § 1964 and over the Civil Rights claims pursuant to 28 U.S.C. § 1343.  As I have exhausted all administrative remedies, this court has jurisdiction as to the federal tort claims pursuant to 28 U.S.C. § 2675.  This court has supplemental jurisdiction as to the remaining claims, pursuant to 29 U.S.C. § 1367 and Georgia's Long Arm Statue. Additionally, the Court has jurisdiction pursuant to 28 U.S.C. § 1332, as the allegations of the complaint establish diversity of citizenship

---

[2] The plaintiff has prepared a <u>Choice of Law Motion</u> and will file with the Clerk forthwith.

exists among the parties and the plaintiff seeks damages in excess of one hundred and seventy-five million dollars ($175,000,000.00).

8.  Venue is proper in this District pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1391, 28 U.S.C. § 2675, O.C.G.A. § 9-10-93, O.C.G.A. § 14-2-510, O.C.G.A. § 16-14-11, and Georgia's long-arm statue.


## II.  PARTIES

9.  Vizant Technologies, LLC is a Delaware limited liability corporation with its principal place of business at: 5 Christy Drive, Suite 202, Chadds Ford, PA 19317. At all times material hereto, Vizant Technologies, LLC was registered with the Georgia Secretary of State as a foreign limited liability company.  At all times material hereto, Vizant Technologies, LLC was an "enterprise" within the meaning of RICO, 18 U.S.C. Section 1961(4).  The Court has personal, territorial, and subject matter jurisdiction as to the defendant Vizant Technologies, LLC.

10.  Capital Solutions, INC is a Pennsylvania corporation owning a majority part of Vizant Technologies, LLC, with its principal place of business at:  910 Harvest Drive, Blue Bell, PA 19422. Certain of

Capital's employees serve on the Board of Directors of Vizant Technologies, LLC. Through its agency relationship, Capital Solutions, INC maintains management and financial control of the defendant Vizant Technologies, LLC. At all times material hereto, Capital Solutions, Inc. was a "person" within the meaning of RICO, 18 U.S.C. Section 1961(3). The Court has personal, territorial, and subject matter jurisdiction as to the defendant Capital Solutions, INC.

11. Frank Seidman, the leader of the organized crimes detailed in this complaint and an adult individual, is the Chief Executive Officer and board member of Capital Solutions, INC and the Chairman of the Board for Vizant Technologies, LLC, and can be served at: 910 Harvest Drive, Blue Bell, PA 19422. At all times relevant to this matter, Frank Seidman maintained ownership and a board level position in both the enterprise, Vizant Technologies, LLC, and the majority shareholder, Capital Solutions, Inc. Mr. Seidman has an agency relationship with the enterprise. Mr. Seidman has colluded, conspired, and participated in the misconduct detailed herein and has financed that misconduct with monies bilked from

the customers, employees, partners, and vendors of the enterprise. At all times material hereto, Frank Seidman was a "person" within the meaning of RICO, 18 U.S.C. Section 1961 (3). The Court has personal, territorial, and subject matter jurisdiction as to the defendant Frank Seidman.

12. Joseph N. Bizzarro, an adult individual, resides at 150 Stonegate Drive, Landenberg, PA 19350. At all times relevant to this matter, Joseph N. Bizzarro maintained a board level position and was employed as the Chief Executive Officer of the enterprise. Bizzarro has participated in the misconduct detailed herein, committed numerous illegal acts for the common purpose of furthering the enterprise, has orchestrated much of the said misconduct, and acted as a "servant" of Frank Seidman. At all times material hereto, Joseph N. Bizzarro was a "person" within the meaning of RICO, 18 U.S.C. Section 1961 (3) and maintained an agency relationship with the enterprise. The Court has personal, territorial, and subject matter jurisdiction as to the defendant Joseph N. Bizzarro.

13.   Lane Wiggers, an adult individual, is the Asset Manager of the

enterprise and can be served at: 5 Christy Drive, Suite 202,

Chadds Ford, PA 19317.  At all times relevant to this matter,

Lane Wiggers maintained ownership, a board level position, and

an agency relationship with Vizant Technologies, LLC.  Wiggers

has conspired and participated in the misconduct detailed herein,

and acting as a servant from Frank Seidman, has orchestrated

much of the said misconduct.  At all times material hereto, Lane

Wiggers was a "person" within the meaning of RICO, 18 U.S.C.

Section 1961 (3).  The Court has personal, territorial, and subject

matter jurisdiction as to the defendant Lane Wiggers.

14.   David Askinas, an adult individual, at all times relevant to this

complaint was the Vice President & General Counsel of the

enterprise and his home address is currently unknown.  David

Askinas maintained an executive level position with Vizant

Technologies, LLC and an agency relationship.  Mr. Askinas

conspired and participated in the misconduct detailed herein. At

all times material hereto, David Askinas was a "person" within

the meaning of RICO, 18 U.S.C. Section 1961 (3).  The Court has

personal, territorial, and subject matter jurisdiction as to the defendant David Askinas.

15. KANG HAGGERTY & FETBROYT, LLC, is a Pennsylvania corporation with its principal place of business at: 123 South Broad Street, Suite 1670, Philadelphia, PA 19109. Certain employee(s) and owner(s) of KANG HAGGERTY & FEBROYT conspired, colluded, and participated in the misconduct detailed herein. At all times material hereto, KANG HAGGERTY, was a "person" within the meaning of RICO, 18 U.S.C. Section 1961 (3) and maintained an agency relationship with the enterprise. The Court has personal, territorial, and subject matter jurisdiction as to the defendant KANG HAGGERTY, & FEBROYT, LLC.

16. Edward T. Kang, an adult individual, can be served at the offices of KANG HAGGERTY & FETBROYT LLC. At all times relevant to this matter, Edward Kang has been employed by the enterprise for the illicit purpose of furthering the enterprise through numerous racketeering acts. Mr. Kang conspired and participated in the misconduct detailed herein, and with the common goal of furthering the enterprise, Mr. Kang has acted as a servant to

Frank Seidman.  Mr. Kang maintains ownership and a board level position in KANG HAGGERT & FETBROTY and an agency relationship with the enterprise.  At all times material hereto, Edward Kang was a "person" within the meaning of RICO, 18 U.S.C. Section 1961 (3).  The Court has personal, territorial, and subject matter jurisdiction as to the defendant Edward T. Kang.

17.  Gregory Mathews, an adult individual, can be served at the offices of KANG HAGGERTY & FETBROYT.  At all times relevant to this matter, Mr. Mathews has been contracted by the enterprise, and has conspired with the codefendants to commit numerous criminal acts on behalf of the enterprise.  At all times material hereto, Gregory Mathews acted as a servant for Frank Seidman and was a "person" within the meaning of RICO, 18 U.S.C. Section 1961 (3) and maintained an agency relationship with the enterprise.  The Court has personal, territorial, and subject matter jurisdiction as to the defendant Gregory Mathews.

18.  POOLE HUFFMAN, LLC, is a domestic limited liability company with its principal place of business at 315 W. Ponce De Leon Ave, Decatur, GA 30030.  Certain employee(s) and owner(s) of POOLE

HUFFMAN conspired with the codefendants to violate federal law with the intent of obstructing the plaintiff's efforts to seek redress. At times material hereto, POOLE HUFFMAN, LLC was a "person" within the meaning of RICO, 18 U.S.C. Section 1961 (3) and maintained an agency relationship with the enterprise. The Court has personal, territorial, and subject matter jurisdiction as to the defendant POOLE HUFFMAN.

19. Todd J Poole, an adult individual, can be served at the offices of POOLE HUFFMAN. At times material hereto, Todd Poole has conspired to violate federal law, received monies, from the enterprise, for his illegal acts and misconduct, with the common purpose of furthering the enterprise and inflicting severe and sustained damages on Whitchurch. Mr. Poole maintains ownership and a board level position with POOLE HUFFMAN, LLC, and an agency relationship with the enterprise. At times material hereto, Mr. Poole was a servant of Frank Seidman and a "person" within the meaning of RICO, 18 U.S.C. Section 1961 (3). The Court has personal, territorial, and subject matter jurisdiction as to the defendant Todd Poole.

20.   ELARBEE THOMPSON SAPP & WILSON, LLP, is a domestic

limited liability partnership with its principal place of business at

800 International Tower, 229 Peachtree Street, N.E., Atlanta, GA

30303.  Certain employee(s) and partner(s) of ELARBEE

THOMPSON conspired with the codefendants to violate federal

law with the intent of obstructing and impeding the

administration of justice. At times material hereto, ELARBEE

THOMPSON SAPP & WILSON, LLP was a "person" within the

meaning of RICO, 18 U.S.C. Section 1961 (3) and maintained an

agency relationship with the enterprise.  The Court has personal,

territorial, and subject matter jurisdiction as to the defendant

ELARBEE THOMPSON SAPP & WILSON, LLP.

21.   Read Gignilliant is an adult individual and can be served at

ELARBEE THOMPSON SAPP & WILSON, LLP, with its

principal place of business at 800 International Tower, 229

Peachtree Street, N.E., Atlanta, GA 30303.  At all times material

herein, Mr. Gignilliant conspired with the codefendants to violate

federal law with the intent of obstructing and impeding the

administration of justice and furthering the enterprise. At times

material hereto, Read Gignilliant was a "person" within the meaning of RICO, 18 U.S.C. Section 1961 (3) and maintained an agency relationship with the enterprise.  The Court has personal, territorial, and subject matter jurisdiction as to the defendant.

22.   Douglas Duerr is an adult individual and can be served at ELARBEE THOMPSON SAPP & WILSON, LLP, with its principal place of business at 800 International Tower, 229 Peachtree Street, N.E., Atlanta, GA 30303.  At all times material herein, Mr. Duerr conspired with the codefendants to violate federal law with the intent of obstructing and impeding the administration of justice and furthering the enterprise. At times material hereto, Douglas Duerr was a "person" within the meaning of RICO, 18 U.S.C. Section 1961 (3) and maintained an agency relationship with the enterprise.  The Court has personal, territorial, and subject matter jurisdiction as to the defendant.

23.   IT ACCELERATION, INC, WILSON, LLP, is a Pennsylvania corporation with its principal place of business at 215 West Church Street, Suite 104, King of Prussia, PA 19406.  Certain employee(s) and partner(s) of IT ACCELERATION conspired with

the codefendants to violate federal law with the intent of

obstructing and impeding the administration of justice, and

furthering the enterprise. At times material hereto, IT

ACCELERATION, INC was a "person" within the meaning of

RICO, 18 U.S.C. Section 1961 (3) and maintained an agency

relationship with the enterprise. The Court has personal,

territorial, and subject matter jurisdiction as to the defendant IT

ACCELERATION, INC.

24.   David Yarnall is an adult individual and can be served at IT

ACCELERATIO, INC. At all times material herein, Mr. Yarnall t

conspired with the codefendants to violate federal law with the

intent of obstructing and impeding the administration of justice

and furthering the enterprise. At times material hereto, David

Yarnall was a "person" within the meaning of RICO, 18 U.S.C.

Section 1961 (3) and maintained an agency relationship with the

enterprise. The Court has personal, territorial, and subject

matter jurisdiction as to the defendant.

25.   Russell Vineyard, an adult person, is a federal judge serving the

Northern District of Georgia, Atlanta District Court and can be

served at the Richard B. Russell Federal Building, 2211 United

States Courthouse, 75 Ted Turner Drive, SW, Atlanta, Ga 30303.

The Court has personal, territorial, and subject matter

jurisdiction as to the defendant Judge Russell Vineyard.

26.   Matt Keown, an adult person, is a US Marshall serving the

Northern District of Georgia, Atlanta District Court and can be

served at the Richard B. Russell Federal Building, 2211 United

States Courthouse, 75 Ted Turner Drive, SW, Atlanta, Ga 30303.

The Court has personal, territorial, and subject matter

jurisdiction as to the defendant Matt Keown.

27.   M. Blackwood, an adult person, is a US Marshall serving the

Northern District of Georgia, Atlanta District Court and can be

served at the Richard B. Russell Federal Building, 2211 United

States Courthouse, 75 Ted Turner Drive, SW, Atlanta, Ga 30303.

The Court has personal, territorial, and subject matter

jurisdiction as to the defendant M.  Blackwood.

28.   Rebecca Shephard, an adult person, is a supervisory attorney with

the Federal Defender Program, Inc. and can be served at 101

Marietta Street, NW, Atlanta, GA 30303.  The Court has personal,

territorial, and subject matter jurisdiction as to the defendant
Rebecca Shephard.

29.     Harvey Bartle, III, an adult person, is a federal judge serving the
Eastern District of Pennsylvania, District Court and can be served
at 60 Market Street, Philadelphia, PA 19106.  The Court has
personal, territorial, and subject matter jurisdiction as to the
defendant Judge Russell Vineyard.

30.     US Department of Justice/US Marshals Service can be served at
the Office of General Counsel, Washington DC 20530-0001.  This
Court has subject matter jurisdiction as to the defendant, DOJ/US
Marshals Service.

## IV.  BACKGROUND

### a.  Employment with Vizant Technologies, LLC

31.     In the most basic sense, Vizant Technologies, LLC is a business
that has been built on cutting cost in the processing of credit cards
for a business.  As an example, if Company accepts credit cards
and pays a rate of 1.75% and Vizant Technologies, LLC identifies
ways to lower that rate to 1.45%, Vizant would be compensated a

negotiated percentage of the savings. Contractually, Vizant was to be compensated *only* for the savings that were identified by and the direct result of Vizant's intervention. And while the services of Vizant Technologies, LLC has been expanded over the years to identifying cost savings measures within the entire treasury functions of a business, the bread and butter of Vizant is lowering the cost of a business in the processing of payment cars. I began my employment with Vizant Technologies, LLC as a Business Development Manager (an outside sales representative). I was promoted in 2012 to a Regional Director of Business Development and again in August of 2013 to the National Director of Business Development. At the time of my promotion to National Director, in mid-July of 2013, I meet with Joseph Bizzarro. Mr. Bizzarro promised me an annual salary of $110,000 plus commissions, bonuses, and reimbursement for any out of pocket expenses I incurred in my role as the National Director.

32. At all times during my employment, I, as well as all other Vizant employees that reported to me, in a business development/sales role, had a verbal and written compensation plan and a promise

by Joseph N. Bizzarro to be compensate in the form of wages, commissions, bonuses, and reimbursement of expenses incurred in the performance of their/my duties.

33.    In a scheme to defraud Whitchurch and other Vizant employees, of those monies, the defendants[3] used false weights and measurements in calculating those earnings to ensure that if, and/or when, the enterprise was to compensate the employee as promised, the payment would be pennies on the dollar for the actual earnings, commissions, and expenses owed to the employees.

34.    In January of 2013 Bizzarro described and detailed the 2013 earning structure for the Business Development Managers and myself.  Thereafter, he rolled out the plan, by way of a conference call with the Business Development Managers, Regional Directors, and myself.  That plan included a bonus for every appointment I, and/or the employees in a business development role, attended and conducted with a prospective client. Bizzarro encouraged, approved, and promised to compensate Whitchurch

---

[3] Vizant Technologies, LLC, Frank Seidman, Lane Wiggers, Capital Solutions, Inc, David Askinas, and Joseph N. Bizzarro.

for EVERY appointment she was physically able to attend, either on her own or with one of the Business Development Managers reporting to her. Because of Bizzarro's false representations of compensation, I spent eleven (11) months working an average of 60-70 hours per week traveling extensively to attend as many appointments as possible, often spending my own money for travel expenses[4]. Each month when it came time for Vizant to make good on Bizzarro's promises, Bizzarro would represent there had been some sort of "error" on the part of the payroll or finance department and fraudulently represented the monies would be forthcoming. On numerous occasions, I asked Bizzarro to rescind the offer to compensate the employees, and myself, in this manner *if* the company could not afford it. On each occasion Bizzarro stood firm with the lies and excuses and assured me it was all a big mistake and the payments would be forthcoming.

35.    Through those deceptive business practices, and other similar schemes, $12,076.92 in earned compensation was fraudulently withheld from me. I secured a professional services agreement

---

[4] On numerous occasions the company American Express credit cards were suspended and/or canceled because Vizant fell behind on the payments.

between Vizant Technologies, LLC and Floor & Décor Outlets of America, headquartered in Atlanta. Calculated in accordance with the Vizant earning plan and Bizzarro's representations my earnings were $3,211.54. After multiple attempts to collect, and well after I was terminated, I received a check in the amount of $582. I was never compensated the remaining $2,622. As well, and despite multiple representations, I was never reimbursed the $3,400 in out of pocket expenses incurred while traveling on behalf of Vizant. In addition, I was never compensated the $5,000 for attending/conducting over 100 appointments with prospective clients.

36. The defendants continued the same wage and earnings scheme as late as the summer of 2015, as Gregory Parentice filed a verified complaint in the Commonwealth of Delaware declaring the defendant, Vizant Technologies, LLC was fraudulently withholding over $30,000 in promised and earned wages and commissions. According to the verified complaint, Mr. Parentice was coerced into signing a Non-Compete & Confidentiality Agreement by the defendant with fraudulent promises of being

paid the $30K in back wages and earnings only to be terminated within days of signing the agreement and before being paid the earnings. **(Exhibit A)**

37. During the spring and summer of 2013, I was being hammered with calls and emails from employees, vendors, partners, and clients: 1) demanding answers as to why they had not been compensated for services rendered and when those payments would be forthcoming; 2) allegations Vizant Technologies, LLC had exaggerated their roll in the cost savings realized by the customer or unexaggerated the same when it came time to compensate the employee and the alliance partners. **(Exhibit B)** I went to Bizzarro repeatedly, only to be told one lie after the other, i.e. "the checks in the mail", "mistake in the payroll department", "software error", and/or "tell them to sue me". By the late summer of 2013, the defendants had fallen so far behind in payments; and with the Vizant investors being owed their quarterly monies, the defendants began misappropriating the funds the employees were contributing to the company provided health insurance plan. By early September of 2013, the employees

who participated in the health insurance program, to include the plaintiff, received a "Prior Coverage" letter from the health insurance provider, United Healthcare, indicating our health insurance had been canceled.  In addition, and at this same time, I was receiving calls from employees, who were being denied health insurance benefits and told their health insurance had been canceled.  **(Exhibit C) (Exhibit D)**

38. Upon information and belief and as late as 2016, the enterprise and persons associated with, continued with the ongoing scheme of misappropriating the employee contributions for health insurance premiums, causing each participant to receive a Notice of Prior Coverage from the provider.

39. By the fall of 2013, Bizzarro, Vizant Technologies, LLC, Frank Seidman, Lane Wiggers, David Askinas, and Capital Solutions, INC were robbing from "Peter" (the employees, vendors, and agent/partners), to pay "Paul" (the investors).  In September of 2013 and with a "Ponzi" like scheme, in which deceptive and outright false financial projections were made, Capital Solutions,

INC, the enterprise, and persons associated[5] therewith, raised

over 1,000,000 from unsuspecting investors. **(Exhibit E)**

40. After witnessing evidence of the scheme for over a year, which

included, but was not limited to:  gross financial mismanagement,

theft of employees' earnings, misappropriation of health insurance

premium payments, overbilling of clients, the filing of vexatious

lawsuits against clients, and an ongoing fraud aimed at deceiving

the employees, clients, partners, and investors of monies; I

contacted the Vizant Board of Directors, Frank Seidman, Lane

Wiggers, and Capital Solutions, INC and reported the malfeasants

and criminal activities going on at Vizant Technologies, LLC.

41. On December 4, 2013, I spoke with Lane Wiggers while I was

boarding a flight from Boston to Atlanta, after attending

appointments with prospective Vizant clients, Mr. Wiggers

instructed me to contact the Vice President of Human Resources

for Vizant, Shawnna Kurimura.  When I asked Wiggers why I

needed to file a report with HR, Mr. Wiggers responded "as a

means to protect yourself".  Upon landing in Atlanta, I received a

---

[5] Kyle Bransfield.

voicemail from David Askinas, informing me that I was

terminated.   The following day, December 5, 2013, my sister,

Jamie Davis, who at the time was employed as a Business

Development Manager, was terminated in retaliation.

## b. Georgia Department of Labor &
## Cobb County Superior Court

42.   Upon being wrongfully terminated, I and my sister (Davis) filed

for unemployment benefits through the Georgia Department of

Labor. Vizant Technologies, LLC opposed the payment of those

benefits.   Specifically, in December of 2013 and January of 2014,

Shawn Kurimura and David Askinas, who were being paid by

Vizant Technologies, LLC, made knowingly false representations

to GA DOL, via wire and US Mail.   Both stated I had been

terminated for sexually harassing female workers, credit card

fraud, failure to follow management, and violent combative

outburst.

43.   In January of 2014, the GA DOL conducted separate hearings on

both the Whitchurch claim and the Davis claim.   During the

proceeding, in the Whitchurch matter, David Askinas impersonated an attorney and presented himself as "Vice President & General Counsel of Vizant Technologies, LLC", despite having no license to practice law. Mr. Askinas, on behalf of, and conducting the matters of law for the enterprises, purposely and corruptly intimated and influenced the GDOL representative by making false claims *he* was an attorney and *I* had committed credit card fraud and was prone to violent combative outburst. The defendants' intent was to defraud the State of Georgia and the United States. Because of the defendants' defamatory statements and corrupt influence, the GA DOL denied my, and my sister's, benefits.

44. On January 17th, 2014, I launched the website www.nocapitalsolutions.com warning the public of the gross incompetence and malfeasance of Joseph N. Bizzarro and the breach of fiduciary care, responsibility, and loyalty duties of the private equity management firm, Capital Solutions, Inc, to the investors, employees, and/or customers of Vizant Technologies, LLC.

45.   Immediately thereafter, and on January 21, 2014 Vizant Technologies, LLC filed a vexatious civil action in the Cobb County Superior Court, State of Georgia, Case No. 14-1-403-49. The verified (by Bizzarro) civil action was a stereotypical SLAPP suit which alleged claims of:  Defamation, Disclosure of Confidential Information, Breach of Contract, Tortious Interference with Business Relations, and Misappropriation of Trade Secrets.  Anthony Sanacory of Duanne Morris LLC represented Vizant Technologies, LLC.

46.   The Bizzarro declaration, offered in support of the complaint and in furtherance of the enterprise, urged I was lying, regarding the lapse of health insurance and wage payments, and included the following statement:

> "…statements regarding a lapse of health care coverage are false. Rather, due to an error on the part of Vizant's heath care insurance carrier in the processing of Vizant's payment check…".

And despite the fact that the Vizant payroll was late or absent, routinely, throughout 2013 Bizzarro declared:

"...employees experienced a one-time, one-day delay in receiving their paychecks for the July 15, 2013 payroll due to an error on the part of Vizant's payroll processor."

47. During the discovery phase of the Cobb County litigation, I subpoenaed the Vizant payment records from United Healthcare. Those records confirmed the employees' health insurance policy was canceled because Vizant Technologies, LLC did not pay the premiums on time, despite the fact the monies were being withheld from the employees. **(Exhibit F)** I subpoenaed the records from Vizant's payroll processor "ADP". Those records showed conclusively that, despite Bizzarro's sworn declarations, there was *no* "error on the part of Vizant's payroll processor". Rather Vizant Technologies, LLC, CFO, David Jablonski, sent an email to the staff at ADP instructing the payroll processor *not to pay* the employees as scheduled. **(Exhibit G)**

48. Despite Bizzarro's sworn representations to the contrary, there were no less than ten (10) pay periods between March 2013 and December 2013 when the employees' earnings, to include mine, were paid late, were far less than owed, and/or were not paid at all.

49.  On or about February 3rd, 2014, I was invited to meet with Vizant

Technologies, LLC outside counsel, Anthony Sanacory at the law

offices of Duane Morris LLP in Atlanta GA, to discuss the

outstanding wages and expenses being unlawfully withheld.  The

discussion quickly elevated to outright extortion as Mr. Sanacory

threatened Vizant Technologies, LLC would continue with their

claims (of sexual harassment and fraud) with the GA Department

of Labor if I would not agree to the terms of their settlement.  I

argued it was illegal for Vizant and Sanacory to negotiate using

the State of GA benefits and my stolen money as leverage. Mr.

Sanacory countered that "often times companies will oppose

unemployment benefits to reach a settlement with an employee".

I told Mr. Sanacory he was wrong.   Either I was entitled to the

benefits, as a matter of law and policy, or I was not; it was not

legal for Vizant to continue to make knowingly false statements to

the State of GA, or anyone else, to coerce a settlement from me

and informed Sanacory that "just cause everybody's doing it, don't

make it right." Mr. Sanacory became infuriated and told me that

Vizant would only release the earnings and expenses being

withheld if, **and only if,** I would release Vizant and Capital

Solutions from any and all wrongdoing and agree to be

permanently restrained from issuing any warnings or ringing any

alarms as to the Vizant/Capital Solution scheme. I told Sanacory,

in no uncertain terms, I would not be a party to him and the

defendants extorting me with 1) knowingly false claims to the GA

DOL and 2) my own money. I told Sanacory I had faith the GA

Department of Labor would overturn the previous ruling on my

appeal.

50.   On February 8, 2014, and 5 days after the meeting with Sanacory,

I received, via USPS, an erroneous 1099 MISC Internal Revenue

Service Earning Statement fraudulently prepared and issued by

Vizant Technologies LLC, in the amount of $20,451.19 for alleged

2013 earnings. I immediately contacted Capital Solutions, Frank

Seidman, Lane Wiggers, Joseph Bizzarro, and Vizant's counsel

and adamantly denied the $20,451.19 in additional 2013 earnings

and demanded they withdraw the knowingly false fillings. The

defendants refused and because of the fraudulent reporting to the

IRS, I was billed over $7,000 in taxes on income that I never earned, never received, and Vizant Technologies, LLC never paid.

51. By late February of 2014, Anthony Sanacory, of Duane Morris, LLC, resigned or was terminated and the defendants hired, and projected their fraud onto the next law firm, ELARBEE, THOMPSON, WILSON, & SAPP, LLC, located in Atlanta, Georgia.

52. On February 25th and April 17th of 2014 the Georgia Department of Labor reversed their decisions and granted both Whitchurch and Davis benefits. The GA DOL stated, in part and in regard to Whitchurch's claim; had Whitchurch not reported the gross illegal activities of the CEO she would not have been terminated. And in part and with regards to Davis, had Davis' sister not reported the gross illegal activities of the CEO, Davis would not have been terminated. The DOL went on to stated they had found "no credible testimony was given by Vizant Technologies, LLC" in regard to their opposition of the claims. **(Exhibit H)**

53. During the month of March 2014, I exchanged multiple communications between Vizant Technologies, Capital Solutions,

and the attorneys of ELARBEE THOMPSON. And at the request of those parties, who fraudulently represented Vizant would be forthcoming with the owed earnings and expenses, I resubmitted months and months of earning and expense reports detailing the exact monies being unlawfully withheld and the necessary documentation to back those claims. I had performed this same exercise, no less than three (3) times, for the previous attorneys of record, the VP of Human Recourses, and the CFO of Vizant Technologies, LLC. And for the fourth (4th) time, the reports were submitted to Vizant Technologies, LLC, Capital Solutions, Inc., Frank Seidman, Lane Wiggers, Joseph N. Bizzarro, Read Gignilliant, and Douglas Duerr.

54. On or about March 20, 2014 I was invited to meet with Douglas Duerr and Read Gignilliant of the law firm ELARBEE THOMPSON WILSON & SAPP, located in Atlanta, GA to discuss the withheld compensation, expenses, and the IRS filing. Once again, the "meeting" was nothing more than an attempt to extort, coerce, and threaten me. Mr. Gignilliant was quick to inform me that I would not be given the monies owed and the false 1099

MISC form would not be withdrawn from the IRS *unless,* I agreed

to the settlement demands. At the same time Mr. Duerr and Mr.

Gignilliant were squeezing me for a settlement in the conference

room of ELARBEE THOMPSON, the ELARBEE employees were

in their offices were engaged in extensive research regarding

"stalking protective order", "cyber stalking", "attack website" and

"work place violence".

55. On March 25, 2014, I was on the receiving end of the defendants'

third attempt at extortion/coercion, as Mr. Douglas Duerr emailed

me to reiterate Mr. Gignilliant's message from the previous

meeting, "withdrawal of the 1099, …in return for your (and Mrs.

Davis) agreeing to all of the other settlement terms." Once again,

I let counsel know it was illegal for them to attempt to extort a

settlement from me using a manufactured and knowingly false tax

document; either I worked, earned the monies, they paid me the

monies, and now I owe the federal government 30% in income tax,

*or* I **did not** work, earn the monies, and/or get paid and therefore

would not owe any taxes. But under no circumstances could

Vizant dream up false claims of earnings and payments and report that to the IRS as a way to negotiate with me.

56. On or about April 1, 2014 I learned Bizzarro had been fired by his two previous employers, both in which he held the position of Chief Operating Officer and/or Chief Financial Officer and both firings were in the wake of the employers having to file for bankruptcy relief. On or about April 11, 2014, I updated the website www.nocapitalsolutions.com to include information regarding Bizzarro's previous employment history and Bizzarro's role in the demise and subsequent bankruptcy of those employers.

57. On April 11, 2014, and immediately following the posting of Bizzarro's employment history, and within as little as five (5) minutes of the Defendants and the attorneys at ELARBEE logging off my website, from their IP addresses: 69.137.140.84, 173.49.35.242, and 66.28.216.186, I was sent an email which read: *"I know where you live...How are the boys? Safe and secure?"* **(Exhibit I)**

The "boys" was a reference to my then two (2) minor sons. I immediately notified Capital Solutions, Inc., Frank Seidman, Lane Wiggers, and the attorneys at ELARBEE that Bizzarro was

sending me threatening communication and that I was terrified and wanted to end our differences.

58.   I received a second email from the same email address; Whitchurchfamily@gmail.com.  This email threatened a website would be "dedicated to Whitchurch". And true to that threating communication, Kevin Davis of Vizant Technologies, LLC immediately purchased the domain "juliewhitchurch.com".

**(Exhibit J)**

59.   On April 10, 2014, I was once again invited to meet with Douglas Duerr at EALRBEE THOMPSON, on the fraudulent pretense that the withheld compensation and expenses would be paid.  The meeting, which was conducted five (5) days before the Cobb County Superior Court hearing on Vizant's motion for a preliminary injunction, was nothing short of the defendants' forth (4th) attempt to extort, coerce, and threaten me.  Mr. Duerr reiterated the defendants' previous threats: my money would not be returned and the false IRS earning statement would not be withdrawn, unless I agreed to release Vizant Technologies, LLC, Joseph Bizzarro, Lane Wiggers, Frank Seidman, Capital

Solutions, Mr. Gignilliant, Mr. Duerr, and ELARBEE

THOMPSON of all wrong doing and agreed to a permanent prior

restraint against issuing any warning to the public or law

enforcement regarding the defendants fraudulent business scheme

and organized crimes.

60.  The defendants (Vizant, Capital, Seidman, Wiggers, Askinas, and

Bizzarro) knew they would not be able to successfully defend

themselves against my allegations of misconduct and financial

wrong doing, so they conspired with Mr. Duerr and Mr. Gillianant

and put forth a false narrative that I was a disgruntled employee

stalking my former employer and their family members.  The

defendants' plan was to fabricate evidence to implicate me in the

crime of stalking and have the Cobb County Superior Court issue

a preliminary/permanent restraining my speech and presenting

me in a false light to the community so my allegations of financial

wrongdoing and a PONZI scheme being executed by Capital

Solutions, INC would not be taken seriously.  After conspiring

with the persons associated with the enterprise, Mr. Duerr and

Mr. Gignilliant prepared Bizzarro to provide the court with the

false and inflammatory testimony that I and Davis were stalking

him, his minor son, the board members and their families.  Mr.

Gignilliant sprung the knowingly false "cyber stalking" and "work

place violence" claims, researched by his employees, on me during

his opening statements of the April 14th, 2014 hearing on Vizant's

motion for a preliminary injunction.  I was too stupid to know I

could have objected to the newly fabricated claims.  During the

preliminary injunction hearing held on April 14th and 16th of 2014

in Cobb County Superior Court and despite suing me and Davis

for misappropriation of trade secrets, tortious interference,

defamation, and breach of confidentiality in the Ga action,

Bizzarro stated during the PI hearing:

> "We get no other joy out of being in this courtroom other
> than to get you to stop stalking, harassing, intimidating,
> causing distress for board members and their families.
> That's the only reason we're here today. There's no other
> reason." (Cobb County Superior Court, April 2014,
> Preliminary Injunction Hearing Bizzarro testimony, page 39,
> lines 20-24).

61.   I was prepared to defend the allegations contained in the Vizant

complaint, i.e.; misappropriation of trade secrets, tortious

interference, breach of confidentiality, etc.  Operating pro se, I was

ill prepared to defended myself against the fabricated stalking

allegations sprung on me during the preliminary injunction

hearing and, as stated above, I lacked the legal knowledge to

know I could have objected to newly manufactured claims of the

defendants and the trickery of the ELARBEE THOMPSON

attorneys.

62.   During the April 14th and 16th, 2014 Preliminary Injunction

hearing, Joseph Bizzarro testified I was stalking his, then, fifteen

(15) year old minor son through repeated and harassing Facebook

communications.  He testified:

> "I am not in fear personally for my safety. You know, I am a
> big boy. But when she started scaring my family and
> reaching out to my son multiple times, and it wasn't just a
> friend request, it was a Facebook page set up that was very
> derogatory toward me and others, my son was very scared,
> my wife was scared,..." (Cobb County Superior Court,
> Preliminary Injunction Hearing Bizzarro testimony, page 6,
> lines 24 & 25, page 7, lines 4).

When questioned by the Vizant Technologies, LLC counsel of

ELARBEE THOMPSON:

> "Mr. Bizzarro, it's been suggested that your son is 15 years
> old. Is that accurate?"

Bizzarro testified: "That is correct." (Preliminary Injunction

Hearing Bizzarro testimony, page 8, lines 5-7).

63.   Additionally, Bizzarro offered sworn testimony during the PI

hearing which included:

1)   Whitchurch was stalking and harassing Mr. and Mrs. Frank
Seidman, so much so, that Mrs. Seidman was "in fear for her life"
and it was necessary for Vizant Technologies, LLC hire armed
gunmen to provide the Seidmans with protection, 24 hours a day
for several weeks.  Mr. Seidman was the "money man" and was in
charge of the financial matters for the enterprise, Vizant
Technologies, LLC.

2)   The Pennsylvania State Police viewed Whitchurch as a
threat, and upon learning she traveled to Pennsylvania in
January of 2014, were dispatched to the Vizant Technologies, LLC
office in Chadds Ford, PA and remained at that office for three (3)
days "waiting to arrest" Whitchurch "had you shown up".

64.   Based on Bizzarro's inflammatory and perjured "stalking"

testimony and the misconduct of the attorneys of EALRBEE

THOMPSON the court issued a preliminary injunction restraining

my civil rights.

65.   Knowing Bizzarro to be a pathological liar and after witnessing, in

every single interaction with Mr. Gignilliant and Mr. Duerr, their

aversion to and/or perversion of the truth; combined with the

FACT that; 1) I would not and did not have ANY contact with a

purported Bizzarro minor child, and 2) that Bizzarro **had no**

minor 15 year old son at the time of his testimony; I sought the

records and/or invoices from: 1) Strike Force, the purported

private security firm, hired by Bizzarro for the Seidman home, 2)

*Any* records from the Pennsylvania State Police Department

relating to myself, Vizant Technologies, LLC and/or this matter,

and 3) birth records and/or any evidence of Bizzarro's fictional 15

year old son.  The documents received, and more importantly,

those not received because they did not exist, showed Bizzarro had

committed gross perjury, as:

> 1)  No such 24 hour a day, two-week security had been
>
> provided at the Seidman house.  In fact, Mrs. Seidman
>
> adamantly rebuffed the security Bizzarro had hired and
>
> ordered them off her property immediately upon their
>
> arrival.  Mr. Bizzarro was aware of this at the time of his
>
> April 2014 testimony, as Mr. Jeffrey Martin, VP of
>
> Operations for Strike Force, had emailed Mr. Bizzarro three
>
> (3) months prior and informed him that Mrs. Seidman had
>
> dismissed the security team immediately upon their arrival,

at her home.  Mr. Bizzarro responded to Mr. Martin's email
with "If that is what she wants.  Pull the security from the
home.  **(Exhibit K).**  (As well, fast forward to 1 year later in
the late spring of 2015, I had the opportunity to depose Mr.
Frank Seidman on the matter and Bizzarro's sworn
statements and testimony.  Mr. Seidman refuted Mr.
Bizzarro's preliminary injunction hearing testimony and
testified he was *never* in fear for his life or the life of his
wife and that he opposed Bizzarro's hiring of private security
company.

2)  The PA State Police *never* viewed Whitchurch as a
threat, had any knowledge of Whitchurch and/or her travels
to PA, and had no record of any measures taken to provide
security for the enterprise, Vizant Technologies, LLC.  In
fact, there was not even a record of a random "drive-by"
performed and/or a request made for such, by the enterprise
or any of the persons associated with the enterprise.
**(Exhibit L)**

3)  By Mrs. Bizzarro's own statements, the statements of her

children, Joseph N. Bizzarro's affidavit[6] , and the birth

records of the Pennsylvania, Delaware, New York,

Maryland, and New Jersey Departments of Health, Lorraine

and Joseph N. Bizzarro have three (3) adult children, none of

which were minors and/or a 15-year-old son at the time of

Bizzarro's PI hearing testimony.

4)  I obtained my Facebook activity records from Facebook

Inc.  The records showed I did not initiated any "friend

requested" or any other contact, to *any* person from

December of 2013 through November of 2014.

66.   In short, Bizzarro testimony regarding: 1) me stalking his 15-year-

old son through repeated Facebook contact; 2) the PA State Police

waiting at the Vizant corporate office for three days with the

intent of arresting me; 3) Mrs. Seidman being so afraid of me she

was "in fear for her life"; 4) the Vizant employees' health

insurance was canceled because there was a "error" on the part of

United Healthcare; and  5) that there had only been one (1)

---

[6] "I am married to Lorraine David Bizzarro.  Natalie C. Bizzarro is our daughter.  Joseph Bizzarro, JR. and Andrew J. Bizzarro are our sons.." Joseph N. Bizzarro

occasion in which the Vizant payroll was delayed, and on that occasion it was the fault of the payroll processor, ADP, Inc. was nothing more than a conspiracy by the defendants and their attorneys to concoct a false narrative of harassment and stalking as a means to discredit my allegations of fraud, mismanagement, and gross financial wrongdoing.

67.  I notified Mr. Duerr, Mr. Gignilliant, Frank Seidman, and Lane Wiggers that I had discredited Bizzarro and his testimony.  I shared with them the newly discovered evidence rebuffing *ALL* of Bizzarro's testimony.  They took no action to correct Bizzarro's testimony with the court or curtail Bizzarro's misconduct moving forward.

68.  As so on it went, by September 10, 2014 I had caused *Non-Party Request for Documentation* to be served on:  Foot Locker Inc., Hilberto's Mexican Food, Jamba Juice Company, Locust Lumber, and the Dallas Fort Worth International Airport.  All of which Vizant was suing for breach of contract and all of which I contend were the victims of the enterprise's deceptive business practices and fraud.  Additionally, I served the same on Google Inc, seeking

the identity of the account holder behind the threatening "I know where you live.  How are the boys? Safe and secure?" emails.  I caused a NOTICE to PRODUCE to be served on Bizzarro, for the birth certificate of his purported minor son as well as the threatening Facebook communications purportedly sent from me to him.

69.   Desperate to silence and prevent me from exposing Bizzarro's perjured testimony, the attorneys misconduct, and the racket of the enterprise and persons associated therewith, the defendants conspired to and did manufacture more evidence to implicate Whitchurch in the crime of stalking.  Bizzarro produced two Facebook "friend request", a post card, and a declaration swearing I had sent the harassing and threatening communications to Bizzarro and his family, in violation of the preliminary injunction. **(Exhibit M)**

70.   In addition to my and Davis' sworn declarations and testimony denying we had sent the purported friend request, there were obvious graphical errors in the communications which showed conclusively they must have been manufactured by the

defendants. It was simply a "cut and paste" job. Specifically; 1) there is no profile picture of Whitchurch or Davis on either of the request; 2) the Facebook trademark/logo is glaringly absent from both request; and *the most obvious of all*; 3) both Facebook notifications depict both were sent on the same day "September 14, 2014". However, the notification to Lorraine Bizzarro purportedly sent by Davis on September 14, 2014 depicts the 14th as a *Wednesday*. The notification purportedly sent by Whitchurch to Natalie Bizzarro on the same day, September 14, 2014, depicts the 14th as a *Sunday*. The postcard was obviously manufactured and did not travel through the United States Postal Service. The postnet code depicted on the front of the card is not an authentic United States postnet code.

**(Exhibit N) (Exhibit O)**

71. By late October 2014, the defendants had conspired to violate federal law and use the fabricated evidence in a knowingly vexatious Motion to Show Cause seeking my incarceration for purportedly sending the communications. I immediately served Bizzarro with a Notice to Produce the original (meaning a digital

version) Facebook communications received on both Wednesday and Thursday, September 14, 2014 and the original postcard, not a photocopy, purportedly sent to Bizzarro at the same time. Vizant Technologies, LLC and/or Bizzarro were unable to produce *ANY* of those items.

72. On November 8, 2014, and moments before I was scheduled to testify in the Cobb County Superior Court, on the Vizant Motion to Show Cause, David Askinas, a Vizant Technologies, LLC Vice President, fraudulently represented himself as an attorney and asked to meet with me and Davis to discuss a possible settlement. Mr. Askinas showed us to a small conference room located in the Cobb County Superior Court and, in an obvious attempt to threaten, harass, and scare the bejesus out of me, he told a hair-raising story of his college friend who was accused of rape, was innocent, represented himself pro se, was found guilty, spent the next 8 years in federal prison, was violated in unspeakable ways, and "was never the same again". When I refuted the tale as a gross and deliberate attempt to oppress, harass, and intimated me moments before testifying, Mr. Askinas became enraged, offered

me $150,000 and threatened that if I did not take it and agree to their settlement demands, they would "make this go on forever." I made my way to the door immediately.

73.   Faced with an imminent defeat if the Facebook communication, birth certificate of the purported minor son, and postcard could not be produced, Vizant abandoned the vexatious lawsuit and preliminary injunction, by way of a Motion to Voluntary Dismiss and in late January of 2015 the Cobb County Superior Court issued an ordered granting the dismissal of the Vizant Technologies, LLC malicious litigation.  Simply put, after a full year of making false claims, manufacturing evidence, threatening and extorting me, and obstructing justice, when boxed in to produce the authentic Facebook communication to his daughter and wife, real proof of a minor child, and any communications from me to that child, Bizzarro and the enterprise were unable to do so.

c. **Eastern District of Pennsylvania, District Court**

74.   Immediately thereafter, and with the intent "to make it go on forever", upon information and belief, Joseph N. Bizzarro, David

Askinas, Frank Seidman, Lane Wiggers, and Richard "Dick" Corl[7]
conspired with their Pennsylvania attorneys; Mr. Edward T.
Kang, Mr. Gregory Mathews, and Mr. Jason Powell of the law
firm of KANG HAGGERTY & FEBROYT, LLC; to leverage the
personal relationship between Mr. Corl and Judge Harvey Bartle,
III, of the Eastern District of Pennsylvania District Court, and
thereby corruptly influenced Judge Bartle to insure he would be
designated as the trial judge in a civil action against Whitchurch.
In January of 2015, and days after they dismissed the vexatious
Cobb County action, Vizant Technologies, LLC and Joseph N.
Bizzarro filed a complaint in the Eastern District of Pennsylvania
District Court.  As before, they sought a preliminary injunction.
For the most part, the complaint was the same as the Cobb
County action.  However, in the PA action, and to avoid litigation
on the manufactured Facebook communications and Bizzarro's
prior perjured testimony, the defendants contended I was
misappropriating trade secrets and disclosing confidential

---

[7] Dick Corl was a Vizant Technologies, LLC board member and shareholder at all times relevant to the claims herein.

information.  Judge Harvey Bartle, III was assigned as the trial judge.  in the Eastern District of Pennsylvania.

75.  From the onset of the litigation, Mr. Kang and Mr. Mathews began engaging in ex parte communications with Judge Harvey Bartle, III, corruptly influencing him to assist them in coercing me to settle the litigation by aiding them in discrediting and oppressing my allegations of the "Ponzi" like financial racket being run through Vizant Technologies, LLC by the defendants.

76.  In January of 2015 and with a well devised plan to bolster the knowingly false narrative of trade secret misappropriation, the enterprise employed the services of Gary Hunt of IT ACCELERATIONS to perform forensic testing on a company issued laptop computer and USB devise which I had returned to Vizant Technologies, LLC in December of 2013.

77.  On January 29th and 30th of 2015 Mr. Kang was discussing with Gary Hunt, via email, the "forensic analysis of Whitchurch computer and Davis computer" and the "Davis computer issues". Mr. Kang has a 20 minute "Teleconference with G. Hunt re

preliminary opinion". Mr. Kang "Review[s] G. Hunt's preliminary

opinion" for 10 minutes and emails the same to David Askinas.[8]

78.   Two days later and on February 2, 2015 Mr. Kang emails G. Hunt

and instructs him to include the comments of the David Askins in

his "Forensic" report: "re updating his draft report to incorporate

D. Askinas' comments".[9]

79.   On February 9, 2015 Mr. Kang spend another 30 minutes

"revise[ing] G. Hunt's preliminary opinion re Whitchurch

computer forensic analysis".[10]

80.   Later that day Mr. Gary Hunt "declare[d] under the penalty of

perjury" to the "FORENSIC REPORT OF GARY HUNT" and the

report is then offered in support of the plaintiffs Motion for

Preliminary Injunction.[11]

81.   Two days later, February 12th, Mr. Mathews emails Mr. Hunt

regarding "further revisions to IT forensic examination report".

On March 4, 2015 Mr. Kang emails G. Hunt "re USB analysis"

and by the 6th Mr. Kang has hatched the false narrative that I

---

[8] ED of PA District Court, Civil Action 2:15-cv-00431-HB, Doc. No. 129-2, Page 12 and 13 of 50
[9] ED of PA District Court, Civil Action 2:15-cv-00431-HB, Doc. No. 129-2, Page 16 of 50
[10] ED of PA District Court, Civil Action 2:15-cv-00431-HB, Doc. No. 129-2, Page 17 of 50
[11] ED of PA District Court, Civil Action 2:15-cv-00431-HB, Doc. No. 8, Pages 5-8

have stolen a second USB device, as he notes in his billing records: "Teleconference with G. Hunt re Whitchurch and USB device improperly kept, emails to/from G. Hunt re same; teleconference with D. Askinas re same". On the same day, Mr. Mathews is at work emailing Mr. Hunt regarding "USB devise issue with Gary Hunt" and reviewing the revised forensic report. [12]

82.   By March 7, 2015, Mr. Kang and G. Hunt were email and discussing the production of a "supplemental report" showing a "stolen USB device" and, low and behold, two days later March 9, 2015, Mr. Kang is at work putting pen to paper and "revise[ing] G. Hunt's supplemental forensic report relating to Whitchurch having another USB drive".[13]

83.   The following day, March 10, 2015, Mr. Kang has a "Teleconference with G. Hunt re supplemental report and confidential information in Whitchurch's possession". Continuing with his mission to implicate me in a theft, Mr. Kang continues "revising" the forensic opinions of Mr. Hunt, he emails D. Askinas and both sets of attorneys previously representing plaintiff in the

---

[12] ED of PA District Court, Civil Action 2:15-cv-00431-HB, Doc. No. 129-2, Page 19, 27, and 29 of 50
[13] ED of PA District Court, Civil Action 2:15-cv-00431-HB, Doc. No. 129-2, Page 29 and 30 of 50

GA action, the law firms of Duane Morris LLP and Elarbee

Thompson Wilson & Sapp, to discuss "issues relating to the USB

device" and "re chain of custody and the USB drive". Mr. Kang

wraps up his day by further "review[ing] and revise[ing] G. Hunt's

revised supplemental report" and then emails Mr. Hunt the new

improved supplemental forensic opinion; complete with Mr.

Kang's thoughts and opinions.[14] Simply put, up to this point Mr.

Kang and Mr. Mathews have crafted 80% of the "expert forensic

report" and 100% of the bull crap included therein.

84.    On March 13, 2015 Mr. Gregory Mathews has a "Telephone call

with Gary Hunt re chain of custody issues" and immediately

thereafter the law firm of KANG HAGGERTY & FEBROTY, LLC

*hires* the law firm of ELARBEE THOMPSON and the services of

Mr. Douglas Duerr to provide the court with knowingly false and

fabricated testimony and evidence.  At once Mr. Mathews and Mr.

Duerr begin conspiring "re chain of custody issues" and it is

arranged for Mr. Duerr to establish a knowingly false chain of

---

[14] ED of PA District Court, Civil Action 2:15-cv-00431-HB, Doc. No. 129-2, Page 31 and 32 of 50

custody on the fabricated "stolen" USB device with his deposition testimony.

85. On March 20, 2015 Douglas Duerr is deposed by both Mr. Mathews (his client) and Whitchurch.   Mr. Duerr testified the computer Whitchurch returned to the Vizant corporate office in PA, was shipped from there to the offices of ELARBEE THOMPSON sometime in March of 2014, where it sat in his office for a couple of months before being moved to a closet.  No explanation can be given as to why the computer I returned to Vizant in PA is shipped to the attorneys in GA.

86. Knowing of Mr. Bizzarro's and Mr. Duerr's propensity to manufacture evidence and commit perjury, I knew they were up to no good.  So, I questioned Mr. Duerr extensively as to whether he had allowed Bizzarro access to the computer and/or USB device, that I had returned to PA but that was now in GA, during Bizzarro's stay in Atlanta of April 2014 when he attended the Cobb County action PI hearing.

87.   Mr. Duerr adamantly denied Mr. Bizzarro was at the offices of

Elarbee Thompson and/or had any access to the returned

equipment.

> By Whitchurch: "He's in town, right?"
> Duerr Answer: "Mr. Bizzarro, yes."
> By Whitchurch: "And so does he have access to any of this?"
> Duerr Answer: "No."
> By Whitchurch: "None. Was he in your office?
> Duerr Answer: "Not that I recall."
> By Whitchurch: "Not that you recall, but you're not certain?"
> By Mr. Mathews: "Objection."
> By Whitchurch: "Was he in this building?"
> Duerr Answer: "I don't know if he was in this building. I am fairly
> confident that he was not in the office."
> By Whitchurch: "You are fairly confident he was not in this office.
> Have you ever met with Mr. Bizzarro in this office?"
> Duerr Answer: "Not that I recall."
> By Whitchurch: "It's only been a year, Doug. Is your memory that
> bad?"
> By Mr. Mathews: "Objection."
> By Whitchurch: "You can't remember if he was here or not. Is that
> what you're saying? You can't tell me if you met with a client in this
> office?
> Duerr Answer: "I don't recall."
> By Whitchurch: "Who—okay. Who could? Could you get somebody to
> pull up your schedule and let you know if he was here in this building?
> It's important. I mean, I'm saying he was tampering with evidence. I've
> been screaming that all along. You've got unlocked evidence in your
> office. He's here in town.
> By Mr. Mathews: "Objection. This is not a question, Ms. Whitchurch.
> You need to ask a question to the witness---"
> By Whitchurch: "Was he here?"
> By Mr. Mathews: "---rather than give your closing argument."
> Duerr Answer: "I don't ever recall him ever being in this office, no."

88.   In direct contradiction to Mr. Duerr's, under the penalty of perjury

testimony and his blatant attempt to conceal the fact that Mr.

Bizzarro had access to the Whitchurch computer, the billing and timekeeping records of ELARBEE THOMPSON detail an entry of over seven (7) billable hour, in which Mr. Duerr and Mr. Bizzarro meet on Sunday April 13, 2014 at the offices of ELARBEE THOMPSON, the day before the Cobb County action.

89. On March 31, 2015 Mr. Mathews makes his final "edits" and revisions and emails "re supplemental report issues; review[s] and edit[s] supplemental report. The following day Mr. Kang reviews "G. Hunt's supplemental IT forensic report". The same day, April 1, 2015, Gary Hunt of IT Acceleration declares under the penalty of perjury to the "SUPPLEMENTARY REPORT OF GARY HUNT".[15]  In the new and improved forensic report, Mr. Hunt declares that he received a "second USB Drive" from "Vizant's counsel Elarbee Thompson via FedEx...". The supplemental report contains the following statements: "I determined...", "I was asked by counsel Kang Haggerty & Fetbroyt LLC to determine...", "After my review and analysis, I determined...", "I was told that the Second USB Drive is the only USB storage device Vizant received

---

[15] ED of PA District Court, Doc. No. 129-2, Page 48 of 50, Doc. No. 130-4, Page 2 of 37

from Whitchurch....", "Accordingly, I believe the USB...", "My analysis and conclusion is based on the following..."

90.   All in all, the billing and timekeeping records of IT Acceleration and Mr. Gary Hunt show that Mr. Hunt spent less than two hours (2) writing his "FORENSIC REPORT" and the "SUPPLEMENTAL" report. Meanwhile, Mr. Kang and Mr. Mathews logged well over seven (7) hours "revising" and crafting the false narrative of the "Forensic" reports of Gary Hunt.

91.   On April 10, 2015 and to manufacture more fake and damaging evidence, the defendants[16] conspired to, and did, corruptly influenced Mr. Mathews to *hire* Mr. Gignilliant and Mr. Duerr, for the purpose of Mr. Duerr coaching an ELARBEE THOMPSON employee, Karen Larsh, to give knowingly false and misleading testimony through a deposition and declaration, that I was violating the Georgia preliminary injunction. Despite the FACT that when Vizant voluntarily dismissed the vexatious complaint the Cobb County preliminary injunction was dissolved as a matter of law. Mrs. Larsh's knowingly false and misleading declaration

---

[16] Vizant Technologies, LLC, Capital Solutions, INC, Joseph N. Bizzarro, David Askinas, Frank Seidman, Lane Wiggers

and deposition testimony was then presented to the court with the

intent of violating federal law and having my civil rights infringed

upon.  **(Exhibit P)**

92.   Five (5) days before the Preliminary Injunction hearing in the ED

of PA District Court, April 9, 2015, I had still not received *ANY*

Rule 26 disclosures from the defendants or the attorneys at KANG

HAGGERTY & FETBROTY, LLC.  I researched Mr. Gary Hunt

and learned he lacked the necessary education and experience to

be deemed an "Expert Witness" in computer forensics.  I contacted

Mr. Kang, Mr. Mathews, and Mr. Powell and challenged Mr.

Hunt's credentials and demanded the required Rule 26

disclosures. The following email conversation took place between

Mr. Mathews, Mr. Kang, Mr. Powell, and myself:

April 9, 2015

**By Whitchurch:** "Gentlemen, Pursuant to Rule 26(2)(B)(iv), I need to know
if the expert has been published in the previous 10 years. Pursuant to Rule
26(2)(B)(v), I need to know all other cases he has provided expert testimony
in the previous 4 years. Pursuant to Rule 26(2)(B)(vi), I need to know what
his compensation will be for his testimony."
**By Mathews:** "Let's discuss tomorrow."

April 10, 2015
**By Whitchurch:** "Is this discussion still on your agenda today?"
**By Mathews:** "Plaintiffs will supplementally produce disclosures regarding
the expert over the weekend."

**By Whitchurch:** "Greg, 'over the weekend' isn't going to work for me. Your 'expert' doesn't appear to be much of an expert. Looks like he's still wet behind the ears. Maybe I've peeled the wrong guys onion. But the Hunt I read about has 1 case under his belt and one publications. You let me know if that's not the same Hunt and how much his "expert" testimony is costing. You have this information available and I expect you to send it promptly."

93. By the following day, April 11, 2015 and after improperly influencing Judge Bartle to go along with their willful intent to deprive me of my civil liberty of due process; Mr. Kang, Mr. Mathews, and Mr. Powell still refused to make the mandatory Rule 26 disclosures. Simply put, they had improperly arranged the outcome of the trial with Judge Bartle, IIII and ensured he would not hold them accountable for flagrant infringement of my civil right to due process.

94 On Sunday, April 12, 2015 at 1:46 p.m., and three (3) days before the preliminary injunction hearing, I received, for the first time, the "SUPPLEMENTAL REPORT OF DAVID YARNALL" from Mr. Kang and Mr. Mathews. Mr. Yarnall, declares under the penalty of perjury, that he has "added information to this report which came to light in preparation for the Preliminary Hearing. Most of this report has been repurposed from Gary Hunt's prior reports, with supplemental information provided by me to create

this one all-encompassing report." It is the first time I learned of Mr. Yarnall and his report.

95.   Four hours later, on April 12, 2015 at 5:44 p.m. I received a second email from the lawyers, this one instructing me to disregard the earlier email and SUPPLEMENTAL REPORT and attached find a new and improved "SUPPLEMENTAL REPORT" of David Yarnall. Simply put, a supplement to the Yarnall supplement, of the Hunt supplement, to the original "Forensic Report of Gary Hunt".

96.   The Yarnall SUPPLEMENTAL REPORTS, received that Sunday, are identical with one exception, in the second report, item #52 has been supplemented and states: "52) Based on the analysis set forth in this report, it is **our** opinion within a reasonable degree of **professional certainty** the conclusions set forth below:" (emphasis added) The previous report stated *no* certainty as to the conclusions of Gary Hunt.

97.   On April 15, 2015, the preliminary injunction hearing was held before Judge Harvey Bartle, III, in the ED of PA District Court, with Mr. Kang calling his first witness, David Yarnall of IT

Acceleration.  And despite a combined ten (10) hours of billable

time in email correspondence and teleconferences with Gary Hunt

regarding *Mr. Hunt's* examination and analysis as set forth in his

"Forensic Report" and "Supplemental" report, an additional seven

(7) billable hours "revising" those reports and the Fact counsel

logged less than 30 minutes in similar conversations with David

Yarnall, Mr. Kang suborns the following perjury from David

Yarnall during the April 15, 2015 preliminary injunction

(emphasis added):

Q. Have you formed an opinion regarding the **investigation that you have concluded?**
A.  I have. (PI Hearing, April 15, 2015, page 58, lines 7-9)
Q. Are you saying the USB device that **you examined** is a different one from the USB device that was plugged into the computer?
A. That is correct.
Q. Your opinion, is that opinion within a reasonable degree of **scientific certainty?**
A.  It is.
Q. And do you have your written opinion in the form of a written report?
A., I do.
Q. Would you turn Tab P-50?
A. I'm there.
Q. Mr. Yarnall, is that your written report?
A.  It is.
Q. And that report contains your opinion?
A.  It does. (Preliminary Injunction Hearing Testimony, April 15, 2015, page 58 @ line 24-25, page 59 @ line 1-5 emphasis added,)

Q. Mr. Yarnall, the USB device that **you received, based on your analysis**, files—Vizant files, 130 of them, they were created or accessed on January 22, 2014, right?

A. Correct. (Preliminary Injunction Hearing Testimony, April 15, 2015, page 81 @ line 24-25, page 59 @ line 1-5, emphasis added)

98.    From there, Mr. Yarnall testifies to the basis for his opinion in which he describes using a forensic image of the hard drives and "Voom HardCopy". Mr. Kang again starts his questioning with "So the analysis **you've done**..." The subornation of perjury goes on and includes: "And what did **you find**?" Mr. Yarnall then goes in depth as to his testing of the USB stick that he received from Vizant "with my understanding that it was a USB stick that Julie Whitchurch has returned with her laptop." He goes on to testify that "So what **we did as a test** is **we purchased** yet another SanDisk ...", "the test that **we did** was we used the received USB device and **we plugged** it into multiple computers...", "shows the USB stick that **we purchased** and **we did the same test** as a control,..." "as **we plugged** it into different computers". The subornation continues with Mr. Kang's examination of the witness:

Q. And the one in the middle picture, is the picture relating to the **USB device that you received and examined**?
A. That is correct.
Q. And the third one on the bottom, this is the one that you, **Mr. Yarnall, you bought yourself and examined independently**?

A. That's correct.

99.    Despite Mr. Yarnall's, under the penalty of perjury testimony, not once but twice, that he "bought" himself and "examined independently" the USB device; the billing and timekeeping records of Mr. Gary Hunt's, IT Acceleration's, David Yarnall, and KANG HAGGERTY's depict Gary Hunt "purchase and test SanDisk Cruzer USB Device for independent testing; Review results with David and add to presentation".  Mr. Hunt details the cost of the purchase at "$10.59". There is nothing in the billing and timekeeping records of David Yarnall to suggest he "bought" the USB devise or "examined independently" the computer or USB returned by me.

100.   Despite testifying **"Yes"** when questioned "But did you retest anything" the billing and timekeeping records of Gary Hunt, David Yarnall, IT Acceleration, and KANG HAGGERTY contradict the testimony suborned from Mr. Yarnall.  By Mr. Yarnall's own billing records it is clear to see Mr. Yarnall preformed **NO** testing, "retesting", or "independent examination" of the computer or the USB device(s). **(Exhibit Q)**

101. On April 15, 2015, Joseph N. Bizzarro, CEO, Vizant Technologies, LLC testified, during the Preliminary Injunction hearing. Mr. Bizzarro's testimony included his dealings with a prospective client, Amtrak, who subsequently became a Vizant Technologies, LLC client. Mr. Bizzarro testified that during the contract negotiation phase, things with Amtrak "slowed down", and that he had a conversation with Ed Genett of Amtrak, and at that time "they brought up two things", the lawsuits "and they brought up the web site." He went on to testify that because of Amtrak's concerns regarding Whitchurch's website www.nocapitalsolutions, it was necessary to drop the Vizant rates as a concession.[17]

102. During the PI hearing, Aeron Sharp, Vice President Vizant Technologies, LLC, testified she was working with a potential Vizant client, Tacoma Screw Products. She testified that she was informed by Tacoma they would not enter into a contract with Vizant Technologies, LLC because they were made aware of my allegation of Bizzarro's and Vizant's deceptive business practices. I had no knowledge Ms. Sharpe would be testifying or the basis of

---

[17] Bizzarro-Direct, page 142-143 Preliminary Injunction Hearing Transcript, Eastern District of Pennsylvania, April 15, 2015.

that testimony, in fact, there were *NO* Rule 26 disclosures made regarding Aeron Sharp or her testimony.  After the PI hearing, and doubting the veracity of Ms. Sharp's testimony, suspecting she was a paid for witness, I contacted Tacoma Screw Products.  I was informed, and provided with a sworn declaration from John Wolf, Ms. Sharpe's contact, the true reason and the one he shared with the Vizant representative, as to why Tacoma had declined to enter into a contract with Vizant Technologies, LLC.  Their reasoning was 1) Tacoma had too many ongoing projects for their staff to take on any additional work load, and 2) he and his peers felt the Vizant fees were excessive.  I subsequently learned, as suspected, Ms. Sharp had been given money and a promotion for her knowingly false testimony and that Mr. Mathews had worked to coach Ms. Sharp for hours to perfect what he knew, at the time, would be false and misleading testimony.

103.  On June 30, 2015 Whitchurch deposed Mr. Bizzarro. One of the subject matters of that deposition was Mr. Bizzarro's interactions with Amtrak. Mr. Bizzarro contradicted his preliminary injunction hearing testimony and now testified the Amtrak pricing

reductions were not necessary because of me but rather because "Obviously, they [Amtrak] wanted a good deal." [18]

104. Throughout Bizzarro's deposition Mr. Kang just about comes apart trying desperately to lead Bizzarro through his perjured testimony, objecting to almost each, and every question posed. And, despite this, Mr. Bizzarro couldn't keep his previous lies straight and continued to contradict his prior testimony during the preliminary injunction hearing in April of 2015. Specifically, despite representing to the court that the Amtrak contract negotiations were necessary *only* because of my website, Mr. Bizzarro testified during his deposition there were "a lot of different things that gave them hesitance to do business with us." to include the pricing, service agreement, *the number of clients Vizant Technologies had filed lawsuits against*, and the negative reviews on-line.

105. Despite knowing that Amtrak had expressed no less than five (5) concerns in doing business with Vizant (social medial concerns, the contract, the Vizant lawsuits, the rate, and the scope of the

---

[18] Bizzarro Deposition, June 30, 2015 (page 46, line 5-24, page 47, line 1-24, page 48, line 1-24, page 49, line 1-11).

services), the defendants[19] conspired to, and did, press forward with a false narrative that I was the reason, and *the only reason*, for the price reduction with Amtrak.

106. I called Mr. Kang and Mr. Mathews attention to the inconsistences in Bizzarro's testimony regarding the material facts. Neither took steps to correct Bizzarro's misrepresentations with the court, nor did they take reasonable measures to ensure the withheld information regarding the true reason for the contract negotiations, Amtrak "wanted to pay less", was brought to the court's attention.

107. From the onset of the ED of PA district court litigation and as detailed in the billing and timekeeping records of KANG HAGGERTY, the defendants[20] leveraged their improper relationship with the trail judge and engaged in a plethora of unlawful, unethical, and unbeknownst to me communications with Judge Bartle and his staff. The intent and outcome of their pattern of obstruction and abuse of process was to violate my

---

[19] Vizant Technologies, LLC, Capital Solutions, Inc., KANG HAGGERTY & FEBROYT, Joseph N. Bizzarro, Frank Seidman, Lane Wiggers, Edward T. Kang, and Gregory Mathews.
[20] Vizant Technologies, LLC, Capital Solutions, Inc., KANG HAGGERTY & FEBROYT, Joseph N. Bizzarro, Frank Seidman, Lane Wiggers, Edward T. Kang, and Gregory Mathews.

First, Fifth, and Seventh Constitutional rights by deprived me of the liberty of free speech and my property without a jury trial or the  even the liberty of being able to: 1) to know the identity of the witnesses and the nature of their testimony prior to the witness being called to testify, 2) to know the opposing parties evidence prior to it being sprung on them in an "Supplemental Expert Forensic Report"  two (2) days prior to trial.  In fact, the first noted contact of those improper communications is detailed in the billing and timekeeping records of KANG HAGGERTY as Mr. Edward T. Kang and Mr. Gregory H. Mathews conduct their first of many "Teleconferences" with "the chambers" on February 23, 2015.  Mr. Kang's billing records detail the communication as:

> "Teleconference with the chambers re teleconference with the court for preliminary injunction hearing; teleconference with G. Mathews re same."

Mr. Mathews contact with the court is detailed as:

> "...telephone call with the court...".

Simply put, it was the dress rehearsal between the Judge Bartle, Kang, and Mathews for a call scheduled the following day.  I was

not invited to participate in Mr. Kang and Mr. Mathews private call with the court, nor was I ever notified as to the nature of that call.

108. The improper and unlawful contact with the "court", "chambers", and "Judge Bartle" continued from there. On March 5, 2015 and IMMEDIATELY following my notice to Mr. Kang and Mr. Edwards that I intended to conduct the deposition of David Jablonski, CFO of Vizant Technologies, LLC to disprove the notion Vizant's payroll and health insurance payment issues were the fault of the service providers and Bizzarro's allegations I was lying in those regards. Mr. Gregory H. Mathews immediately engages in a flurry of "Emails and telephone conference with the court re motion for deposition of Jablonski." I am not invited to participate in his call with Judge Bartle, nor am I notified that the two have had such communications. The following day, March 6, 2015, Mr. Kang spends twenty (20) minutes sending and receiving "E-mails to/from the court re defendants' motion to compel the deposition of Jablon;" As well, I am not invited to attend or notified of Mr. Kang's improper communications with the court. It is not until

**three (3) days later**, March 10, 2015, and after boundless

communications between Kang, Mathews, and Judge Bartle, that

I am invited to participate in a call with the court to discuss the

compel motion I filed.  Not surprisingly, and as the enterprise

improperly arranged, the compel motion is denied.

109.  The enterprise, and those persons associated therein[21], continued

with the abuse of process and the communication with the court.

Those improper ex parte communications with Judge Harvey

Bartle, III, included, but were by no means limited to:

3/19/2015 GHM "Telephone call with Court…"
3/24/2015 ETK "letter to Judge Bartle.."
3/24/2015 GHM "..re conference with court.."
3/26/2015 GHM "Telephone call with court…"
4/7/2015 ETK "Call with the Court…"
4/7/2015 GHM "Conference call with Court…"
4/16/2015 GHM "Telephone call with Bartle's Chambers…"
5/7/2015 GHM "Emails re teleconferences with Court…
5/26/2015 GHM "Draft letter to Judge Bartle and emails re same"
5/27/2015 ETK "Teleconference with the Court…"
6/1/2015 ETK "Teleconference with the Court…."
6/3/2015 ETK "Teleconference with Judge's chambers…"
6/3/2015 GHM "Conference call with court…"
6/5/2015 GHM "Telephone calls and emails re conference call with court"
6/8/2015 GHM "Participate in conference with court…"
6/26/2015 ETK "Teleconference with the chambers.."
6/29/2015 ETK "Teleconference with the chambers…

---

[21] Vizant Technologies, LLC, Capital Solutions, Inc., KANG HAGGERTY & FEBROYT, Joseph N. Bizzarro, David Askinas, Frank Seidman, Lane Wiggers, Edward T. Kang, and Gregory Mathews.

6/30/2015 ETK "Review and revise enter (SIC) to the judge..."
6/30/2015 GHM "Conference call with Court.."

110.   On or about May 24, 2016, Judge Bartle instructed the parties to
       make an effort to settle the litigation. For the next couple of days,
       I, Mr. Mathews, Mr. Kang, and Mr. Powell engaged in a heated
       email exchange in an unsuccessful effort to settle the differences.
       In addition to the afore mentioned improper and unlawful
       contacts between the attorneys and Judge Bartle, when the effort
       to reach a compromise failed, Mr. Mathews improperly
       communicated a blow- by- blow account of the Rule 408
       discussions between me, him, Kang, and Powell, to Judge Bartle.
       Mr. Mathews and the defendants conspired to improperly
       influenced Judge Bartle to threaten me with contempt and
       imprisonment if I would not agree to the enterprises', and persons
       associated therein, settlement demands, which included a
       permanent prior restraint against my issuing any warnings, to the
       public or the authorities, of the racket they were running through
       Vizant.

111.    As planned, and immediately thereafter, Judge Bartle threatened

that he would hold me in contempt of court if I did not reengage in

settlement talks.  As ordered on May 28, 2016, I and the attorneys

exchanged in email settlement talks.  When I rebuffed the

enterprises' settlement demands, the Rule 408 communications

were, for the second time, improperly relayed to Judge Bartle by

Mr. Mathews, Mr. Kang, and Mr. Powell.

112.    With the threat of being put in jail if I did not settle, on or about

September 15, 2015 Judge Bartle ordered me to appear before

Magistrate Judge Hey, of the ED of PA District Court, for

settlement talks with the defendants. During these discussions,

the defendants used Judge Hey to attempt to coerce me to settle

with the erroneous MISC 1099 wage and earning statement filed

with the IRS.  I was told, by Judge Hey, that if I would succumb to

the enterprises', and persons associated therein, demands for a

permanent restraint against my speech, the enterprise would

withdraw the fraudulently prepared and filed MISC 1099 earning

statement from the Internal Revenue Service. I let everyone at the

table know it was illegal to extort a settlement from me with the

threat of reporting false wage payments to the IRS.  Immediately

thereafter, Judge Hey threated that "things will get a lot worse" if

I did not settle.  I did not, and true to her word "things [got] a lot

worse".

113. At the same time Mr. Kang and Mr. Mathews were using the

court to coerce a settlement from me, I was pressing hard to

conduct the deposition of David Yarnall, the expert forensic

witness for Vizant Technologies, LLC. Simply put, I knew he had

lied.  I knew he did not conduct any testing of the computer or

USB device and only plagiarized the report of his less educated

and minimally experienced employee.  The defendants[22] conspired

to and did improperly prevent any reasonable attempt I made to

conduct the Yarnall deposition.  The schemes included, but were

by no means limited to: demanding Whitchurch send counsel a

three thousand dollar "deposit" for Mr. Yarnall's "time". I argued

Mr. Yarnall charged two-hundred and twenty-five dollars ($225)

an hour and I only wished to depose him for 90 minutes.  As such,

I mailed KANG HAGGERTY a check for four hundred dollars

---

[22] Vizant Technologies, LLC, Capital Solutions, Inc. KANG HAGGERTY & FEBROYT, LLC, Joseph
N. Bizzarro, Frank Seidman, David Askinas, Lane Wiggers, Gregory Mathews, and Edward T. Kang.

($400) for the 90 minutes I planned to depose Yarnall. Simply put, I needed to ask Mr. Yarnall five questions to prove he had been bribed to manufacture evidence and give knowingly false testimony as the expert witness. Mr. Kang and Mr. Mathews argued the $3000 deposit was required per the "Federal Rules of Civil Procedure". When I pressed Mr. Mathews for the specific Rule cited, Mr. Mathews informed me he was no longer able to discuss the matter and Mr. Kang would now be in charge. Despite accepting service of David Yarnall's "Notice" of deposition, Mr. Kang and Mr. Mathews refused to produce Mr. Yarnall for the scheduled deposition. Likewise, when I moved to conduct the deposition testimony of Gary Hunt, the original tester of the computer and USB device; the defendants conspired with IT Acceleration, Mr. Yarnall and Mr. Hunt to provided the court with fabricated testimony that Mr. Hunt left the employment of IT Acceleration three (3) days before the PI hearing and was living in Chicago, IL and unavailable to testify. It was a bald face lie. **(Exhibit R)**

114. Simply put, the enterprise and persons associated therewith[23] hired Gary Hunt of IT Acceleration to perform certain testing on the returned computer and USB device.  His results were questionable at best, completely fabricated at worse.  When I questioned Mr. Hunt's credentials, the enterprise and those persons[24] associated, conspired to, and did pay IT Acceleration and David Yarnall with the ill-gotten proceeds of the enterprise, to oppress Whitchurch from exercising her fundamental and constitutional rights to confront the witness.  Based on the conspiracy, manufactured evidence, perjured testimony, false swearing, and illegal contact with the trial judge, the court granted the preliminary injunction and then set out to apply more pressure for me to settle by holding me in contempt of the unlawful obtained and issued preliminary restraint by fining me over $29,000.

115. On July 16, 2016 Vizant and Bizzarro moved for partial summary judgment.  Throughout the late summer and fall of 2015, and in

---

[23] Vizant Technologies, LLC, Capital Solutions, Inc., KANG HAGGERTY & FEBROYT, Joseph N. Bizzarro, Frank Seidman, David Askinas, Lane Wiggers, Edward T. Kang, and Gregory Mathews.
[24] Vizant Technologies, LLC, Capital Solutions, Inc., KANG HAGGERTY & FEBROYT, Joseph N. Bizzarro, Frank Seidman, Lane Wiggers, Edward T. Kang, and Gregory Mathews.

response to the summary judgement motion, I filed well over 15 motions to conduct discover on the billing and timekeeping records of KANG HAGGERTY, ELARBEE THOMPSON, IT ACCELLERATION, and the declarations of Angie Gruntie, Vice President of Vizant Technologies, and David Askinas, "General Counsel" *ALL* of which had been disclosed for the *first time*, in the Vizant/Bizzarro Partial Motion for Summary Judgement, Monetary Award, and Permanent Injunction.  At the same time, Mr. Kang and Mr. Mathews were in constant communications with Judge Bartle to ensure he was improperly motivated to deny each and every motion.  It was a gross and deliberate abuse of the process, with the intent, and results, of ensuring the denial of: 1) a fair opportunity to confront the witnesses produced in their summary judgement motion; and 2) the jury trial I had demanded and was entitled to.

116. By the fall of 2015 I filed my first Motion for the Recusal of Judge Harvey Bartle, III.  Not surprisingly, Judge Bartle denied the request.  I filed a mandamus with the Third Circuit Court of Appeals detailing the fraud Mr. Kang, Mr. Mathews, Judge Bartle

and the enterprise had perpetrated on the Eastern District of Pennsylvania District Court. Judge Bartle and his codefendants retaliated by conspiring to illicit US Marshall Jim Burke, assigned to the Eastern District of Pennsylvania, to contact me and threaten; if I continued to refuse to come to Philadelphia and "work things out" with the defendants[25], I would be brought to Philadelphia by physical force.

117.  On September 19, 2015, Mr. Edward Kang emails P. Schenck at the US Department of Justice and communicates the knowingly false narrative, concocted by him and his codefendants, that I was committing a criminal act.  **(Exhibit S)**

118.  On January 8, 2016, Judge Bartle issued a summary judgement order, as to ALL the counts of the Vizant complaint, granting in part and denying in part both the Vizant Technologies, LLC/Bizzarro and the Whitchurch/Davis motions for summary judgment.  The Court's order specifically *denied* the pleas, of both Vizant and Bizzarro, for a monetary award.  **(Exhibit T)**

---

[25] Vizant Technologies, LLC, Capital Solutions, INC, KANGE HAGGERTY & FEBROTY, Joseph Bizzarro, Lane Wiggers, David Askinas, Frank Seidman, Gregory Mathews, Edward T. Kang

119. In late January of 2016, I began to wonder out loud if Judge Harvey Bartle had/or was orchestrating the outcome of other cases before him as he had done with my case. Specifically, I wondered if Judge Bartle was engaging in similar judicial misconduct in the Chaka Fattah Jr. and Congressman Fattah cases before him. I raised those questions to Mr. Mathews and Mr. Kang and expressed my intent to raise those same questions with the counsel for Congressman Fattah.

120. Immediately thereafter, and despite denying Vizant's and Bizzarro's pleas for a "monetary award", in his summary judgement order, Judge Bartle ordered me to appear at a "damage trial". Despite the FACT Judge Bartle had already disposed of the entire litigation with the summary judgment order, Judge Bartle scheduled a trial and Vizant and Bizzarro put forth $5.5 million dollars in purported damages by way of "supplemental production" six (6) days before the scheduled March 2, 2016 trial.

121. I immediately moved to conduct discover on the $5.5 million dollars in legal fees and purported contract damages between Vizant and Amtrak. The Amtrak damages were based on the

inflated and fraudulent cost savings projected by Vizant Technologies, LLC. **(Exhibit U)** Once again, acting in a concerted effort to violate my Fourth and Fifth Constitutional rights, Mr. Mathews, Mr. Kang, and Mr. Powell, with the blessings of Judge Harvey Bartle, refused to allow me any opportunity to conduct discovery or confront witnesses on the millions of dollars in damages disclosed a week before trial.  Seeing the mockery of the judicial system and experiencing the raping of my constitutional rights, I refused to appear in Judge Bartle's kangaroo court and participate in the fraud, given all the matters before Judge Bartle had already been decided in his final summary judgement order. I made it clear to the defendants that I was going to tell anyone that would listen "JUDGE HARVEY BARTLE, III IS FIXING CASES IN THE EASTERN DISTRICT OF PENNSYLVANIA".

122. As so the sham trial went on without me.  And in my absence, Judge Bartle awarded Vizant and Bizzarro over $2.5 million in damages, despite the fact the employment agreement between Vizant and myself, which was a focus of the litigation, limits damages to $150,000.   The mock trial was a sham to get me to

travel to Philadelphia, by this time Judge Bartle and the attorneys at KANG HAGGERTY had filed, at least two (2), arrest warrants under seal.  Both without probable cause, an oath in support, or the signature of a judicial officer.

123.  Simply put, there was no reason for me to appear, the fix was in when Judge Bartle improperly ensured he would be the trial judge presiding over this case and he worked in concert with the enterprise and persons associated therewith to knowingly violate my right to due process and seize my assets without affording me a fair and impartial tribunal or an opportunity to by heard.  By this point, Vizant and Bizzarro had paid witnesses and lawyers to knowingly fabricate evidence, I and my children had been threatened, and a US Marsal was attempting to scare the hell out of me with harassing phone calls.  All to silence me from warning others of the criminal enterprise being run by Frank Seidman and his codefendants.

124.  Realizing I was going to continue to seek redress for their illegal conduct and call attention to the kangaroo court being conducted in Judge Bartle's courtroom, and with the intent to implead and

obstruct the administration of justice, the defendants[26] improperly influenced Judge Bartle to issue an erroneous warrant for my arrest.

125. The arrest/bench warrant was **unsigned** by an "Issuing Officer" and contained no oath in support of probable cause.  On March 16, 2016, and six days after the erroneous arrest warrant was docketed, I filed a "Notice to the Clerk" of ED of PA requesting the unsigned and void arrest warrant be taken off the public docket. [27]

126. On April 8, 2016, despite the warrant being void on its face and there being no case law to support their position, the defendants improperly influenced Judge Bartle to "transfer" the bench warrant from the Eastern District of Pennsylvania District Court to the US Marshals of the Northern District of Georgia District Court.  The warrant was return by the US Marshal for the Northern District of Georgia as invalid, given Judge Bartle had no jurisdiction to have a Pennsylvania civil bench warrant executed in Georgia.  From there, James N. Hatten, Deputy Clerk of the

---

[26] Vizant Technologies, LLC, Capital Solutions, INC, Frank Seidman, Lane Wiggers, Joseph Bizzarro, KANG HAGGERTY FETBROYT, Edward Kang, David Askinas, Gregory Mathews.
[27] ED of PA Docket No. 269, in the civil matter 2:15-cv-00431-HB

Northern District of Georgia, is improperly influenced and issues

a "WARRANT FOR ARREST" of Julie P. Whitchurch "Charging

her with: of Judge Harvey Bartle III for failure to appear at the

contempt hearing."

127. Despite there being no oath offered in support of the issued arrest

warrant, and Mr. Hatten lacking his "own" knowledge and the

authority to issue the warrant, the warrant is then forwarded to

the USMS of the Northern District of Georgia for execution.

Given Mr. Hatten had *NO* authority to have anyone arrested, his

warrant is returned as unexecuted and invalid.[28]

128. On or about April 21, 2016, faced with a lack of jurisdiction in

Georgia to have me arrested for a purported offense committed in

Pennsylvania, and with the intent of further terrorizing me and

oppressing my efforts to seek redress of the improper conduct in

his courtroom and the racket being run through Vizant

Technologies, LLC by Capital Solutions, INC. and the persons

associated therein, Judge Harvey Bartle III, contacts Judge

Russell Vineyard of the Northern District of Georgia District

---

[28] Exhibit G, 1:16-CV-00212-AT, DOC NO. 18, Northern District of Georgia District Court

Court and corruptly influenced and persuaded Judge Vineyard to issue a warrant for my arrest for failure to appear in the Eastern District of Pennsylvania. Lacking *any and all* jurisdiction to issue an arrest warrant for a purported crime committed in Pennsylvania, Judge Vineyard does so anyway. Again, the arrest warrant is deficient any probable cause, oath, or signature of a judicial officer.

129. In May of 2016, and with the intent to further the enterprise by unlawfully obtaining Whitchurch's wages, the enterprise hires attorney Mr. Todd J Poole, of POOLE HUFFMAN, to file a knowingly false affidavit for continuing garnishment with Fulton State Court, Georgia. In the affidavit, Mr. Poole, swore the judgement issued by Judge Bartle in the amount of "$29,262.40" was a "Judgment was obtained in the U.S. District Court of Northern District of Georgia." As a result of Mr. Poole's fraud on the court, my wages were illegally garnished.

130. On May 24, 2016, US Marshal Matt Keown and, no less than, four (4) other marshals descended on Whitchurch's home and force their way inside the house. I was made to undress and dress in

full view of the arresting male officers. I beg to see the arrest warrant and told the charges, neither happens. I was shackled, ankles and wrist, in front of my children and placed in the front seat of Keown's car. As he drove us to Atlanta, I was questioned repeatedly. I ask again to see the warrant and told the charges. Keown tells me I am being arrested because I failed to appear before Judge Bartle in Philadelphia. He goes on to tell me that if I do not go to Philadelphia on my own, I will be taken against my will. He threatens my employment and suggest my boss will be contacted if I do not adhere.   We arrive at the Northern District of Georgia courthouse and I am taken to the basement and put in a cage. Several hours later, I am brought before a court appointed lawyer, Ms. Vionnette Reyes Johnson, Supervisory Attorney with the Federal Defender Program, INC. Ms. Johnson informs me the arrest warrant is invalid and that I will be taken before Judge Vineyard. She tells me that I will have to agree to go to Philadelphia or Judge Vineyard will not release me, despite the invalid warrant. After the meeting, I am taken back to the cage. Several hours later, I am brought before Judge Vineyard.   Judge

Vineyard instructs me that he and Judge Bartle have spoken and
I am ordered to "voluntarily appear" before Judge Bartle in the
Eastern District of Pennsylvania, simultaneously Judge Bartle
issues an ORDER for me to appear in the PA district court. I am
released from the illegal custody eight (8) hours later.

131. Fearing for my life and not wanting to be forced to witness Judge
Bartle, Mr. Kang, and Mr. Mathews rape me of my civil rights
with a sham trial in which I wasn't allowed to know the identity of
the witnesses or conduct discovery on the evidence, I declined to
"voluntarily appear" in the Pennsylvania district court and
continued to press forward with my appeal in the 3rd Circuit and
my attempts to have the defendants' misconduct and illegal racket
addressed.

132. In early July of 2016, I was ordered by the Third Circuit Court of
Appeals (Case No. 16-1824) to render a $505 filing fee or file a
motion to proceed in the form of a pauper. My appeal detailed the
fraud perpetrated on the Eastern District of Pennsylvania District
Court by Vizant Technologies, Edward T. Kang, Gregory
Mathews, KANG HAGGERTY & FEBROYT, and Judge Harvey

Bartle, III, as a means to silence my warnings that Capital

Solutions, Inc. was running a Ponzi like scheme through the

enterprise, Vizant Technologies, LLC. The 3d Cir allowed me to

proceed accordingly and pursuant to the order by a deadline of

July 14, 2016, or my appeal would be dismissed.

133. To obstruct my court filings and attempts to seek redress of that

fraud, Judge Bartle contacted Judge Vineyard and, once again,

corruptly influenced Judge Vineyard to issue a warrant for my

arrest for a purported offense committed in Pennsylvania. As

before, Judge Bartle lacked the territorial jurisdiction to have me

arrested so he put undue pressure on the junior Judge Vineyard,

*who lacked **completed** jurisdiction,* and persuaded him to issue

the knowingly void warrant for my arrest. Additionally, there was

no oath offered in support of probable cause and the warrant was

unsigned by a Judicial Officer, rendering it **glaringly void on its**

**face**. Regardless, on July 7, 2016 (seven days before the filing fee

is due at the 3rd Circuit) at approximately 0600 hrs. the front door

of my home was kicked in by US Marshals from the Northern

District of Georgia.

134. Moments before, my nineteen (19) year old son, Matthew, was boxed in, surrounded by US Marshals and forced to pull over, while driving to work. He was order out of his vehicle and searched by the US Marshals. Marshal Keown questioned Whitchurch's son and demanded to know the whereabouts of his mother. Specifically, whether or not I was at home at the time. Despite his repeated request to leave and contact me, he was unlawfully detained by the US Marshals. Specifically, Matthew begged the Marshals to allow him to contact me to ensure I would be properly dressed. His request was laughed off. At one point during the unlawful custody, a Marshal suggest he contacts Matthew's employer "and let them know what's going on".

135. Back at the Whitchurch home, I had just gotten out of the shower and was half dressed when I was snatched up and drugged down the hall and into the living room. I was slung into the banister with great physical force, by the arresting officer M. Blackman. He grabbed me, as I toppled over the top of the railing and slammed me backwards into the front door, whereby he states, "I'm so tired of messing with you". I was handcuffed and dragged

onto my front lawn in the jeans and bra I was wearing. I demanded to see the arrest warrant and be informed of the charges. He laughed and told me "NO". I demanded clothes. He tells me "NO". By this time, my second son, a seventeen (17) year old minor, was on the front lawn with his cell phone filming the event. One of the marshals says "camera" and my son's phone was summarily seized and he was placed in handcuffs.

136. I am put in the back of a van and taken to the Federal Courthouse in Atlanta, I was searched and put in a cell. I remained in that cell until I was brought before Rebecca Shepard. Ms. Shepard informed me she was with the Federal Defender Program, that she is aware Ms. Johnson represented me before, but tells me Ms. Johnson is not available, and Judge Vineyard has asked her to meet with me and answer any questions I may have. She offers to contact my husband and tell him I have been arrested. I accept and provide her with his contact information. Ms. Shephard contacts my husband, represents herself as an attorney with the Federal Defender Program and informs him that I will be taken to Pennsylvania.

137. I am taken back to the cage and 4 hours later I was brought before Judge Vineyard. Ms. Shephard was sitting at the defense table, and I was seated next to her by the US Marshals. Judge Vineyard entered the courtroom, took the bench, and informed everyone he had just "spoken with Judge Bartle" and that the two of them have agreed to have me taken to Pennsylvania since I would not go "voluntarily". I challenged the court's jurisdiction, the unlawful arrest warrant, and Judge Vineyard's authority to have someone extradited[29]. I begged Ms. Shephard to say something in my defense, given she was seated at the defense table and was a public defender.

138. To delay, what appeared to be my kidnapping and given my public defender was nothing more than a deliberate attempt to deny me the constitutional right to counsel, I went at it alone and attempted to prevent the assault on my person and rights. I wasn't; under oath so I denied being me and demanded an identity hearing. Judge Vineyard became enraged and ordered that I be

---

[29] Black's Law Dictionary defines extradition as: The surrender of a criminal by a foreign state to which he has fled for refuge from prosecution to the state within whose jurisdiction the crime was committed, upon the demand of the latter state, in order that he may be dealt with according to its laws.

immediately taken back to the cage.  Ms. Shephard turns to me and states "all you're doing is upsetting everyone."  I look at her like she is crazy.  I am taken back to the basement and questioned repeatedly by the Marshals as to my identity.  I asked again to see the arrest warrant and inquired as to whether anyone was ever going to read me my Miranda rights.  I am told by the Marshals that it is not legally necessary for them to read me my rights.  I tell them they are wrong.  They laugh at me.

139. After being held and terrorized for no less than eight (8) hours, I am taken back before Judge Vineyard.  Once again, Ms. Shephard is seated at the defense table.  And although Ms. Shephard has presented herself as an attorney with the Federal Defenders Program, meet with me in the capacity of her profession, and plopped herself down at the defense table, she refused to defend me.  She's mute.  She's useless.  One of the US Marshals offers testimony that he recognizes me from my prior illegal arrest and is sure I am Julie Whitchurch.  I am never sworn in and asked my identity.  Judge Vineyard offers testimony that he too is certain I am Julie Whitchurch.   The US Marshal and Judge Vineyard are

the only person allowed to testify and speak on the matter, I am not allowed to offer any testimony or call any witnesses.

140. After the sham identity hearing I was turned over to the US Marshals and Judge Vineyard instructed them to take me to Pennsylvania. I was put on a bus that was filled with male federal prisoners. The bus was driven to an undisclosed garage, and the driver embarked. I am harassed relentlessly. I am in fear for my life.

141. I was purposely detained for thirteen (13) days, transported between three (3) different Federal Detention Centers, never shown or given a copy of the arrest warrant, never read my rights, and never afforded *competent* legal representation all for the purpose of obstructing, and impeding the administration of justice and preventing, what would otherwise be, a timely and correctly filed appeal.

142. Upon information and belief, the defendants[30], with Judge Bartle's guidance, improperly influenced Brian Johnson, the ESR Operator

---

[30] Vizant Technologies, LLC, Capital Solutions, INC, Frank Seidman, Lane Wiggers, Joseph Bizzarro, Edward Kang, Gregory Mathews, KANG HAGGERTY & FEBROYT, and David Askinas

during the hearing in the ED of PA District Court, on April 15,

2015, to alter the digital recording of the preliminary injunction

hearing testimony to exclude seventeen (17) pieces of evidence

that had been entered into the record. The transcript of the

testimony has been altered to exclude the arguments made by

Whitchurch, Kang, and Mathews, the comments of Judge Bartle,

and his final rulings on the admission of the evidence.  Those

entire conversations have been deleted and replaced with a

"Pause" or "Thank You".

# V.  RICO Predicated Act

## COUNT I

### *18 U.S. CODE § 1962(d)- Conspiracy to violate RICO statute*

The defendants named in Count 1 are:  Vizant Technologies, LLC, Joseph N. Bizzarro, Frank Seidman, David Askinas, Capital Solutions, INC, Lane Wiggers, IT ACCELERATION, INC, David Yarnall, KANG HAGGERTY & FEBROYT, Edward Kang, Gregory Mathews, Todd Poole, POOLE HUFFMAN, ELARBEE THOMPSON, Read Gignilliant, and Douglas Duerr.

Count 1 of the complaint charges the defendants agreed and conspired with one or more persons to conduct and/or participate in the conduct of the enterprises' affairs through a pattern of racketeering activity, which is detailed herein.

## COUNT II *through* COUNT VI

### *18 U.S. CODE § 1349-Attempt and Conspiracy (2 Counts)*

### *18 U.S. CODE § 371-Conspiracy to Defraud United States (1 Count)*

### *18 U.S. CODE § 1341-Mail Fraud (2 Counts)*

The defendants named in Count 2, 3, 4, 5, and 6 are: Vizant Technologies, LLC, Joseph N. Bizzarro, Frank Seidman, David Askinas, Capital Solutions, INC, Lane Wiggers, ELARBEE THOMPSON WILSON & SAPP, Read Gignilliant, and Douglas Duerr.

As detailed within this complaint, by knowingly agreeing to facilitate two separate schemes to: 1) extort a settlement and/or monies from me by presenting me and the IRS with a knowingly false 1099 MISC form, claiming to have compensated me some $20,000, and thus, causing me to be billed over $7,000 in state and federal income taxes, and representing Vizant Technologies, LLC would withdraw the false claims from the IRS if, *and only if*, I would agree to their settlement terms, which included a prior restraint of my speech, and 2) defraud the Internal Revenue Service with false claims of wage and earning payments to me in an effort to avoid Vizant Technologies, LLC paying federal/state taxes on those monies *and* then using the United States Postal Service (on two separate occasions) to execute both those schemes, the defendants have committed five predicated RICO acts in furtherance of the enterprise.

## COUNT VII through COUNT IX

### 18 U.S. CODE § 1349-Attempt and Conspiracy

### 18 U.S. CODE § 371-Conspriacy to Defraud United States

### 18 U.S. CODE § 1343-Wire Fraud

The defendants named in Count 7, 8, and 9 are:  Vizant Technologies, LLC, Joseph N. Bizzarro, Frank Seidman, David Askinas, Capital Solutions, INC, and Lane Wiggers.

As detailed within this complaint, by conspiring to, and by devising a scheme to cause state and federal benefits to be withheld from Whitchurch, by threatening to and, by make knowingly fraudulent representations to the Georgia Department of Labor, with the intent of defrauding the State of Georgia and the US, of the Vizant Technologies, LLC portion of those payment, and then electronically faxing and emailing those false claims, in furtherance of that scheme and the enterprise, defendants have committed their 7th, 8th, and 9th predicated RICO acts.

## COUNT X and COUNT XI

### 18 U.S. CODE § 1349-Attempt and Conspiracy

### 18 U.S. Code § 1505 - Obstruction of proceedings before departments, agencies, and committees

The defendants named in Count 10 and 11 are:  Vizant Technologies, LLC, Joseph N. Bizzarro, Frank Seidman, David Askinas, Capital Solutions, INC, and Lane Wiggers.

As detailed within this complaint, by compensating David Askinas to fraudulently represent himself as "General Council" of Vizant Technologies, LLC, and one with the legal authority to make the legal decisions on behalf of the enterprise, with the intent to corruptly obstruct and influence the proceedings before the Georgia Department of Labor, in an effort to defraud the United States, State of GA, and Whitchurch of monies, it would appear the defendants have committed their 10th and 11th predicated RICO acts.

## COUNT XII through COUNT XXI

*18 U.S. CODE § 1349-Attempt and Conspiracy (5 Counts)*

*18 U.S.C. § 1512-Tampering with a witness, victim, or informant (5 Counts)*

The defendants named in Counts 12, 13, 14, 15, 16, 17, 18, 19, 20, 21 are:  Vizant Technologies, LLC, Joseph Bizzarro, David Askinas, Lane Wiggers, Frank Seidman, Capital Solutions, INC., Read

Gignilliant, Douglas Duerr, and ELARBEE THOMPSON WILSON & SAPP.

As detailed herein, by conspiring to, and by sending me the email communications which threatened the safety and security of my children, two days prior to my appearance before the Cobb Superior Court, in a willful attempt to terrorize me and/or extort a settlement from me, and then executing that scheme, the defendants have committed two additional predicated RICO acts.

As detailed herein, by conspiring to, and by paying David Askinas to: 1) impersonate a licensed attorney able to legally take the action, as to the law, for the enterprise and parties associated therein; 2) intimate and terrorize me with horrific stories of a pro se litigant being "violated" in federal prison, to the point that he "was never the same again", and then 3) threaten that the enterprises misconduct and illegal actions towards me would continue if I did not agree to take the $150,000.00 they were offering at the time, all moments before I was to testify, against Bizzarro and the enterprise in the Cobb County Superior Court, the defendants have committed two additional predicated RICO acts.

As detailed herein, by conspiring to and by manufacturing the two Facebook friend requests and postcard, and putting all three pieces of fabricated evidence before the court in the Vizant Motion to Show Cause, with the intent of; 1) obstructing and impeding the administration of justice; 2) attempting to coerce me into a settlement; and 3) violating my civil rights by obstructing any chance of a fair and impartial tribunal and attempting to have me unfairly incarcerated, based on their manufactured evidence and Bizzarro's suborned testimony, the defendants have committed their 16th, 17,th, 18th, 19th, 20th , and 21st RICO predicated acts: obstruction of justice x 3 and conspiracy to obstruct x 3.  These six separate acts are in direct violation of federal code 18 U.S.C. § 1512 (c) and 18 U.S. Code § 1349.

## COUNT XXII and COUNT XXIII

*18 U.S. Code § 1028 – Fraud & Related Activity in connection with identification documents, authentic features, and information*
*18 U.S. CODE § 1349-Attempt and Conspiracy*

The defendants named in Counts 22 and 23 are:  Joseph Bizzarro, Lane Wiggers, David Askinas, Frank Seidman, Capital Solutions, Inc.,

Vizant Technologies, LLC, and ELARBEE THOMPSON WILSON &

SAPP, Read Gignilliant, and Douglas Duerr.

By conspiring to and by reproducing and altering the birth

certificate of Bizzarro's adult son, and then transferring that document

to Mr. Gilligiant, with the intent to defraud the Cobb County Superior

Court and obstruct justice, for the purpose of bolstering Bizzarro's

perjured testimony of a minor child, all done in furtherance of the

enterprise, the defendants have committed their 22nd and 23rd RICO

predicate act.

## COUNT XXIV through COUNT XXXV

*18 U.S. Code § 201 - Bribery of public officials and witnesses (6 Counts)*
*18 U.S. CODE § 1349-Attempt and Conspiracy (6 Counts)*

The defendants named in Counts 24, 25, 26, 27, 28, 29, 30, 31, 32,

33, 34, and 35 are: Joseph Bizzarro, David Askinas, Lane Wiggers,

Frank Seidman, Capital Solutions, Inc., Vizant Technologies, LLC,

Edward Kang, Gregory Mathews, and KANG HAGGERTY &

FETBROTY, LLC, ELARBEE THOMPSON WILSON & SAPP, Douglas

Duerr, Read Gignilliant, IT Acceleration, INC, and David Yarnall.

As detailed herein, by conspiring to, and by corruptly persuading and paying David Yarnall and Gary Hunt, of IT Acceleration, with the ill-gotten proceeds from the enterprise, to commit perjury, and alter, conceal, destroy, and/or manufacture evidence, with the intent of obstructing my civil rights and to silence my opposition to the criminal organization, the defendants have committed their 24th and 25th RICO violations.

As detailed herein, by conspiring to, and by corruptly persuading and paying Aeron Sharp, of Vizant Technologies, LLC, with the ill-gotten proceeds of the enterprise, to commit perjury and conceal the material facts regarding her contact, or lack thereof, with John Wolf and Tacoma Screw Products, with the intent of obstructing the administration of justice and furthering the enterprise, the defendants have committed their 26th and 27th RICO predicate acts.

As detailed herein, by conspiring to, and by corruptly persuading and paying Douglas Duerr, of ELERBEE THOMPSON SAPP & WILSON, with ill-gotten investments and proceeds from the enterprise, to commit perjury, suborn perjury, and conceal Bizzarro's access to the computer and USB devise located at the offices of ELARBEE

THOMPSON, the defendants have committed their 28th and 29th predicated RICO violations.

As detailed herein, by conspiring to, and by corruptly persuading and paying Karen Larsh, of ELERBEE THOMPSON SAPP & WILSON, with the ill-gotten proceeds of the enterprise, to commit perjury and conceal material facts, with the intent of biasing the Court and obstructing the fair and impartial administration of justice, in furtherance of the enterprise, the defendants have committed their 3oth and 31st RICO predicate acts.

As detailed herein, by conspiring to and by corruptly influencing, Judge Bartle to persuade and rewarding Brian Johnson for altering the digital recording of the preliminary injunction hearing, with the purpose of obstructing the administration of justice and with the intent of defrauding the Eastern District of Pennsylvania District Court, the defendants have committed their 32nd and 33rd predicated RICO violations.

The defendants named in counts 34 and 35 are:  Joseph Bizzarro, David Askinas, Lane Wiggers, Frank Seidman, Capital Solutions, Inc., Vizant Technologies, LLC, Edward Kang, Gregory Mathews, KANG

HAGGERTY & FETBROYT, Todd Poole, and POOLE HUFFMAN, LLC.
EARBEE THOMPSON WILSON & SAPP, Read Gignilliant, Douglas
Duerr, IT ACCELERATION, and David Yarnall.

By conspiring to, and by corruptly persuading and then paying
Todd Poole, of POOLE HUFFMAN, LLC., with the ill-gotten proceeds of
the enterprise, to file his knowingly false declaration with the Fulton
State Court and conceal records and material facts from that court, for
the purpose of illegally obtaining my wages, to further the enterprise,
the defendants have committed their 34TH and 35th predicated RICO
acts.

## COUNT XXXVI through COUNT XLIX

_**18 U.S. CODE § 1349-Attempt and Conspiracy (2)**_

_**18 U.S. Code § 1201 – Kidnapping (2)**_

_**O.C.G.A. 16-4-8- Conspiracy to commit a Crime (2)**_

_**O.C.G.A. 16-5-40-Kidnapping and False Imprisonment (2)**_

_**18 U.S. CODE § 1349-Attempt and Conspiracy (2)**_

_**18 U.S. Code § 1505 - Obstruction of proceedings before departments, agencies, and committees (2)**_

The defendants named in Count 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, and 47 are:  Vizant Technologies, LLC, Joseph Bizzarro, David Askinas, Frank Seidman, Capital Solutions, INC, Lane Wiggers, Gregory Mathews, Edward Kang, KANG HAGGERTY & FETBROTY, LLC, ELARBEE THOMPSON WILSON & SAPP, Read Gignilliant, Douglas Duerr, POOLE HUFFMAN, Todd Poole, Judge Russell Vineyard, Judge Harvey Bartle, III., US Marshal Keown, US Marshal Blackman, and the Department of Justice/US Marshals Service.

By (twice) conspiring to, and by (twice) orchestrating the unlawful seizing, confining, and transporting across state lines of the plaintiff, under the color of law and with a complete lack of jurisdiction and/or lawful arrest warrant, the defendants have committed eight additional RICO predicated acts in the form of conspiracy to kidnap and kidnapping.

By conspiring to, and by facilitating my kidnapping and arranging for me to be falsely imprisoned, at the same time I was seeking redress of their fraud on the ED of PA district court, and with the intent of preventing my filings with the 3rd Circuit Court of Appeals (as ORDERED by that Court) and thus impeding the administration of

justice, the defendants have committed 4 additional predicated acts in the form of conspiracy to obstruct justice and obstruction of justice. RICO charges are not asserted, at this time, against Judge Russel Vineyard, Judge Harvey Bartle, III, the US Marshals, or the DOJ

## COUNT XLVIII and COUNT XLIX

### CODE § 1349-Attempt and Conspiracy

### 18 U.S. Code § 1509 - Obstruction of court orders

The defendants named in Counts 48 and 49 are: Vizant Technologies, LLC, Joseph Bizzarro, David Askinas, Lane Wiggers, Frank Seidman, Capital Solutions, INC, Edward Kang, Gregory Mathews, KANG HAGGERTY & FETBROYT, LLC, ELARBEE THOMPSON WILSON & SAPP, Read Gignilliant, Douglas Duerr, Todd Poole, and POOLE HUFFMAN.

By conspiring to, and by corruptly persuading Judge Bartle to coerce Judge Russell Vineyard and James Hatten, of the Northern District of Georgia, to issue knowingly unlawful warrant(s) for the plaintiff's arrest, with the intent of causing the plaintiff to withhold documents and other objects from the official proceedings in the 3rd

Circuit Court of Appeals, the defendants have committed 48th and 49th predicated RICO violations.

## COUNT L through COUNT LIII

*O.C.G.A. § 16-8-4  Theft by Conversion*

*O.C.G.A. § 16-8-4  Theft by Deception*

*O.C.G.A. § 16-8-4  Theft of Service*

*O.C.G.A. § 16-8-4  Theft by Extortion*

The defendants named in Counts 50, 51, 52, and 53 are:  Vizant Technologies, LLC, Joseph Bizzarro, David Askinas, Lane Wiggers, Frank Seidman, Capital Solutions, INC, Edward Kang, Gregory Mathews, KANG HAGGERTY & FETBROYT, LLC, ELARBEE THOMPSON WILSON & SAPP, Read Gignilliant, Douglas Duerr, Todd Poole, and POOLE HUFFMAN.

By bribing Todd Poole to file a knowingly false affidavit proclaiming Vizant Technologies, LLC had obtained a monetary judgment in the Northern District of Georgia District Court, for the purpose of unlawfully seizing my wages, in furtherance of the

enterprise and criminal organization, the defendants have committed their 50th predicated RICO act.

By falsely representing, multiple times, that I would be reimbursed for all out of pocket expenses occurred in the performance of my duties as the National Director of Business Development, with the full knowledge that the enterprise and criminal organization associated therewith had no intention of such, the defendants have committed their 51st predicated RICO act.

By falsely representing that I would be compensated for attending/conducting meetings with potential Vizant Technologies, LLC clients, the defendants have committed their 52nd predicated RICO act.

By conspiring to, and by bribing Douglas Duerr and Read Gignilliant to extort and/or coerce a settlement from Whitchurch by fraudulent representing she would be given the earnings and wages owed if she would agree to the criminal organizations demands.  The defendants have committed their 53rd predicated act.

## COUNT LIV

### *18 U>S. Code § 373- Solicitation to commit a crime of violence*

The defendants named in Counts 54 are: Vizant Technologies, LLC, Joseph Bizzarro, David Askinas, Lane Wiggers, Frank Seidman, Capital Solutions, INC, Edward Kang, Gregory Mathews, KANG HAGGERTY & FETBROYT, LLC, ELARBEE THOMPSON WILSON & SAPP, Read Gignilliant, Douglas Duerr, Todd Poole, and POOLE HUFFMAN, Judge Vineyard, and Judge Harvey Bartle, III.

With the intent that the US Marshals would engage in conduct that constituted a felony, Whitchurch's unlawful arrest and false imprisonment, the defendants have violated 18 U.S. Code § 373 and committed their 54th RICO predicated act.

## Civil Rights Violations

## COUNT LV

### *18 U.S. Code § 241 - Conspiracy against rights*

The defendants named in Count 55 are: Vizant Technologies, LLC, Joseph Bizzarro, David Askinas, Lane Wiggers, Frank Seidman, Capital Solutions, INC, Edward Kang, Gregory Mathews, KANG

HAGGERTY & FETBROYT, LLC, Todd Poole, POOLE HUFFMAN, ELARBEE THOMPSON WILSON & SAPP, Douglas Duerr, Read Gignilliant, Judge Russell Vineyard, Judge Harvey Bartle, III, Marshal Keown, Marshal Blackwood, Rebecca Shephard, and the Department of Justice/Marshals Service.

From the onset of the Cobb County Superior Court litigation, in April of 2014, and continuing to date, the defendants conspired to and did injure, oppress, threaten, and intimidate Whitchurch in the free exercise and enjoyment of rights and privileges secured by the Constitution.  Specifically, by engaging in a pattern of bad and, outright illegal conduct with the intent of illegally stripping Whitchurch of her rights to free speech, to be free from unlawful seizures, rights to due process, and her right to a fair and impartial tribunal, for the purpose of silencing Whitchurch allegations of a Ponzi scheme and criminal organization being run by the defendants, they have knowingly violated 18 U.S.C. § 241.

By conspiring to oppress, prevent, and/or block any reasonable attempts made by Whitchurch to conduct the deposition of the expert witness; and by conspiring to, and by suborning the perjury of the

witnesses, to include: David Askinas, Karen Larsh, Douglas Duerr, Aeron Sharp, Joseph Bizzarro, Todd Poole, Gary Hunt, and David Yarnall, and for the purpose of furthering the criminal organization and the enterprise, the defendants have violated 18 U.S.C. § 241.

By conspiring to have Whitchurch unlawfully arrested, transported across state lines, and held for half a month without due process and jurisdiction, for the purpose of obstructing the administration of justice and terrorizing Whitchurch, the defendants have violated 18 U.S.C. § 241.

By conspiring to, and by giving the appearance of legal power to act on behalf Whitchurch, and by participating in the sham identity/extradition hearing with the expressed purpose and intent of; 1) blocking Whitchurch from receiving competent legal representation; 2) aiding and abetting the defendants in Whitchurch's unlawful arrest and false imprisonment/kidnapping, and 3) to obstruct Whitchurch's court filings in the 3rd Circuit Court of Appeal all in furtherance of the enterprise and/or at the bequest of persons associated with the enterprise, Ms. Shephard violated 18 U.S.C. § 241..

## COUNT LVI

### *18 U.S. Code § 242 - Deprivation of rights under color*

The defendants named in Count 56 are: Judge Russell Vineyard, Judge Harvey Bartle, III, US Marshal Keown, Rebecca Shephard, and US Marshal Blackwood.

By acting under the color of law and willfully subjecting Whitchurch, to what they knew at the time, was an unlawful arrest and kidnaping, for the expressed purpose of terrorizing her and preventing her court filings, which detailed Judge Harvey Bartle's participation in a fraud in the ED of PA District Court, the defendants have violated 18 U.S.C. § 242.

## State Law Violations

## COUNT LVII

### *Pennsylvania Common law claim for Abuse of Process*

The defendants named in Counts 57 are: Vizant Technologies, LLC, Joseph Bizzarro, David Askinas, Lane Wiggers, Frank Seidman, Capital Solutions, INC, Edward Kang, Gregory Mathews, KANG HAGGERTY & FETBROYT, LLC, ELARBEE THOMPSON WILSON &

SAPP, Read Gignilliant, Douglas Duerr, Todd Poole, POOLE
HUFFMAN, IT ACCELERATION, and David Yarnall.

By engaging in a pattern of bad faith and illegal conduct during
the ED of PA litigation, which included, but was not limited to: bribing
witnesses, obstructing justice, preventing depositions or refusing to
produce witnesses with abusive litigation tactics, suborning perjury,
perjury, manufacturing and concealing evidence, the defendants have
committed a gross violation of the Pennsylvania statue against an
Abuse of Process,

## COUNT LVIII

*O.C.G.A. 51-6-1- Georgia Tort Claim for Fraud and Deceit*
*O.C.G.A. 51-6-2-Misrepresentaiton of material Fact*

The defendants named in Counts 58 are: Vizant Technologies,
LLC, Joseph Bizzarro, David Askinas, Lane Wiggers, Frank Seidman,
Capital Solutions, INC, Edward Kang, Gregory Mathews, KANG
HAGGERTY & FETBROYT, LLC, ELARBEE THOMPSON WILSON &
SAPP, Read Gignilliant, Douglas Duerr, Todd Poole, POOLE
HUFFMAN, IT ACCELERATION, and David Yarnall.

As detailed herein, by making willful misrepresentations
promising certain wages, earnings, and expenses for services rendered

by Whitchurch, with the intent to induce Whitchurch to act, knowing full well the owed wages, earnings, and expenses would not be paid as promised, and thus causing injury to Whitchurch, the defendants have committed a tortious offence of fraud.

As detailed herein, by making numerous willful misrepresentations promising to give Whitchurch the owed earnings, wages, and expenses, with the intend of cause Whitchurch to act, and thereby causing injury, the defendants have committed a tortious offense of fraud.

As detailed herein by making willful misrepresentations to the Fulton State Court, with the intent of causing the court to act to Whitchurch's detriment, and thereby causing injury, the defendants have committed a tortious offense of fraud.

## COUNT LIX

*O.C.G.A. 51-7-1-Right of action for False Arrest*
*O.C.G.A. 51-7-22-False imprisonment by several persons*
*O.C.G.A. 16-4-7-Criminal Solicitation and Criminal Conspiracy*

The defendants named in Counts 59 are:  Vizant Technologies, LLC, Joseph Bizzarro, David Askinas, Lane Wiggers, Frank Seidman,

Capital Solutions, INC, Edward Kang, Gregory Mathews, KANG HAGGERTY & FETBROYT, LLC, ELARBEE THOMPSON WILSON & SAPP, Read Gignilliant, Douglas Duerr, Todd Poole, POOLE HUFFMAN, IT ACCELERATION, David Yarnall, Judge Harvey Bartle, III, Judge Russel Vineyard, US Marshall Keown, US Marshal Blackwood, and Rebecca Shephard.

As detailed herein, with intent that the US Marshals engage in conduct constituting a felony, the defendants conspired to and did solicit, request, command, and otherwise cause the Marshals to engage in such conduct.

## COUNT LX

### O.C.G.A. 51-2-2-Imputable Negligence

The defendants named in Counts 60 are: Vizant Technologies, LLC, Joseph Bizzarro, David Askinas, Lane Wiggers, Frank Seidman, Capital Solutions, INC, Edward Kang, Gregory Mathews, KANG HAGGERTY & FETBROYT, LLC, ELARBEE THOMPSON WILSON & SAPP, Read Gignilliant, Douglas Duerr, Todd Poole, POOLE HUFFMAN, IT ACCELERATION, and David Yarnall.

As details herein, by allowing, encouraging, rewarding, and/or turning a blind eye to the unlawful and bad faith conduct of their employees, the defendants are liable for the injuries to Whitchurch caused by those acts.

## COUNT LXI

*O.C.G.A. 51-5-4-Defamation*

The defendants named in Counts 61 are: Vizant Technologies, LLC, Joseph Bizzarro, David Askinas, Lane Wiggers, Frank Seidman, Capital Solutions, INC, Edward Kang, Gregory Mathews, KANG HAGGERTY & FETBROYT, LLC, ELARBEE THOMPSON WILSON & SAPP, Read Gignilliant, Douglas Duerr, Todd Poole, POOLE HUFFMAN, IT ACCELERATION, and David Yarnall.

As detailed herein, by imputing to the US Marshals, Mr. Schenck, and other third parties, that Whitchurch had committed a crime, Whitchurch was damaged in her person and reputation.

## COUNT LXII

*Invasion of Privacy/False Light*

The defendants named in Counts 62 are: Vizant Technologies, LLC, Joseph Bizzarro, David Askinas, Lane Wiggers, Frank Seidman, Capital Solutions, INC, Edward Kang, Gregory Mathews, KANG

HAGGERTY & FETBROYT, LLC, ELARBEE THOMPSON WILSON & SAPP, Read Gignilliant, Douglas Duerr, Todd Poole, POOLE HUFFMAN, IT ACCELERATION, David Yarnall, M. Keown, and M. Blackwood.

As detailed herein, by publicly placing Whitchurch in a false light as a criminal and publicly disclosing private facts that are offensive the defendants have knowingly and intentionally invaded her privacy.

## COUNT LXI

### *Intentional infliction of emotional distress*

The defendants named in Counts 61 are: Vizant Technologies, LLC, Joseph Bizzarro, David Askinas, Lane Wiggers, Frank Seidman, Capital Solutions, INC, Edward Kang, Gregory Mathews, KANG HAGGERTY & FETBROYT, LLC, ELARBEE THOMPSON WILSON & SAPP, Read Gignilliant, Douglas Duerr, Todd Poole, POOLE HUFFMAN, IT ACCELERATION, David Yarnall, Judge Harvey Bartle, Judge Russell Vineyard, US Marshall Keown, and US Marshal Blackwood.

The defendants' conduct, detailed herein, was intentional, reckless, and extreme.  As a direct result of my false arrest, kidnapping, and physical assault and the defendants outrageous misconduct and illegal actions detailed herein, I suffer from debilitating anxiety, panic attacks, and depression.

## Relief Sought Damages

I ask for judgment against the Defendants, jointly and severally, as follows:

a.      For an INJUNCTION ORDER enjoining defendant[31] from managing, overseeing, investing, participating in/or conducting the affairs of the enterprise;

b.      For an ORDER OF DISGORGEMENT (without compensation) of the ill-gotten proceeds, gained by KANG HAGGERTY, Capital Solutions, Inc., POOLE HUFFMAN, LLC, Frank Seidman, Joseph N. Bizzarro, Lane Wiggers, David Askinas, IT Acceleration, David Yarnall, ELARBEE THOMPSON SAPP & WILSON, Todd Poole,

---

[31] Elarbee Thompson Wilson & Sapp, Read Gignilliant, Douglas Duerr, IT Acceleration, David Yarnall, Capital Solutions, INC, Frank Seidman, Lane Wiggers, David Askinas, Joseph N. Bizzarro, KANG HAGGERTY & FEBROYT, LLC, Edward T. Kang, Gregory Mathews, POOLE HUFFMAN, LLC, and Todd Poole.

Edward T. Kang, Gregory Mathews, Read Gignilliant, Douglas Duerr, and their employees for racketeering acts committed in furtherance, and on behalf, of the enterprise;

c.　　For compensatory damages against Defendants in an amount to be determined by a jury at trial, together with interest thereon, plus special, consequential, and incidental damages, plus cost to date;

d.　　For punitive damages sufficient to punish and deter Defendants;

e.　　For lost wages; past, present, and future;

f.　　For those earnings, commissions, and expenses stolen from the plaintiff;

g.　　For the trebling of all compensatory damages (including all general, special, consequential, and incidental damages, and costs) and punitive damages as demanded by the provisions of Georgia RICO statues.

h.　　For a trial by jury of twelve citizens; and

i.　　For such other and further relief that the Court deems just and proper.

I declare under the penalty of perjury that the foregoing allegations detailed in the complaint are true and correct.

December 18, 2017

Julie P. Whitchurch

103 Golden Hills Drive

Woodstock, GA 30189

404.606.3626

# Exhibit A

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet

_____DELAWARE_____ **County**

| For Prothonotary Use Only: |
|---|
| Docket No: **FILED** |
| 15-5864 2015 JUL -6 PM 2:09 |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

## SECTION A

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Transfer from Another Jurisdiction
- ☐ Petition
- ☐ Declaration of Taking

Lead Plaintiff's Name:
**GREGORY M. PARENTICE**

Lead Defendant's Name:
**VIZANT TECHNOLOGIES, LLC**

**Are money damages requested?** ☒ Yes ☐ No

Dollar Amount Requested:
(check one)
- ☐ within arbitration limits
- ☒ outside arbitration limits

**Is this a *Class Action Suit*?** ☐ Yes ☒ No

**Is this an *MDJ Appeal*?** ☐ Yes ☒ No

Name of Plaintiff/Appellant's Attorney: **PIETRO A. BARBIERI, ESQUIRE**

☐ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

## SECTION B

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/Defamation
- ☐ Other:

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☒ Toxic Waste
- ☐ Other:

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional:

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☒ Debt Collection: Other

- ☐ Employment Dispute: Discrimination
- ☒ Employment Dispute: Other
  UNPAID WAGES

- ☐ Other:

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other:

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other

- ☐ Zoning Board
- ☐ Other:

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other:

*Updated 1/1/2011*

**IN THE COURT OF COMMONS PLEAS
OF DELAWARE COUNTY, PENNSYLVANIA
CIVIL DIVISION**

| | | |
|---|---|---|
| GREGORY M. PARENTICE, | : | CIVIL ACTION – LAW |
| 114 Magnolia Drive | : | |
| Chester Springs, PA 19425 | : | No. |
| | : | |
| Plaintiff, | : | |
| | : | Jury Trial Demanded |
| vs. | : | |
| | : | |
| VIZANT TECHNOLOGIES, LLC, | : | |
| Brandywine Two Building | : | |
| 5 Christy Drive, Suite 202 | : | |
| Chadds Ford, PA 19317 | : | |
| | : | |
| Defendant. | : | |

### NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by an attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or money or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

**LAWYERS REFERENCE SERVICE
DELAWARE COUNTY BAR ASSOCIATION**
Front and Lemon Streets
Media, PA 19063
(610) 566-6625



# Exhibit

# A

## Business Development Manager Incentive Plan

Effective:     January 1st, 2014
Last Updated:  January 1st, 2014

### 1. Definition of Incentives

Incentives are offered to augment the base salary compensation of an employee for performance and production.  Incentives do not fall under the category of base compensation paid by Vizant to an employee.  They are paid solely at the discretion of Vizant management pursuant to qualifying circumstances set forth herein.

### 2. Employee Incentive Eligibility

Any employee who secures a signed Professional Services Agreement (PSA) between Vizant and a Client, regardless of Title or Position, is eligible for incentives under this Plan, as indicated herein

### 3. Management Incentives

Management Incentives are specific to those who supervise others, such as a regional business development manager or a regional director of business development. Management incentives are linked to the performance of the individuals being managed.  Any manager is eligible for incentives for any PSA that they secure directly and through their own efforts. Incentives tied to team and individual performance for managers are outlined in the Business Development Management Incentive plan.

### 4. Monthly, Quarterly and Other Incentives

The Company may offer monthly, quarterly and other sales contests and incentive programs to promote sales and increased business activity. These programs will be communicated and outlined at the time they are offered.  Certain terms contained herein will also apply to those incentives.

### 5. Internal Analysis Completion

This refers to Vizant's collection of all applicable client financial data and information as part of its client boarding and integration process in order to perform its analysis of client's financial payments environment and potential financial payment cost reductions solutions and initiatives.

### 6. Financial Payment Report Presentation

Plaintiffs Exhibit A - 1

This refers to Vizant's Report analyzing the Clients financial payments environment and the associated recommendations and solutions that Vizant presents to the Client: *Financial Payments Analysis and Recommendation Report* (the "Report").

### 7. Execution Incentive Advance
This Incentive is structured and designed to reward an employee for the execution of a PSA Agreement. The Incentive is an "Advance" and it is based on "Estimated Financial Payment Volume". It is structured as an Advance against the financial payment volume incentive. This gives us the ability to reward the employee as soon as possible after the execution of a PSA. Since this Incentive is paid in advance of the internal analysis completion and determination of actual financial payment volume, it will be deducted from any incentive that is determined under the "Financial Payment Volume Incentive"
The details of this incentive are as indicated under "PSA Execution Incentive Advance Amounts".

### 8. Financial Payment Volume Incentive
This Incentive is structured and designed to reward an employee based on the total financial payment dollars that the Client receives and accepts. The Incentive is based both on Payment Card Volume and Other Financial Payment Volume. The larger this number is, the greater the incentive dollars that the employee can earn. An employee is eligible for this incentive upon the occurrence of the following two (2) events: "Internal Analysis Completion" and "Financial Payment Report Presentation". The amount of this incentive is based on financial payment volume and is as indicated under "PSA Financial Payment Volume Incentive"

### 9. Payment Card Volume
This is the annualized volume of client payment cards accepted, including consumer and commercial credit, debit, prepaid cards from all card networks and card brands. It excludes private label, gift cards and other payment forms which Vizant may not be able to offer cost reduction solutions for.

### 10. Other Financial Payment Volume
This is the annualized volume of all client payments accepted that are not made with a payment card. It includes all payments made with a paper check, e-check, ACH payment and any other types and methods of payment that are not made with a payment card.

### 11. Execution Incentive Advance Amounts
This incentive is based on the estimated financial payment volume of a Client when a PSA is executed and it is determined based on multiple financial payment volume tiers. The employee

is eligible for this incentive upon the execution of the PSA. The incentive amounts are as indicated on the attached Schedule A.

### 12. Financial Payment Volume Incentive Amounts

This incentive is based on actual annual historical confirmed financial payment volume dollars, after the completion of our internal analysis. There are two (2) different incentives that are calculated separately: 1] Payment Card Volume Incentive and Other Financial Payment Volume Incentive.

The largest incentive is tied to payment card volume incentive and the smaller incentive is tied to other financial payment card volume. They are mutually exclusive and calculated independently of each other.

If non-payment card volume is excluded from the PSA, then the "other financial payment volume" incentive is not applicable and cannot be earned.

The incentive is not earned until after the presentation of our findings and solutions, as identified in our Report to the Client. The incentive amounts are indicated in Schedule B. The incentive amounts will be calculated and netted against any amounts already earned or paid under the "Execution Incentive Advance".

### 13. Incentive Payments

Employees are eligible for and shall earn incentives based on the terms indicated herein. Management shall review and approve any and all incentives upon all criteria being met. The payment of any incentives earned under this Plan shall be at the timing and sole discretion of management.

Large dollar incentives may be paid over multiple pay periods.

Management will work to ensure that payments under this Plan are made in a timely fashion.

### 14. Standard PSA Term and PSA Service Fee

The PSA Execution Agreement Incentives and the PSA Financial Payment Volume Incentives are based on a PSA that has a 3 Year Term and a Services Fee of 45%-40%-35%. A PSA with a full services fee of 50%-45%-40% will earn an additional incentive above the scheduled rates in Schedule A and Schedule B.

Any PSA with a full term and full services fee will earn a 25% additional incentive based on the dollar amounts indicated Schedule A and Schedule B

### 15. PSA Term and PSA Service Fee

Any PSA that is less than 3 years or has a services fee of less than 45%-40%-35% will result in a downward adjustment of the incentive amounts indicated in Schedule A and Schedule B.

A two (2) year contract will result in a 50% reduction of the scheduled incentive amounts. A services fee of less than 45%-40%-35% will be reduced pro-rata as follows: A 45%-40%-35% is considered full fee and totals 120%. Any fee structure that totals less than 120% will be adjusted downward.

For example, a services fee of 40%-35%-30% totals 105% and will result in 87.5% of the scheduled incentive being earned.

We will not adjust incentives downward in every case where both the term and services fee are less than standard. For example, a two (2) year PSA with a rate of 45%-40% will only be adjusted for the term reduction, not the services fee. However, a 2 year PSA with rates below 85% will be adjusted downward, using the same methodology as indicated above.

### 16. Market Sector Incentive Adjustments

In the event that a PSA is secured in a market sector that Vizant does not consider a desirable or profitable market sector, management may elect to adjust, modify, reduce or eliminate any incentive under this Plan, at its sole discretion.

### 17. PSA Agreement Exclusions

In the event that a PSA has financial payment analysis excluded from our Agreement, or in the event that the Client has recently entered into or modified existing financial payment service provider agreements, the Company reserves the right to adjust any incentives under this Agreement.

### 18. Disputed, Problematic or Terminated PSA's

Subsequent to a PSA being signed, if any of the following issues arise, any incentives earned under this Plan will be considered forfeited. In the event the incentives were paid, the incentives will be charged back to the employee. The following conditions will result in incentive forfeitures and adjustments:

- Client Integration and Welcome call does not occur within 30 days of PSA execution, unless excused by management
- Initial financial payment data and information not received within 30 days of client's initial integration call/meeting
- Ongoing monthly financial payment data and information ceases to be provided by Client
- The Client elects to terminate the PSA
- The PSA results in no revenue being earned by Vizant
- Client disputes any terms of the PSA
- Vizant initiates legal action against the Client

**19. Adjustments to Incentives**

The company retains the right to charge back or offset against future compensation of the employee any incentive that was paid to an employee based upon fraudulent, incorrect or erroneous information provided by the employee to Vizant. Chargebacks and offsets under this section may be deducted at the sole discretion of Vizant either from future incentives or the base compensation of the employee.

The PSA Execution Incentive is based on estimated financial payment volume provided by the Client to the Employee. After the initial analysis is complete, if it is determined that the financial payment volume is lower than was estimated at time of the PSA execution, and it would have resulted in the employee being eligible for a lower tier incentive, then the employee will be charged back for the difference based on the revised incentive tier.

**20. Retained Management Rights**

Vizant retains the sole right to change any and all elements of this Incentive Plan at any time, without notice, due to business requirements or business conditions

**21. Retention of Incentives upon Separation**

Vizant reserves the right to retain all or a portion of an employee's incentives upon their separation from employment under any or all of the following circumstances: failure to return Vizant equipment in working condition in a timely manner, failure to account for expenses and provide receipts in a timely fashion, having a negative PTO balance, financial amounts due to Vizant, and /or other actions or situations that Vizant deems unacceptable or damaging to Vizant.

I, _____, have read, understand and agree to the terms of this Business Development Incentive Plan.

Signed this _____ day of _____, 2014.

_____

Vizant Employee

**SCHEDULE B - Annual Payment Card Volume Incentive**

| Tier Number | Low Range of Tier | High Range of Tier | Incentive Dollars | 3 Year and Full Fee Incentive | Total Maximum Incentive |
|---|---|---|---|---|---|
| 1 | $1,000,000 | $5,000,000 | $750 | $188 | $938 |
| 2 | $5,000,000 | $10,000,000 | $1,000 | $250 | $1,250 |
| 3 | $10,000,000 | $15,000,000 | $1,250 | $313 | $1,563 |
| 4 | $15,000,000 | $20,000,000 | $1,500 | $375 | $1,875 |
| 5 | $20,000,000 | $25,000,000 | $2,000 | $500 | $2,500 |
| 6 | $25,000,000 | $35,000,000 | $2,500 | $625 | $3,125 |
| 7 | $35,000,000 | $45,000,000 | $3,000 | $750 | $3,750 |
| 8 | $45,000,000 | $55,000,000 | $3,500 | $875 | $4,375 |
| 9 | $55,000,000 | $65,000,000 | $4,000 | $1,000 | $5,000 |
| 10 | $65,000,000 | $75,000,000 | $4,500 | $1,125 | $5,625 |
| 11 | $75,000,000 | $100,000,000 | $5,250 | $1,313 | $6,563 |
| 12 | $100,000,000 | $125,000,000 | $6,000 | $1,500 | $7,500 |
| 13 | $125,000,000 | $150,000,000 | $6,750 | $1,688 | $8,438 |
| 14 | $150,000,000 | $175,000,000 | $7,500 | $1,875 | $9,375 |
| 15 | $175,000,000 | $200,000,000 | $8,250 | $2,063 | $10,313 |
| 16 | $200,000,000 | $250,000,000 | $8,750 | $2,188 | $10,938 |
| 17 | $250,000,000 | $300,000,000 | $10,250 | $2,563 | $12,813 |
| 18 | $300,000,000 | $350,000,000 | $11,250 | $2,813 | $14,063 |
| 19 | $350,000,000 | $400,000,000 | $12,250 | $3,063 | $15,313 |
| 20 | $400,000,000 | $450,000,000 | $13,250 | $3,313 | $16,563 |
| 21 | Above $450,000,000 | | $15,000 | $3,750 | $18,750 |

This Rate Schedules Applies to all Three (3) Year PSA's with a Services Fee of No less Than 45%-40%-35%.
For all Non-Standard PSA's, there will be Downward Adjustments to these Dollars, as outlined in the Terms

Copying Prohibited

**SCHEDULE B – Other Financial Payment Volume Incentive**

| Tier Number | Low Range of Tier | High Range of Tier | Incentive Dollars | 3 Year and Full Fee Incentive | Total Maximum Incentive |
|---|---|---|---|---|---|
| 1 | $5,000,000 | $25,000,000 | $500 | $125 | $625 |
| 2 | $25,000,000 | $50,000,000 | $750 | $188 | $938 |
| 3 | $50,000,000 | $75,000,000 | $1,000 | $250 | $1,250 |
| 4 | $75,000,000 | $100,000,000 | $1,250 | $313 | $1,563 |
| 5 | $100,000,000 | $125,000,000 | $1,500 | $375 | $1,875 |
| 6 | $125,000,000 | $150,000,000 | $1,750 | $438 | $2,188 |
| 7 | $150,000,000 | $200,000,000 | $2,000 | $500 | $2,500 |
| 8 | $200,000,000 | $250,000,000 | $2,250 | $563 | $2,813 |
| 9 | $250,000,000 | $300,000,000 | $2,500 | $625 | $3,125 |
| 10 | Above $300,000,000 | | $3,000 | $750 | $3,750 |

This Rate Schedules Applies to all Three (3) Year PSA's with a Services Fee of No less Than 45%-40%-35%.
For all Non-Standard PSA's, there will be Downward Adjustments to these Dollars, as outlined in the Terms

Copying Prohibited

**SCHEDULE A - PSA Execution Advance Incentive**
**Based on Total Revenue and/or Total Financial Payments**

| Tier Number | Low Range of Tier | High Range of Tier | Advance Incentive |
|---|---|---|---|
| 1 | $1,000,000 | $5,000,000 | $500 |
| 2 | $5,000,000 | $10,000,000 | $750 |
| 3 | $10,000,000 | $15,000,000 | $1,000 |
| 4 | $15,000,000 | $20,000,000 | $1,250 |
| 5 | $20,000,000 | $25,000,000 | $1,500 |
| 6 | $25,000,000 | $35,000,000 | $1,750 |
| 7 | $35,000,000 | $50,000,000 | $2,000 |
| 8 | $50,000,000 | $60,000,000 | $2,250 |
| 9 | $60,000,000 | $75,000,000 | $2,500 |
| 10 | $75,000,000 | And Above | $2,500 |

This Rate Schedules Applies to all Three (3) Year PSA's with a Services Fee of No [
For all Non-Standard PSA's, there will be Downward Adjustments to these Dollar

Copying Prohibited



# Exhibit

# B

## Business Development Manager Incentive Plan

**Effective: January 1st, 2014**
**Revised: August 1st, 2014**

### 1. Definition of Incentives

Incentives are offered to augment the base salary compensation of an employee for performance and production. Incentives do not fall under the category of base compensation paid by Vizant to an employee. They are paid solely at the discretion of Vizant management pursuant to qualifying circumstances set forth herein.

### 2. Employee Incentive Eligibility

Any employee who secures a signed Professional Services Agreement (PSA) between Vizant and a Client, regardless of Title or Position, is eligible for incentives under this Plan. In the event that more than one employee is involved with Vizant securing a new PSA, then management will decide how and to what extent any incentives under this Plan are shared or nor shared.

### 3. Management Incentives

Management Incentives are specific to those who supervise others, including but not limited to the examples of a regional business development manager or a regional director of business development. Management incentives are linked to the performance of the individuals being managed. Any manager is eligible for incentives for any PSA that they secure directly and through their own efforts. Incentives tied to team and individual performance for managers are outlined in the Business Development Management Incentive plan.

### 4. Monthly, Quarterly and Other Incentives

The Company may offer monthly, quarterly and other sales contests and incentive programs to promote sales and increased business activity. These programs will be communicated and outlined at the time they are offered.

### 5. Internal Analysis Completion

This refers to Vizant's collection of all applicable client financial data and information as part of its client boarding and integration process in order to perform its analysis of client's financial payments environment and potential financial payment cost reductions solutions and initiatives.

### 6. Financial Payment Report Presentation

This refers to Vizant's Report which analyzes and evaluates a Clients financial payments environment and the associated recommendations, solutions and cost reduction items which Vizant presents to all of its Clients. It is called *Financial Payments Analysis and Recommendation Report* ("Report").

### 7. Execution Incentive Advance

This incentive is structured and designed to reward an employee for the execution of a PSA Agreement. The incentive is an "**Advance**" and it is based on "Estimated Financial Payment Volume". It is structured as an Advance against the financial payment volume incentive. This gives us the ability to reward the employee as soon as possible after the execution of a PSA.

Since this incentive is paid in advance of the internal analysis completion and determination of actual financial payment volume, it will be deducted from any incentive that is determined and ultimately earned under the

1

"Financial Payment Volume Incentive". The details of this incentive are as indicated under Section 12: "Execution Incentive Advance Amounts".

### 8. Financial Payment Volume Incentive
This incentive is structured and designed to reward an employee based on the total financial payment dollars that the Client receives and accepts. The incentive is based both on Payment Card Volume and Non-Payment Card Volume. The larger this number is, the greater the incentive dollars that the employee can earn. An employee is eligible for this incentive upon the occurrence of the following two (2) events: "Internal Analysis Completion" and "Financial Payment Report Presentation". The amount of this incentive is based on total financial payment volume verified to Vizant by Client's provision of financial documentation, and is as indicated under Section 13: "Verified Financial Payment Volume Incentive". The Financial Payment Volume Incentive is subject to modification pursuant to Section 11 herein.

### 9. Payment Card Volume
This is the annualized volume of client payment cards accepted and processed. It includes all consumer, commercial, credit, debit and prepaid cards, from all card networks and card brands. It excludes private label cards, gift cards and other payment forms.

### 10. Non-Payment Card Volume
This is the annualized volume of all client payments accepted and processed that are not classified as a payment card. It includes payments such as: paper check, e-check, ACH, EFT or other payment method. This is an all-encompassing category that includes any payment type, payment volume and payment transaction that is not a payment card.

### 11. Financial Payments that are Excluded from Incentive Plan
If a PSA excludes Vizant from reviewing and analyzing non-payment card costs, then there is no incentive for non-payment card volume. If a PSA is a standard one and includes the review and analysis of all financial payments, but the Client does not provide the non-payment-card data as noted in section 8, above, then there is no incentive for non-payment card volume. If a client provides all financial payment data then does not let Vizant work on any particular aspect of financial payment volume, then excluded dollars are be deducted from any incentive calculations. Cash is never included in any calculation of financial payment volume.

### 12. Execution Incentive ADVANCE Amounts
This incentive is based on the estimated financial payment volume of a Client when a PSA is executed and it is determined based on multiple financial payment volume tiers. The employee is eligible for this incentive upon the execution of the PSA. *The incentive amounts are as indicated on the attached Schedule 1.*

### 13. VERIFIED Financial Payment Volume Incentive
This incentive is based on actual annual historical confirmed and verified financial payment volume dollars, after the completion of our internal analysis. There are two (2) different incentives that are calculated separately: 1) Payment Card Volume Incentive and Non-Payment Card Volume Incentive.
The larger incentive is tied to payment card volume and the smaller incentive is tied to non-payment card volume. They are mutually exclusive and calculated independently of each other.
The incentive is not earned until we present the Client with our findings and solutions, as identified in our Report to the Client. *The incentive amounts for Payment Card Volumes are indicated in Schedule 1. The incentive amounts for Non-Payment Card Volume are indicated on Schedule 1.*

2

Plaintiffs Exhibit B - 2

The incentive amounts will be calculated and netted against any amounts already earned or paid under the "Execution Incentive Advance Amounts".

### 14. Timing of Incentive Payments

Employees are eligible for and shall earn incentives based on the terms indicated herein. Management shall review and approve any and all incentives upon all criteria being met. The payment of any incentives earned under this Plan shall be at the timing and sole discretion of management. Large dollar incentives (over $1,500.00) will be paid in multiple payments.

### 15. Standard PSA Term and PSA Service Fee

The PSA Execution Agreement Incentives and the PSA Financial Payment Volume Incentives are based on a PSA that has a 3 Year Term and a Services Fee of 45%-40%-35%. A PSA with a full services fee of 50%-45%-40% will earn an additional incentive above the scheduled rates in Schedule 1.

Any PSA with a full term and full services fee will earn a 25% additional incentive based on the dollar amounts indicated Schedule 1.

### 16. PSA Term and PSA Service Fee

Any PSA that is less than 3 years OR has a services fee of less than 45%-40%-35% will result in a downward adjustment of the incentive amounts that are indicated in Schedule 1.

A two (2) year contract will result in a 50% reduction of the scheduled incentive amounts. A services fee of less than 45%-40%-35% will be reduced pro-rata as follows: A 45%-40%-35% is considered full fee and totals 120%. Any fee structure that totals less than 120% will be adjusted downward.

For example, a services fee of 40%-35%-30% totals 105% and will result in 87.5% of the scheduled incentive being earned.

We will not adjust incentives downward in every case where both the term and services fee are less than standard. For example, a two (2) year PSA with a rate of 45%-40% will only be adjusted for the term reduction, not the services fee. However, a 2 year PSA with rates below 85% will be adjusted downward, using the same methodology as indicated above.

### 17. Market Sector Incentive Adjustments

In the event that a PSA is secured in a market sector that Vizant does not consider a desirable or profitable market sector, management may elect to adjust, modify, reduce or eliminate any incentive under this Plan, at its sole discretion. Restaurants, lodging establishments and car dealerships are considered undesirable markets and will result in reduced or no incentives.

### 18. PSA Agreement Exclusions

In the event that a PSA has financial payment analysis excluded from our Agreement, or in the event that the Client has recently entered into or modified existing financial payment service provider agreements, the Company reserves the right to adjust any incentives under this Agreement.

### 19. Disputed, Problematic or Terminated PSA's

Subsequent to a PSA being signed, if any of the following issues arise, any incentives earned under this Plan will be considered forfeited. In the event the incentives were paid, the incentives will be charged back to the employee. The following conditions will result in incentive forfeitures and adjustments:

- Client Integration and Welcome call does not occur within 30 days of PSA execution, unless excused by management

3

Plaintiffs Exhibit B - 3

INCENTIVE SCHEDULE 1

| Level # | EXECUTION INCENTIVE ADVANCE Estimated Financial Payment Volume & Amount | | | VERIFIED INCENTIVE TRUE-UP Payment Card Volume and Amount | | | VERIFIED INCENTIVE TRUE-UP Non-Payment Card Volume and Amount | | | TOTAL INCENTIVE |
|---|---|---|---|---|---|---|---|---|---|---|
| | From | To | Amount | From | To | Amount | From | To | Amount | |
| 1 | $2,000,000 | $6,000,000 | $400 | $2,000,000 | $5,000,000 | $500 | $2,000,000 | $5,000,000 | $0 | $500 |
| 2 | $5,000,000 | $10,000,000 | $650 | $5,000,000 | $10,000,000 | $750 | $5,000,000 | $10,000,000 | $0 | $750 |
| 3 | $10,000,000 | $15,000,000 | $900 | $10,000,000 | $15,000,000 | $1,000 | $10,000,000 | $15,000,000 | $0 | $1,000 |
| 4 | $15,000,000 | $20,000,000 | $1,150 | $15,000,000 | $20,000,000 | $1,250 | $15,000,000 | $20,000,000 | $500 | $1,750 |
| 5 | $20,000,000 | $25,000,000 | $1,400 | $20,000,000 | $25,000,000 | $1,500 | $20,000,000 | $25,000,000 | $750 | $2,250 |
| 6 | $25,000,000 | $30,000,000 | $1,650 | $25,000,000 | $30,000,000 | $1,750 | $25,000,000 | $30,000,000 | $1,000 | $2,750 |
| 7 | $30,000,000 | $35,000,000 | $1,900 | $30,000,000 | $35,000,000 | $2,000 | $30,000,000 | $35,000,000 | $1,250 | $3,250 |
| 8 | $35,000,000 | $40,000,000 | $2,150 | $35,000,000 | $40,000,000 | $2,250 | $35,000,000 | $40,000,000 | $1,500 | $3,750 |
| 9 | $40,000,000 | $45,000,000 | $2,400 | $40,000,000 | $45,000,000 | $2,500 | $40,000,000 | $45,000,000 | $1,750 | $4,250 |
| 10 | $45,000,000 | $50,000,000 | $2,500 | $45,000,000 | $50,000,000 | $3,000 | $45,000,000 | $50,000,000 | $2,000 | $5,000 |
| 11 | $50,000,000 | $60,000,000 | n/a | $50,000,000 | $60,000,000 | $3,500 | $50,000,000 | $60,000,000 | $2,250 | $5,750 |
| 12 | $60,000,000 | $70,000,000 | n/a | $60,000,000 | $70,000,000 | $4,000 | $60,000,000 | $70,000,000 | $2,500 | $6,500 |
| 13 | $70,000,000 | $80,000,000 | n/a | $70,000,000 | $80,000,000 | $4,500 | $70,000,000 | $80,000,000 | $2,750 | $7,250 |
| 14 | $80,000,000 | $90,000,000 | n/a | $80,000,000 | $90,000,000 | $5,000 | $80,000,000 | $90,000,000 | $3,000 | $8,000 |
| 15 | $90,000,000 | $100,000,000 | n/a | $90,000,000 | $100,000,000 | $5,500 | $90,000,000 | $100,000,000 | $3,250 | $8,750 |
| 16 | $100,000,000 | $110,000,000 | n/a | $100,000,000 | $110,000,000 | $6,000 | $100,000,000 | $110,000,000 | $3,500 | $9,500 |
| 17 | $110,000,000 | $120,000,000 | n/a | $110,000,000 | $120,000,000 | $6,500 | $110,000,000 | $120,000,000 | $3,750 | $10,250 |
| 18 | $120,000,000 | $130,000,000 | n/a | $120,000,000 | $130,000,000 | $7,000 | $120,000,000 | $130,000,000 | $4,000 | $11,000 |
| 19 | $130,000,000 | $140,000,000 | n/a | $130,000,000 | $140,000,000 | $7,500 | $130,000,000 | $140,000,000 | $4,250 | $11,750 |
| 20 | $140,000,000 | $150,000,000 | n/a | $140,000,000 | $150,000,000 | $8,000 | $140,000,000 | $150,000,000 | $4,500 | $12,500 |
| 21 | $150,000,000 | $175,000,000 | n/a | $150,000,000 | $175,000,000 | $8,500 | $150,000,000 | $175,000,000 | $4,750 | $13,250 |
| 22 | $175,000,000 | $200,000,000 | n/a | $175,000,000 | $200,000,000 | $9,000 | $175,000,000 | $200,000,000 | $5,000 | $14,000 |
| 23 | $200,000,000 | $225,000,000 | n/a | $200,000,000 | $215,000,000 | $9,500 | $200,000,000 | $225,000,000 | $5,000 | $14,500 |
| 24 | $225,000,000 | $250,000,000 | n/a | $225,000,000 | $250,000,000 | $10,000 | $225,000,000 | $250,000,000 | $5,000 | $15,000 |
| 25 | $250,000,000 | $275,000,000 | n/a | $250,000,000 | $275,000,000 | $10,500 | $250,000,000 | $275,000,000 | $5,000 | $15,500 |
| 26 | $275,000,000 | $300,000,000 | n/a | $275,000,000 | $300,000,000 | $11,000 | $275,000,000 | $300,000,000 | $5,000 | $16,000 |
| 27 | $300,000,000 | $325,000,000 | n/a | $300,000,000 | $325,000,000 | $11,500 | $300,000,000 | $325,000,000 | $5,000 | $16,500 |
| 28 | $325,000,000 | $350,000,000 | n/a | $325,000,000 | $350,000,000 | $12,000 | $325,000,000 | $350,000,000 | $5,000 | $17,000 |
| 29 | $350,000,000 | $375,000,000 | n/a | $350,000,000 | $375,000,000 | $12,500 | $350,000,000 | $375,000,000 | $5,000 | $17,500 |
| 30 | $375,000,000 | $400,000,000 | n/a | $375,000,000 | $400,000,000 | $13,000 | $375,000,000 | $400,000,000 | $5,000 | $18,000 |
| 31 | $400,000,000 | $425,000,000 | n/a | $400,000,000 | $425,000,000 | $13,500 | $400,000,000 | $425,000,000 | $5,000 | $18,500 |
| 32 | $425,000,000 | $450,000,000 | n/a | $425,000,000 | $450,000,000 | $14,000 | $425,000,000 | $450,000,000 | $5,000 | $19,000 |
| 33 | $450,000,000 | $475,000,000 | n/a | $450,000,000 | $475,000,000 | $14,500 | $450,000,000 | $475,000,000 | $5,000 | $19,500 |
| 34 | $475,000,000 | $500,000,000 | n/a | $475,000,000 | $500,000,000 | $15,000 | $475,000,000 | $500,000,000 | $5,000 | $20,000 |
| 35 | $500,000,000 | And Higher | n/a | $500,000,000 | And Higher | $15,500 | $500,000,000 | And Higher | $5,000 | $20,500 |

Plaintiffs Exhibit B - 4

- Initial financial payment data and information not received within 30 days of client's initial integration call/meeting unless excused by management
- Ongoing monthly financial payment data and information ceases to be provided by Client
- The Client elects to terminate the PSA
- Client disputes any terms of the PSA and said dispute is not resolved without litigation or financial compromise on the part of Vizant
- Vizant initiates legal action against the Client

### 19. Adjustments to Incentives

The company retains the right to charge back or offset against future compensation of the employee any incentive that was paid to an employee based upon fraudulent, incorrect or erroneous information provided by the employee to Vizant. Chargebacks and offsets under this section may be deducted at the sole discretion of Vizant either from future incentives or the base compensation of the employee.

The PSA Execution Incentive is based on estimated financial payment volume provided by the Client to the Employee. After the initial analysis is complete, if it is determined that the financial payment volume is lower than was estimated at time of the PSA execution, and it would have resulted in the employee being eligible for a lower tier incentive, then the employee will be charged back for the difference based on the revised incentive tier.

### 20. Retained Management Rights

Vizant retains the sole right to change any and all elements of this Incentive Plan at any time, without notice, due to business requirements or business conditions.

### 21. Retention of Incentives upon Separation

Vizant reserves the right to retain all or a portion of an employee's incentives upon their separation from employment under any or all of the following circumstances: failure to return Vizant equipment in working condition in a timely manner, failure to account for expenses and provide receipts in a timely fashion, a negative PTO balance, financial amounts due to Vizant, and /or other actions or situations that Vizant deems unacceptable or damaging to Vizant.

I, _____, have read, understand and agree to the terms of this Business Development Incentive Plan.

Signed this _____ day of _____, 2014.

_____

Vizant Employee

4



# Exhibit

# C

*Confidential*

## NON-DISCLOSURE, NON-COMPETITION, NON-SOLICITATION, NON-DISPARAGEMENT, AND ASSIGNMENT AGREEMENT

This Non-Disclosure, Non-Competition, Non-Solicitation, Non-Disparagement, and Assignment Agreement (this "Agreement") is made and entered into as of _____, 20___ (the "Effective Date"), by and between Vizant Technologies, LLC, a Delaware limited liability company (the "Company"), and _____, an individual residing at _____ ("Employee"). The Company or Employee may be referred to herein individually as a "Party" or collectively as the "Parties."

### BACKGROUND

WHEREAS, the Company is engaged in the highly competitive business of providing certain advisory and consulting services in the area of inbound payments, treasury and banking services and outbound payments regarding efficiency and cost of payments and treasury, including a highly personalized and customized assessment, along with solutions to achieve efficiency and cost reduction for its customers;

WHEREAS, the Company desires to hire Employee and Employee desires to be employed by the Company in connection with these services under the terms of this Agreement;

WHEREAS, the Parties recognize and agree that in the performance of these services, and in discharging Employee's duties, Employee will acquire certain trade secrets, confidential information, and other information concerning customer or customer relationships of the Company; Employee further recognizes and agrees that considerable trade secret, private knowledge, financial information, payments information, treasury information, banking information, contract information, third party service provider information and know-how related to the business affairs, processes, methods, analytics, benchmarking, work product, information, relationships, cost structures, pricing, accounts, and dealings of the Company, are a valuable and proprietary right of the Company, and that the same are information and knowledge not generally known in the public domain, nor part of the skills which Employee will acquire during his/her employment with the Company; and

WHEREAS, the Parties agree that the Company will share its confidential information and trade secrets with Employee with the understanding and agreement that such confidential information and trade secrets will be solely and strictly used for its sole benefits and not in competition with or to the detriment of the Company, directly or indirectly, by Employee, or any of his/her agents, future employees, or future employers.

NOW, THEREFORE in consideration of the mutual promises herein set forth, and other good and valuable consideration the receipt of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1. Incorporation of Background. The introductory provisions set forth in the Background section above are incorporated into this Agreement.

2. Non-disclosure, Non-competition, Non-solicitation, Non-disparagement.

2.1 Non-Disclosure of Confidential Information.

2.1.1 Confidential Information. Employee acknowledges that the Company has a valuable property interest in all aspects of the Business (defined below) of the Company. Employee will, during the term of Employee's employment with the

Employee Initials _____

*Confidential*

Company (the "Service Term"). have access to and be working with Confidential Information (defined below). "Confidential Information" means any of the proprietary or confidential information, technical data, trade secrets or know-how of the Company, in any form or format, including but not limited to product information; financial information; internal procedures, processes, and operations; marketing information and strategy; information regarding existing and potential customers; information on suppliers and sources with which the Company does business, including affiliates of suppliers and sources; the Company's manner of operation, strategies and plans; software, including all source and object code, whether completed or in development; inventions, whether or not patented or patentable; discoveries; improvements; processes; and other proprietary and commercial information. However, "Confidential Information" does not include any of the foregoing items which is now, or in the future becomes, public knowledge through no act or omission of Employee or any other person with an obligation of confidentiality to the Company.

2.1.2 <u>Treatment of Confidential Information</u>. Employee acknowledges and agrees that all Confidential Information is confidential and/or constitutes trade secrets and is the sole and exclusive property of the Company. Employee also acknowledges that all Confidential Information is required to be maintained in confidence for the continued success of the Company and its Business. Therefore, Employee covenants and agrees that during the Service Term and anytime thereafter Employee will not disclose, divulge, copy, or otherwise use any Confidential Information other than as necessary in discharging his/her duties and for the exclusive benefit of the Company during the Service Term.

2.1.3 <u>Obligations at End of the Service Term</u>. At the end of the Service Term, Employee shall deliver to the Company the originals and copies, whether hard copies or electronic copies, of any and all Confidential Information that she/he had in her/his possession, custody, or control. Employee agrees to cooperate with Company in all procedures that Company may adopt to assure that no Confidential Information is retained on computers and/or other electronic storage media belonging to or used by Employee.

2.2 <u>Non-Competition</u>. During the Service Term and for a period of TWO (2) YEARS thereafter, Employee agrees that she/he shall not compete, directly or indirectly, or participate as a director, officer, employee, representative, or otherwise, or as a stockholder, partner or joint venture, or have any direct or indirect financial interest in any business or other entity which competes directly with the Business of the Company (including its subsidiaries and/or affiliates) within any geographical area in which the Business of the Company (including its subsidiaries and/or affiliates) is being conducted during the term of this Agreement.

2.3 <u>Non-Solicitation</u>. Employee agrees that during the Service Term and for a period of TWO (2) YEARS thereafter, Employee shall not for any reason, either directly or indirectly, on his or her own behalf or in the service or on behalf of others:

2.3.1 Solicit, recruit, or attempt to persuade any person to terminate employment with the Company; or

2.3.2 Solicit, or interfere in any manner with the Company's relationship with, any of its customers, vendors, suppliers, sources, licensors, licensees, agents, affiliates, or partners.

Employee Initials _____

Plaintiffs Exhibit C - 2

*Confidential*

2.4 Non-Disparagement. Employee agrees that during the Service Term and for anytime thereafter, Employee shall not publish or communicate disparaging or derogatory statements or opinions about the Company that may damage the Company's good-will.

2.5 Business. For the purposes of this Section 2, the term "Business" shall refer to the business of the Company as conducted by the Company (including any business for which the Company has devoted meaningful development activities) during the period from the Effective Date until the end of the Service Term.

2.6 Reasonableness of Restrictions. Employee has carefully read and considered the provisions of this Section 2 and, having done so, agrees that the restrictions set forth in such Section (including, but not limited to, the time period of restriction and the geographical areas of restriction set forth in this Section 2) are fair and reasonable and are reasonably required for the protection of the interests of the Company.

2.7 Notice to Future Employer. If, following termination or expiration of the Service Term, Employee accepts employment or affiliates with, or is appointed or elected as a director of, or enters into a business relationship with a business that competes with the Company, Employee shall obtain from the business a written acknowledgment by the business of its notification of the terms of this Agreement. In addition, Employee agrees that the Company may contact such business for the purpose of ensuring compliance with the provisions of this Section 2.

2.8 Valuable Consideration. In consideration of Employee's execution of this Agreement and agreeing to the restrictive covenants set forth in this Section 2, the Company agrees to and does hereby hire Employee as set forth in this Agreement and Employee shall continue his/her employment during the Service Term as an at-will employee of the Company and shall receive future wages and benefits, payment of which during the Service Term is a condition of this Agreement. Employee acknowledges the receipt and sufficiency of this consideration.

3. Inventions.

3.1 Duty to Disclose. Employee will promptly disclose in writing to the Company all discoveries, developments, designs, improvements, inventions, formulae, processes, techniques, programs, know-how, data or other information of possible technical or commercial importance, whether or not patentable or registrable under patent, copyright or similar statutes, made, conceived, reduced to practice or learned by Employee, either alone or jointly with others, during the Service Term or during the period of ONE (1) YEAR following the termination of the Service Term, that are related to (x) activities or business or proposed activities or business of the Company, (y) any work the Employee may do for the Company, or (z) any Confidential Information, whether or not discovered, made, conceived, reduced to practice or learned during ordinary business hours or otherwise and whether on the Company's premises or elsewhere (all such discoveries, developments, designs, improvements, inventions formulae, processes, techniques, programs, know-how, data and other information are hereinafter referred to as "Inventions"). In the event that any Invention is described in a patent application or is disclosed to third parties by the Employee, directly or indirectly, within one year after termination of Employee's employment with the Company, it is to be conclusively presumed that the Invention was conceived or made during the Service Term. The Employee also agrees that the Company shall be entitled to similar rights with respect to any Invention conceived or made

Employee Initials _____

*Confidential*

by the Employee during the Service Term, even if not related in any manner to any business or proposed business of the Company, if it was conceived or made on the Company's time or with the use of the Company's personnel, facilities or materials.

3.2 <u>Assignment of Rights; Duty to Assist; Power of Attorney</u>. Employee hereby assigns to the Company any rights Employee may have or acquire in such Inventions and agrees that all such Inventions, including all patents, copyrights and other rights connected thereto, shall be the sole property of the Company and its assigns. At the request and expense of the Company, Employee agrees to assist the Company in every proper way to obtain and from time to time to enforce patents, copyrights and other rights and protections relating to such Inventions in any and all countries, and to that end Employee will execute all documents for use in applying for and obtaining such patents, copyrights and other rights and protections on and enforcing such Inventions, as the Company deems necessary or desirable, together with any assignments thereof to the Company or persons designated by it. Employee's obligation to assist the Company in obtaining and enforcing patents, copyrights and other rights and protections relating to such Inventions in any and all countries shall survive and continue beyond the termination of the Service Term, but the Company shall compensate Employee at a reasonable rate after Employee's termination or expiration of the Service Term for time actually spent by Employee rendering such assistance at the Company's request. In the event the Company is unable, after reasonable effort, to secure Employee's signature on any document or documents needed to apply for or prosecute any patent, copyright or other right or protection relating to any Invention because of Employee's physical or mental incapacity, Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney in fact, to act for and in Employee's behalf and stead to execute and file any such applications or documents and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights or similar protections thereon with the same legal force and effect as if executed by Employee. Employee expressly acknowledges, stipulates and agrees that the foregoing power of attorney is coupled with an interest and is, therefore, irrevocable and shall survive the death or incompetence of Employee.

3.3 <u>Rights in Works</u>. The Employee agrees that any copyrightable work of authorship, including without limitation any technical description for products, user guides, illustrations, advertising materials, computer programs, forms and other materials, regardless of the media on which placed, and any contributions to such materials (collectively, "Works") created by or under the supervision of the Employee, and whether alone or with others the Employee during the period of the Employee's employment with the Company, and in the course of the Employee's duties to the Company, shall belong solely and exclusively to the Company and shall be considered as a "work for hire" under the provisions of Section 101 and 201 of the United States Copyright Law, Title 17 of the United States Code. To the extent that the provisions of such law do not fully vest in the Company all rights, title and interest in and to such Works, including the right to obtain a copyright therein, the Employee hereby assigns such rights, title and interest therein to the Company and agrees to assist the Company (but without expense to the Employee) in obtaining, perfecting and fully protecting the same for the sole benefit of the Company, irrespective of whether a request for any such assistance occurs during or subsequent to the Employee's employment with the Company.

Employee Initials _____

*Confidential*

4.    Injunctive Relief. Employee agrees that Employee's failure to perform any of Employee's covenants in Section 2 of this Agreement would cause irreparable injury to the Company and it would be impossible or inadequate to measure and calculate the Company's damages from any breach of the covenants set forth in this Agreement. Accordingly, Employee agrees that if it breaches any of such covenants, the Company will have available, in addition to any other right or remedy available, the right to obtain an injunction from a court of competent jurisdiction restraining such breach or threatened breach and to specific performance of any such provision of this Agreement. Employee further agrees that no bond or other security shall be required in obtaining such equitable relief and each Party hereby consents to the issuance of such injunction and to the ordering of specific performance.

5.    No Defense for Employee Breach of this Agreement. Employee acknowledges that the existence of any claims or causes of action of Employee against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to enforcement by the Company of the covenants, restrictions, and terms of this Agreement.

6.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided, however, Employee may not assign any rights or delegate any duties hereunder without the prior written consent of the Company. Any attempted assignment by Employee without first obtaining the prior written consent of the Company shall be null and void.

7.    Unenforceable Provisions. If any provision of this Agreement shall be held invalid or unenforceable, in whole or in part, such provision shall be deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

8.    Waiver of Breach. No term or provision hereof will be considered waived by either Party, and no breach consented to by either Party, unless such waiver or consent is in writing signed on behalf of the Party against whom the waiver or consent is asserted. No consent to or waiver of a breach by either Party, whether express or implied, will constitute a consent to, waiver of, or excuse for any other, different, or subsequent breach by such Party.

9.    Governing Law; Jurisdiction. This Agreement and the rights and obligations of the Parties shall be governed by the internal laws of the Commonwealth of Pennsylvania without regard to its rules concerning conflict of laws. The venue for any proceedings brought to resolve any dispute arising from either this Agreement or any other matters between the Parties shall exclusively be the federal court located in Philadelphia County, Pennsylvania or the state court located in Delaware County, Pennsylvania, and the Parties irrevocably agree to submit themselves to the jurisdiction of the federal court located in Philadelphia County or the state court located in Delaware County, Pennsylvania.

10.   At Will Employment. This Agreement is not a contract of employment and does not give the Employee any right to employment for any specific period of time. The Parties agree that Employee is an at-will employee and either Party may terminate this Agreement at any time with or without notice.

Employee Initials _____

*Confidential*

11.   <u>Recovery of Expenses</u>.   In the event the Company files suit to enforce the covenants or other provisions contained this Agreement against Employee, the Company shall be entitled to recover from Employee, in addition to all other damages provided under law and equity, the expenses incurred in prosecuting the suit, including reasonable attorneys' fees.

12.   <u>Amendment or Modification</u>.   No amendment, modification or supplement of any provision of this Agreement will be valid or effective unless made in writing and signed by the Parties.  Any change or modification made directly on this Agreement in whole or in part shall be ineffective unless such change or modification is acknowledged and signed by the Party against whom enforcement of the change or modification is sought.

13.   <u>Counterparts</u>.   This Agreement may be executed in counterparts each of which shall be an original and all of which shall, taken together, constitute one in the same instrument.

14.   <u>Headings</u>.   The headings in this Agreement are for reference only and shall not deemed to alter or affect any provision hereof.

15.   <u>Entire Agreement</u>.   The Parties agree that this Agreement constitutes the entire agreement between the Parties as to the subject matter herein and supersedes all prior written or oral and all contemporaneous oral agreements (whether expressed or implied), understandings, and negotiations between the Parties with respect to the subject matter hereof.

IN WITNESS HEREOF, the Parties have read and agree to be legally bound by the above terms and conditions and have entered into this Agreement effective as of the Effective Date.

**VIZANT TECHNOLOGIES, LLC**       **EMPLOYEE**

By: _____          _____

Title: _____     Print Name: _____

Date: _____     Date: _____

Employee Initials _____

Barbieri & Associates     Attorney for Plaintiff
Pietro A. Barbieri, Esquire
Attorney I.D. No. 28162
657 Exton Commons
Exton, PA 19341
P: (610) 280-7078
F: (484) 252-2575
E: peterlaw@pacivillaw.com

---

GREGORY M. PARENTICE,   : IN THE COURT OF COMMON PLEAS
114 Magnolia Drive      : OF DELAWARE COUNTY, PENNSYLVANIA
Chester Springs, PA 19425    :
            : CIVIL ACTION - LAW
    Plaintiff,      :
            : No.
   v.         :
            :
VIZANT TECHNOLOGIES, LLC,  : Jury Trial Demanded
Brandywine Two Building    :
5 Christy Drive, Suite 202    :
Chadds Ford, PA 19317     :
            :
    Defendant.     :

---

## **ENTRY OF APPEARANCE**

Kindly enter my appearance for the Plaintiff, Gregory M. Parentice, in the above-captioned matter.

DATE: 7/1/15

            Pietro A. Barbieri, Esquire

# Exhibit B

**Julie Whitchurch**

| | |
|---|---|
| **From:** | Michael Hobbs |
| **Sent:** | Tuesday, July 16, 2013 6:48 AM |
| **To:** | Julie Whitchurch |
| **Subject:** | Payroll |

*[handwritten: day After still / PAYDAY / no deposit]*

J

I don't have a payroll deposit in my bank account.   Do you?

This is not good....


**Michael Hobbs**
*Director of National Accounts*
**Vizant Technologies / www.vizant.com**
Mobile: 214.701.0241
Fax: 866-343-1226
mhobbs@vizant.com

*[handwritten: D0218]*

**Julie Whitchurch**

**From:** Julie Whitchurch
**Sent:** Tuesday, July 16, 2013 7:06 AM
**To:** David Jablonski
**Subject:** FW: Commissions

David,

Is this an isolate issue?

*No response from Dave*

-----Original Message-----
From: Aeron Sharp
Sent: Tuesday, July 16, 2013 6:58 AM
To: Julie Whitchurch
Subject: Commissions

Good morning,

I hate to start the day off like this, but I did not get my commissions. I did get regular pay.
Thanks!

Sent from My Mobile Device
Aeron Sharp
Regional Business Development Manager
Vizant Technologies
704.942.6783

D0219

## Julie Whitchurch

**From:** Julie Whitchurch
**Sent:** Tuesday, July 16, 2013 7:12 AM
**To:** David Jablonski
**Subject:** It's not isolated

I'm hearing from the BDMS.  Please advise on commission payments. J

**Julie Whitchurch**
*National Director of Business Development*
**Vizant Technologies | www.vizant.com**
Mobile | 470.214.1016
Fax | 888.748.2713
jwhitchurch@vizant.com

*no response from Dave*

DO 220

## Julie Whitchurch

**From:** Julie Whitchurch
**Sent:** Tuesday, July 16, 2013 10:42 AM
**To:** Joseph Bizzarro
**Subject:** Commissions

Joe, can you pls ask Dave to update Directors on commission payments. Michael and I are fielding calls from the BDMs, they've received regular pay but many did not receive commissions/ISP.  We just need to know what the company line is. J

Sent from My Mobile Device
Julie Whitchurch
National Director
Business Development
Vizant Technologies
470.214.1016

D0221

**Julie Whitchurch**

| | |
|---|---|
| **From:** | Shawna Kurimura |
| **Sent:** | Tuesday, August 13, 2013 7:46 PM |
| **To:** | Vizant |
| **Subject:** | Payroll Notification |

**Importance:** High

*LIE*

Team,

*ADP*

Unfortunately, we again had an issue with our processor for the 8/15 payroll, specifically with multiple dates on the direct deposit file that the bank received.
As a result of this error, a small number of people would receive their direct deposit as usual, while the remainder was scheduled for a later direct deposit date.

Rather than being late, a decision was made to cut checks to the people affected.

It is important to Vizant that everyone be paid on time, so we are express mailing checks so everyone affected by this error will have a check in hand on pay day.

We are working with our payroll company to try to avoid future mishaps. We apologize for the inconvenience.

Thank you,

**Shawna Kurimura**
*Director of Administration & Human Resources*
**Vizant Technologies | www.vizant.com**
Office | 509.828.4381
Mobile | 509.863.5547
Fax | 866.665.7403
skurimura@vizant.com

*It is clearly NOT important. And the more we "now important it is" SAY the bigger liars we become.*

D0222

**From:** David Jablonski
**Sent:** Friday, July 12, 2013 6:12 PM
**To:** Vizant
**Subject:** ADP processing error on 7/15 payroll

On Wednesday we submitted payroll to ADP as usual, and on time. Although we waited until after 10:30PM PST to receive our file back, we received instead a series of processing errors.
Due to the late hour, we were unable to reach support until Thursday morning  to rectify the issues. Unfortunately this delay in processing resulted in our payroll day being pushed back one day until the 16th.
I apologize for the inconvenience.


**David Jablonski**
*Chief Financial Officer*
**Vizant Technologies | www.vizant.com**
Mobile | 610-357-4816
Office | 610-358-3244
Fax | 866.526-5001
djablonski@vizant.com

**Julie Whitchurch**

**From:**        Julie Whitchurch
**Sent:**        Thursday, August 15, 2013 3:40 PM
**To:**          Anita Williams
**Subject:**     Fwd: Paychecks

Anita, can you pls answer the below questions? Thank you. J

Sent from My Mobile Device
Julie Whitchurch
National Director
Business Development
Vizant Technologies
470.214.1016

Begin forwarded message:

> **From:** David Jablonski <djablonski@Vizant.com>
> **Date:** August 15, 2013, 3:35:22 PM EDT
> **To:** Julie Whitchurch <jwhitchurch@Vizant.com>
> **Subject: RE: Paychecks**
>
> Speak to Anita
>
> David Jablonski
> Chief Financial Officer
> Vizant Technologies | www.vizant.com
> Mobile | 610-357-4816
> Office | 610-358-3244
> Fax | 866.526-5001
> djablonski@vizant.com
>
> -----Original Message-----
> From: Julie Whitchurch
> Sent: Thursday, August 15, 2013 3:24 PM
> To: David Jablonski
> Subject: Paychecks
>
> Dave, getting a couple of calls from BDMs  stating paychecks haven't arrived. Can you give me
> an ETA or delivery method? Reg mail, express? All scheduled for delivery today yes?
>
> Sent from My Mobile Device
> Julie Whitchurch
> National Director
> Business Development
> Vizant Technologies
> 470.214.1016

D0224

## Julie Whitchurch

**From:**      Julie Whitchurch
**Sent:**      Thursday, August 15, 2013 5:54 PM
**To:**        Anita Williams
**Subject:**   Paychecks

I've still got folks that haven't received. Any words of wisdom? J

Sent from My Mobile Device
Julie Whitchurch
National Director
Business Development
Vizant Technologies
470.214.1016

D00225

## Julie Whitchurch

**From:**      Julie Whitchurch
**Sent:**      Thursday, August 15, 2013 6:03 PM
**To:**        David Jablonski
**Subject:**   ISP Commissions

Dave, we're getting hammered by calls/emails from the BDMS. I've got a couple that haven't received checks yet. But I understand from Anita that theses are all scheduled to be delivered by end of day.

What's the company line on ISP commissions?

Sent from My Mobile Device
Julie Whitchurch
National Director
Business Development
Vizant Technologies
470.214.1016

D00226

## Julie Whitchurch

**From:** Julie Whitchurch
**Sent:** Thursday, August 15, 2013 6:05 PM
**To:** Anita Williams
**Subject:** What can u

Tell me about ISP commissions?

Sent from My Mobile Device
Julie Whitchurch
National Director
Business Development
Vizant Technologies
470.214.1016

D0227

**From:** Shawna Kurimura
**Sent:** Thursday, August 29, 2013 12:09 PM
**To:** Vizant
**Subject:** August 30 Payroll
**Importance:** High

Good Morning Team,

All employee paychecks were submitted on time and will be made via direct deposit as scheduled on Friday, August 30th. However, commission calculations were not approved by management prior to our payroll processor's submission deadline. However, Commission Checks were approved by our CEO on Wednesday and will be sent to employees via FedEx overnight so that they are in your hands on Friday (tomorrow).

Thank you,

**Shawna Kurimura**
*Director of Administration & Human Resources*
**Vizant Technologies | www.vizant.com**
Office | 509.828.4381
Mobile | 509.863.5547
Fax | 866.665.7403
skurimura@vizant.com

*Does Joe not know that the 15th & 30th are on the 15th & 30th of every f***ing month.*

**Julie Whitchurch**

| | |
|---|---|
| **From:** | Steven Barnes |
| **Sent:** | Tuesday, September 10, 2013 1:10 PM |
| **To:** | Julie Whitchurch |
| **Subject:** | Fwd: Christa and commissions |

What is this about do you know

**Steven Barnes**
*Director of Business Development*
**Vizant Technologies |www.vizant.com**
Mobile | 509-951-2085
Office | 509-828-4390
Fax | 888-466-1069
sbarnes@vizant.com

Begin forwarded message:

**From:** Joseph Bizzarro <jbizzarro@Vizant.com>
**Date:** September 10, 2013, 9:56:18 AM PDT
**To:** Julie Whitchurch <jwhitchurch@Vizant.com>, Michael Hobbs <mhobbs@Vizant.com>, Steven Barnes <sbarnes@Vizant.com>
**Cc:** Kimberly Dallin <kdallin@Vizant.com>, Shawna Kurimura <skurimura@Vizant.com>
**Subject: Christa and commissions**

We will pay her for all ISP though this week. Dave shared the email with me.

Also, I noted that she mentioned me in that email. Seriously? My Patience is wearing thin

All ISP commissions through Friday August 16th will be paid this week...

I expect each of you to properly balance your role as both employe and manager.

Joe    *Yes Seriously, your employees distrust you*

Sent from my iPad mini
Excuse any typos
Joseph N Bizzarro
Chief Executive Officer
Jbizzarro@vizant.com
484-319-5255

D0229

**Please send me back your ISP report verifications by noon on Monday.** I do not send ISP's to payroll until I have EVERYONES report's verified. Let's not hold up the teams.

**Sandi Olsen**
*Manager, Client Research and Development*
**Vizant Technologies | www.vizant.com**
Office | 509-414-5063

**David Jablonski**
*Chief Financial Officer*
**Vizant Technologies | www.vizant.com**
Mobile | 610-357-4816
Office | 610-358-3244
Fax | 866.526-5001
djablonski@vizant.com

**From:** Julie Whitchurch
**Sent:** Tuesday, September 10, 2013 8:34 AM
**To:** Shawna Kurimura; David Jablonski
**Subject:** FW:

Good morning Dave,

I had a conf call with my team yesterday and delivered the message that ISP commissions would be paid 30 days in the rear as opposed to 2 weeks in the rears.  Commissions earned the first 2 weeks of the month will be paid on the 15th of the following month & commissions earned the last 2 weeks of the month will be paid on the 30th of the following month.

As you can see from the below email this is going to cause a financial hardship for Christa.  Is it possible to do a "one off" and bring her current on her commissions owed?  Then moving forward she would be paid 30 days in the rear under the above schedule.

Let me know your thoughts. J

**From:** Christa Ansley
**Sent:** Tuesday, September 10, 2013 8:10 AM
**To:** Julie Whitchurch
**Subject:**

Good morning Julie,

I am so struggling over the commissions. Julie, I was put in the hole when I only received payment for one ISP versus the four ISP's I was supposed to be paid.  I was paid $300.00 instead of $1,200.00 for ISP's and not even given a warning. Now I am to be paid $1,800.00 for ISP's on the 15th and will only be paid $900.00.  Half of what I am supposed to be paid.  I just don't know what to do.  I have two other people depending on me and my one child is battling Cancer.  I know that every one of us has a story and that it is not only me, but I have somehow got to be paid what I am supposed to be paid and when the Company said I would.  Is there any possible way for this to happen??

D0230

If not, who would I talk to about immediately canceling my Health Insurance and stopping my 401K so it is not taken out of my check? Julie, I worked hard to get those seven ISP's. I just do not understand Joe's thinking.

Thank you very much,

**Christa Ansley**
*Business Development Manager*
**Vizant Technologies | www.vizant.com**
Mobile | 614-634-6576
cansley@vizant.com

<Copy of Ansley ISPs 8-4_8-17.xlsx>

# Exhibit C

## Julie Whitchurch

| | |
|---|---|
| **From:** | Julie Whitchurch |
| **Sent:** | Tuesday, August 06, 2013 5:53 PM |
| **To:** | Kevin Keeler |
| **Subject:** | RE: Insurance |

Kevin, I sounded the alarm and just got off the phone with Joe. He has assured me that there is not an issue, we have an external company that manages our benefits. Shawna is contacting them now to find out what is going on. I will keep you updated. J

**From:** Kevin Keeler
**Sent:** Tuesday, August 06, 2013 5:05 PM
**To:** Julie Whitchurch
**Subject:** Insurance

Hi Julie,

Christa called me asking if our Group Insurance was cancelled because that's what they told her when she went to buy her prescriptions.

Have you heard anything about this?

**Kevin Keeler**
*Regional Manager of Business Development*
**Vizant Technologies | www.vizant.com**
Mobile | 219-688-2876
Fax | 866.859.8100
kkeeler@vizant.com

ID# 2014-0103815-CV
Page 157



## Julie Whitchurch

**From:**        Steven Barnes
**Sent:**        Saturday, August 10, 2013 9:07 PM
**To:**          Julie Whitchurch; Michael Hobbs
**Subject:**     Fwd: Help now please

This is what I sent to Shawna today...

I will let the two if you know if she reply's

**Steven Barnes**
*Director of Business Development*
**Vizant Technologies |www.vizant.com**
Mobile | 509-951-2085
Office | 509-828-4390
Fax | 888-466-1069
sbarnes@vizant.com

Begin forwarded message:

> **From:** <sbarnes@Vizant.com>
> **Date:** August 10, 2013, 6:03:37 PM PDT
> **To:** Shawna Kurimura <skurimura@Vizant.com>
> **Subject: Help now please**
>
> They are already emailing and calling
>
> The letters are arriving at our homes.
>
> Do we currently have health insurance?
>
> It says it ended on 7/1
>
> Simple yes/ no will be the best answer here.
>
> And what is the plan.
>
> I know your on PTO...
>
> **Steven Barnes**
> *Director of Business Development*
> **Vizant Technologies |www.vizant.com**
> Mobile | 509-951-2085
> Office | 509-828-4390

ID# 2014-0103815-CV Page 156



ID# 2014-0103815-CV
Page 42

## Julie Whitchurch

| | |
|---|---|
| **From:** | Shawna Kurimura |
| **Sent:** | Monday, August 12, 2013 6:51 PM |
| **To:** | Vizant |
| **Subject:** | United Healthcare |

**Importance:** High

Good Afternoon Team,

We received notification that a cancellation of coverage letter was sent out to employees from United Healthcare to anyone currently enrolled in this plan. This letter was sent out in error by United Healthcare, please disregard it. Everyone that is currently enrolled in the plan is still covered and will not have any lapse in coverage.

We apologize for the inconvenience that this may have caused, please contact me if you have any questions or concerns.

**Shawna Kurimura**
*Director of Administration & Human Resources*
**Vizant Technologies | www.vizant.com**
Office | 509.828.4381
Mobile | 509.863.5547
Fax | 866.665.7403
skurimura@vizant.com

1

D1187

# Exhibit D

VIZANT TECHNOLOGIES, LLC
5 Christy drive ste 202
chadds ford PA 19317
509-342-2411

2013217-5342206-1014-01

 UnitedHealthcare



August 5, 2013

JULIE P. WHITCHURCH
424 SYCAMORE TRAIL
WOODSTOCK GA  30189

### Certification of Prior Creditable Coverage



The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") requires health plans to provide former participants and beneficiaries with a Certificate of Prior Creditable Coverage ("Certification"). If you become eligible under a new health plan that excludes coverage for preexisting medical conditions, you may need to furnish this Certification to reduce the preexisting condition exclusion period. You also may need to provide this Certification if medical advice, diagnosis, care or treatment (including treatment with prescription drugs) was recommended or received for the condition within the six-month period prior to your enrollment in the new plan. The maximum preexisting condition exclusion permitted under HIPAA is 12 months after your enrollment date, or 18 months if you are a late enrollee; therefore, the maximum period of continuous coverage that needs to be certified is 18 months.

This certification describes periods of health coverage administered by UnitedHealthcare Insurance Company and/or its affiliated companies, that provide insurance or HMO coverage.

You are receiving this certificate due to:
- Termination of coverage provided by UnitedHealthcare and/or its affiliated companies; or
- Your change from one of the company's benefit package/option to another.

**If you become covered under a new health plan, check with the health plan, plan administrator or employer to see if you need to provide this Certification. We recommend that you attach this Certification to your former plan policy and provide both documents to your new health plan, plan administrator or employer.**

**IMPORTANT - KEEP THIS CERTIFICATE.** This certificate is evidence of your coverage under your former plan. Under HIPAA, you may need evidence of your coverage to reduce a preexisting condition exclusion period under another plan, to help you get special enrollment in another plan, or to get certain types of individual health coverage even if you have health problems.

If you have any questions about why you are receiving this certificate or believe any information contained within this form is not accurate, please contact Customer service at 1-800-357-0978 .

PRIMEFEDLE

5342FEDL
Rev 07/21/08
130701

2013217-534228E-1014-02



### Statement of HIPAA Portability Rights

**Preexisting condition exclusions.** Some group health plans restrict coverage for medical conditions present before an individual's enrollment. These restrictions are known as "preexisting condition exclusions." A preexisting condition exclusion can apply only to conditions for which medical advice, diagnosis, care, or treatment was recommended or received within the 6 months before your "enrollment date." Your enrollment date is your first day of coverage under the plan, or, if there is a waiting period, the first day of your waiting period (typically, your first day of work). In addition, a preexisting condition exclusion cannot last for more than 12 months after your enrollment date (18 months if you are a late enrollee). Finally, a preexisting condition exclusion cannot apply to pregnancy and cannot apply to a child who is enrolled in health coverage within 30 days after birth, adoption, or placement for adoption, unless the child subsequently has a break in coverage 63 days or more.

If a plan imposes a preexisting condition exclusion, the length of the exclusion must be reduced by the amount of your prior creditable coverage. Most health coverage is creditable coverage, including group health coverage, COBRA continuation coverage, coverage under an individual health policy, Medicare, Medicaid, State Children's Health Insurance Program (SCHIP), and coverage through high-risk pools and the Peace Corps. Not all forms of creditable coverage are required to provide certificates like this one. If you do not receive a certificate of past coverage, talk to your new plan administrator.

You can add up any creditable coverage you have, including the coverage shown on this certificate. However, if at any time you went for 63 days or more without any coverage (called a break in coverage) a plan may not have to count the coverage you had before the break.

> Therefore, once your coverage ends, you should try to obtain alternative coverage as soon as possible to avoid a 63-day break. You may use this certificate as evidence of your creditable coverage to reduce the length of any preexisting condition exclusion if you enroll in another plan.

**Right to get special enrollment in another plan.** Under HIPAA, if you lose your health plan coverage, you may be able to get into a group health plan for which you are eligible (such as a spouse's plan), even if the plan generally does not accept late enrollees, if you request enrollment within 30 days. (Additional special enrollment rights are triggered by marriage, birth, adoption, and placement for adoption.)

> Therefore, once your coverage ends, if you are eligible for coverage in another plan (such as a spouse's plan), you should request special enrollment as soon as possible.

**Prohibition against discrimination based on a health factor.** Under HIPAA, a group health plan may not keep you (or your dependents) out of the plan based on anything related to your health. Also, a group health plan may not charge you (or your dependents) more for coverage, based on health, than the amount charged a similarly situated individual.

**Right to individual health coverage.** Under HIPAA, if you are an "eligible individual," you have a right to buy certain individual health policies (or in some states, to buy coverage through a high-risk pool) without a preexisting condition exclusion. To be an eligible individual, you must meet the following requirements.

- You have had coverage for at least 18 months without a break in coverage of 63 days or more;
- Your most recent coverage was under a group health plan;
- Your group coverage was not terminated because of fraud or nonpayment of premiums;
- You are not eligible for COBRA continuation coverage or you have exhausted your COBRA benefits (or continuation coverage under a similar state provision); and,
- You are not eligible for another group health plan, Medicare, or Medicaid, and do not have any other health insurance coverage.

The right to buy individual coverage is the same whether you are laid off, fired, or quit your job.

# Exhibit E

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
### FORM D

### Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Expires: | August 31, 2015 |
| Estimated average burden hours per response: | 4.00 |

---

### 1. Issuer's Identity

CIK (Filer ID Number)

Previous Names  [X] None

Entity Type

0001585791

Name of Issuer

PE Systems Preferred, L.P.

Jurisdiction of Incorporation/Organization

PENNSYLVANIA

Year of Incorporation/Organization

[ ] Corporation
[X] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2013
[ ] Yet to Be Formed

---

### 2. Principal Place of Business and Contact Information

Name of Issuer

PE Systems Preferred, L.P.

Street Address 1

C/O CAPITAL SOLUTIONS, INC.

Street Address 2

910 HARVEST DRIVE, SUITE 105

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| BLUE BELL | PENNSYLVANIA | 19422 | 215-540-0505 |

---

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| PE Systems General II, L.P. | N/A | |
| Street Address 1 | Street Address 2 | |
| c/o Capital Solutions, Inc. | 910 Harvest Drive, Suite 105 | |
| City | State/Province/Country | ZIP/PostalCode |
| Blue Bell | PENNSYLVANIA | 19422 |

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

*D2754*

Clarification of Response (if Necessary):

General Partner of the Issuer

| Last Name | First Name | Middle Name |
|---|---|---|
| PE Class A General, LLC | N/A | |
| Street Address 1 | Street Address 2 | |
| c/o Capital Solutions, Inc. | 910 Harvest Drive, Suite 105 | |
| City | State/Province/Country | ZIP/PostalCode |
| Blue Bell | PENNSYLVANIA | 19422 |

Relationship: ☐ Executive Officer ☒ Director ☐ Promoter

Clarification of Response (if Necessary):

General Partner of PE Systems General II, L.P., General Partner of the Issuer

| Last Name | First Name | Middle Name |
|---|---|---|
| Seidman | Frank | |
| Street Address 1 | Street Address 2 | |
| c/o Capital Solutions, Inc. | 910 Harvest Drive, Suite 105 | |
| City | State/Province/Country | ZIP/PostalCode |
| Blue Bell | PENNSYLVANIA | 19422 |

Relationship: ☐ Executive Officer ☒ Director ☐ Promoter

Clarification of Response (if Necessary):

Member and Manager of PE Class A General, LLC

| Last Name | First Name | Middle Name |
|---|---|---|
| Bransfield | Kyle | |
| Street Address 1 | Street Address 2 | |
| c/o Capital Solutions, Inc. | 910 Harvest Drive, Suite 105 | |
| City | State/Province/Country | ZIP/PostalCode |
| Blue Bell | PENNSYLVANIA | 19422 |

Relationship: ☐ Executive Officer ☒ Director ☐ Promoter

Clarification of Response (if Necessary):

Member of PE Class A General, LLC

| Last Name | First Name | Middle Name |
|---|---|---|
| Wiggers | Lane | |
| Street Address 1 | Street Address 2 | |
| c/o Capital Solutions, Inc. | 910 Harvest Drive, Suite 105 | |
| City | State/Province/Country | ZIP/PostalCode |
| Blue Bell | PENNSYLVANIA | 19422 |

Relationship: ☐ Executive Officer ☒ Director ☐ Promoter

Clarification of Response (if Necessary):

D2755

Member of PE Class A General, LLC

## 4. Industry Group

| Agriculture | Health Care | ☐ Retailing |

☐ Agriculture

Banking & Financial Services

☐ Commercial Banking

☐ Insurance

☒ Investing

☐ Investment Banking

☐ Pooled Investment Fund

Is the issuer registered as an investment company under the Investment Company Act of 1940?

☐ Yes      ☐ No

☐ Other Banking & Financial Services

☐ Business Services

Energy

☐ Coal Mining

☐ Electric Utilities

☐ Energy Conservation

☐ Environmental Services

☐ Oil & Gas

☐ Other Energy

Health Care

☐ Biotechnology

☐ Health Insurance

☐ Hospitals & Physicians

☐ Pharmaceuticals

☐ Other Health Care

☐ Manufacturing

Real Estate

☐ Commercial

☐ Construction

☐ REITS & Finance

☐ Residential

☐ Other Real Estate

☐ Retailing

☐ Restaurants

Technology

☐ Computers

☐ Telecommunications

☐ Other Technology

Travel

☐ Airlines & Airports

☐ Lodging & Conventions

☐ Tourism & Travel Services

☐ Other Travel

☐ Other

## 5. Issuer Size

| Revenue Range                OR | Aggregate Net Asset Value Range |
|---|---|
| ☐ No Revenues | ☐ No Aggregate Net Asset Value |
| ☐ $1 - $1,000,000 | ☐ $1 - $5,000,000 |
| ☐ $1,000,001 - $5,000,000 | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | ☐ Over $100,000,000 |
| ☒ Decline to Disclose | ☐ Decline to Disclose |
| ☐ Not Applicable | ☐ Not Applicable |

D 2756

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

[ ] Rule 504(b)(1) (not (i), (ii) or (iii))      [ ] Rule 505

[ ] Rule 504 (b)(1)(i)                           [X] Rule 506

[ ] Rule 504 (b)(1)(ii)                          [ ] Securities Act Section 4(5)

[ ] Rule 504 (b)(1)(iii)                         [ ] Investment Company Act Section 3(c)

| | |
|---|---|
| [ ] Section 3(c)(1) | [ ] Section 3(c)(9) |
| [ ] Section 3(c)(2) | [ ] Section 3(c)(10) |
| [ ] Section 3(c)(3) | [ ] Section 3(c)(11) |
| [ ] Section 3(c)(4) | [ ] Section 3(c)(12) |
| [ ] Section 3(c)(5) | [ ] Section 3(c)(13) |
| [ ] Section 3(c)(6) | [ ] Section 3(c)(14) |
| [ ] Section 3(c)(7) | |

## 7. Type of Filing

[X] New Notice   Date of First Sale 2013-09-03   [ ] First Sale Yet to Occur

[ ] Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?   [ ] Yes [X] No

## 9. Type(s) of Securities Offered (select all that apply)

[X] Equity                                                      [ ] Pooled Investment Fund Interests

[ ] Debt                                                        [ ] Tenant-in-Common Securities

[ ] Option, Warrant or Other Right to Acquire Another Security  [ ] Mineral Property Securities

[ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security  [ ] Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?   [ ] Yes [X] No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $10,000 USD

## 12. Sales Compensation

—

D 2757

| Recipient | Recipient CRD Number [X] None |
|---|---|
| (Associated) Broker or Dealer [X] None | (Associated) Broker or Dealer CRD Number [X] None |
| Street Address 1 | Street Address 2 |
| City | State/Province/Country | ZIP/Postal Code |

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States

All States

☐ Foreign/non-US

## 13. Offering and Sales Amounts

Total Offering Amount    $1,075,000 USD   or ☐ Indefinite

Total Amount Sold    $1,075,000 USD

Total Remaining to be Sold    $0 USD   or ☐ Indefinite

Clarification of Response (if Necessary):

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:    [13]

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD ☐ Estimate

Finders' Fees $0 USD ☐ Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$50,000 USD [X] Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

D2758

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against it in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Rule 505 exemption, the issuer is not disqualified from relying on Rule 505 for one of the reasons stated in Rule 505(b)(2)(iii).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|--------|-----------|----------------|-------|------|
| PE Systems Preferred, L.P. | Frank Seidman | Frank Seidman | Manager of PE Class A General, LLC, GP of the GP of Issuer | 2013-09-11 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

D-759

# Exhibit F



Jan M. Olsson
Legal Services
MN017-E300; 9700 Health Care Lane
Minnetonka, MN 55343
Tel 952- 979-5720 Fax 952- 979-7810

September 9, 2014

Ms. Julie P. Whitchurch
103 Golden Hills Drive
Woodstock, GA 30189

Re: Subpoena for Records

Dear Ms. Whitchurch:

This is in response to the subpoena received from you.

Enclosed is the information we have on file regarding the cancellation of your coverage. This information was communicated to United from the Agent on record, Ellen Cosgrove, Senior Employee Benefits Account Manager Univest Corporation.

In addition, we are providing the records, documents and correspondence in our possession sent, or communicated to Vizant Technologies regarding delinquent payments of healthcare coverage provided by UnitedHealthcare or any information communicated to a third party relating to Vizant Technologies for the period from July 2013 through November, 2013. Please see enclosed information.

Vizant Technologies was cancelled for nonpayment on 8/5/13 effective 7/1/13 and were reinstated with no lapse in coverage on 8/7/13 after payment in full was received by United. Vizant is still active with United as of today.

Sincerely

*Jan M. Olsson*

Jan M. Olsson
UHC Legal Services

Enclosures

UnitedHealthcare
Dept. CH 10151
600550151C0009
Palatine IL    60055-0151



**UnitedHealthcare**
A UnitedHealth Group Company

Page:  1 of  1

1936473P4N0979601

**VIZANT TECHNOLOGIES, LLC**
Brandywine Two
5 Christy drive ste 202
chadds ford PA    19317

Statement No: S1006731405
Statement Date: Jul 12, 2013
Customer No: 596714
Bill Group No: 1
Due Date: Upon Receipt



## Statement of Account

| Activity Date | Ref Number | Description | Charges | Credits | Original Due Date |
|---|---|---|---|---|---|
| 06/08/2013 | 0031587264 | Invoice | $29,807.99 | | 07/01/2013 |
| 06/08/2013 | 0031587348 | Invoice | | $-1,038.51 | 07/01/2013 |
| | | **Total Amount Due** | **$28,769.48** | | |

### Past Due Aging

| 0 - 30 Days | 31 - 60 Days | 61 - 90 Days | 91 - 120 Days | Over 120 Days |
|---|---|---|---|---|
| $28,769.48 | $0.00 | $0.00 | $0.00 | $0.00 |

Our records indicate that as of 07/12/2013 the below amount is past due.  To keep your coverage in effect, it is important that we receive full payment of the below balance for your account.  If full payment is not received, your coverage may be subject to termination under the terms stated in your contract.  Termination of coverage will be effective 07/01/2013.  Please detach the payment stub of this statement and mail it with your payment.  Return payments are subject to a service charge.

This statement is provided in addition to your monthly invoice as a way to summarize all past-due open balances. If payment has been sent, please disregard this notice. If you have any questions regarding this statement, please contact your Billing/Accounts Receivable Representative. 1-888-842-4571

Please advise your employees immediately if this coverage is going to be cancelled.  They should refer to their contract documents in order to determine what conversion rights, if any, are available.  The carrier is not responsible for claims incurred after the contract termination date. If you continue to collect contributions for coverage beyond the date of cancellation, you may be held solely liable for any benefits for which you have collected contributions.

⤶     **Please Detach and Return the Portion Below with Remittance**     ⤵

| Customer Name | Customer# | Payment Due Date | Statement No |
|---|---|---|---|
| VIZANT TECHNOLOGIES, LLC | 596714 | Upon Receipt | S1006731405 |

*Return payment stub to:*

**AMOUNT DUE**    | $28,769.48 |

UnitedHealthcare Insurance Company
Dept. CH 10151
Palatine IL    60055-0151

**AMOUNT PAID**    $_____

MC2438.GRM(07407)

UnitedHealthcare
Dept. CH 10151
600550151C0009
Palatine IL   60055-0151

**UnitedHealthcare**
A UnitedHealth Group Company



Page:   1 of   1

1646473P4N0914301

VIZANT TECHNOLOGIES, LLC
Brandywine Two
5 Christy drive ste 202
chadds ford PA    19317

Statement No: S1006682268
Statement Date: Jun 13, 2013
Customer No: 596714
Bill Group No: 1
Due Date: Upon Receipt

## Statement of Account

| Activity Date | Ref Number | Description | Charges | Credits | Original Due Date |
|---|---|---|---|---|---|
| 05/10/2013 | 0031309070 | Invoice | $30,154.16 | | 06/01/2013 |
| | | **Total Amount Due** | **$30,154.16** | | |

### Past Due Aging

| 0 - 30 Days | 31 - 60 Days | 61 - 90 Days | 91 - 120 Days | Over 120 Days |
|---|---|---|---|---|
| $30,154.16 | $0.00 | $0.00 | $0.00 | $0.00 |

Our records indicate that as of 06/13/2013 the below amount is past due.  To keep your coverage in effect, it is important that we receive full payment of the below balance for your account.  If full payment is not received, your coverage may be subject to termination under the terms stated in your contract.  Termination of coverage will be effective 06/01/2013.  Please detach the payment stub of this statement and mail it with your payment.  Return payments are subject to a service charge.

This statement is provided in addition to your monthly invoice as a way to summarize all past-due open balances. If payment has been sent, please disregard this notice. If you have any questions regarding this statement, please contact your Billing/Accounts Receivable Representative. 1-888-842-4571

Please advise your employees immediately if this coverage is going to be cancelled.  They should refer to their contract documents to determine what conversion rights, if any, are available.  The carrier is not responsible for claims incurred after the contract termination date.  If you continue to collect contributions for coverage beyond the date of cancellation, you may be held solely liable for any benefits for which you have collected contributions.

↓   **Please Detach and Return the Portion Below with Remittance**   ↓

| Customer Name | Customer # | Payment Due Date | Statement No |
|---|---|---|---|
| VIZANT TECHNOLOGIES, LLC | 596714 | Upon Receipt | S1006682268 |

*Return payment stub to:*

**AMOUNT DUE**      $30,154.16

**AMOUNT PAID**     $ _____

UnitedHealthcare Insurance Company
Dept. CH 10151
Palatine IL    60055-0151

MC2436.GRN(07407)

# Exhibit G

026414385      PAY    21Z    0076    P.E. SYSTEMS LLC

Jul 3 2013 6:27PM      Closed

Closed duplicate      David    Jablonski      6103574816      OLSEND

*** PHONE LOG 07/03/2013 03:28:27 PM LOPEZPM
Hi Ally,

Thank you for your email.
We have added this information to case#26414385.
A team member will follow up to provide assistance.

Thank you,

ADP Northwest Client Services


From: Cole, Ally (ES)
Sent: Wednesday, July 03, 2013 3:23 PM
To: MA Service Northwest Hotline
Subject: 0076 21z - Vizant 7/15 payroll

Hi team!

Can someone let me know if it would be possible to change their paydate from 7/15 to
7/16?

Thank you!

Ally Cole
Workforce Management Specialist
District Manager | Major Account Services
(: Office 509.315.4979 | (: Cell 206.383.5029 | *: ally.cole@adp.com
<mailto:ally.cole@adp.com>


From: David Jablonski [<mailto:djablonski@Vizant.com>]

Sent: Wednesday, July 03, 2013 3:15 PM
To: Cole, Ally (ES)
Subject: Vizant 7/15 payroll

Would it be at all possible to change or pay date from 7/15 to 7/16

I also need to discuss the live check issue with you one more time

David Jablonski
Chief Financial Officer
Vizant Technologies | <www.vizant.com>
Mobile | 610-357-4816
Office | 610-358-3244
Fax | 866.526-5001
djablonski@vizant.com <mailto:djablonski@vizant.com>


*** CASE CLOSE 07/03/2013 03:34:18 PM OLSEND

026414369     PAY     21Z     0076     P.E. SYSTEMS LLC

Jul 3 2013 6:28PM     Closed     Closed     21Z - SH - Changing PD
David     Jablonski 6103574816          OLSEND

** NOTES 07/03/2013 03:28:46 PM TREMBLAB Action Type: Case Notes
From: Cole, Ally (ES)
Sent: Wednesday, July 03, 2013 3:23 PM
To: MA Service Northwest Hotline
Subject: 0076 21z - Vizant 7/15 payroll

Hi team!

Can someone let me know if it would be possible to change their paydate from 7/15 to 7/16?

Thank you!

Ally Cole
Workforce Management Specialist
District Manager | Major Account Services
(: Office 509.315.4979 | (: Cell 206.383.5029 | *: ally.cole@adp.com
<mailto:ally.cole@adp.com>


From: David Jablonski [mailto:djablonski@Vizant.com]
Sent: Wednesday, July 03, 2013 3:15 PM
To: Cole, Ally (ES)
Subject: Vizant 7/15 payroll

Would it be at all possible to change or pay date from 7/15 to 7/16

I also need to discuss the live check issue with you one more time

David Jablonski
Chief Financial Officer
Vizant Technologies | <www.vizant.com>

Mobile | 610-357-4816
Office | 610-358-3244
Fax | 866.526-5001
djablonski@vizant.com <mailto:djablonski@vizant.com>


*** EMAIL OUT 07/03/2013 03:33:49 PM OLSEND Action Type:Not Assigned
Send to:[ally.cole@adp.com]
Case Number: 026414389
Co. Code: 21Z
Co. Name: VIZANT TECH.LLC

Dear Ally,

Thank you for your email.  Vizant can change their pay date from 07/15 to 07/16/
2013...there is no problem with that.  Should it be done or is it still in the discussion
stage?

Thank you,
Danelle
ADP Northwest Service Center




*** NOTES 07/03/2013 04:08:41 PM TREMBLAB Action Type:Case Notes
From: Cole, Ally (ES)
Sent: Wednesday, July 03, 2013 4:07 PM
To: MA Northwest Service Email Autocase (ES)
Subject: Re: Case 026414389 Company Code 21Z Service Ctr 0076 CSR 1%

Hi team!

Thank you! Please go ahead per the client's request. Can you advise on the question below?

OK, please change the pay date from Monday 7/15 to Tuesday 7/16 <x-apple-data-detectors://0>.

Do we have to change the submission date as well, or are we OK with leaving it as is?

Thanks!

Ally Cole
(509) 315-4979
Cell (206) 383-5029

On Jul 3, 2013, at 3:34 PM, "ADP Northwest Service Team"
<NorthwestService@ADP.com <mailto:NorthwestService@ADP.com>> wrote:
Case Number: 026414389
Co. Code: 21Z
Co. Name: VIZANT TECH.LLC

Dear Ally,

Thank you for your email. Vizant can change their pay date from 07/15 to 07/16/ 2013...there is no problem with that. Should it be done or is it still in the discussion stage?

Thank you,
Danelle
ADP Northwest Service Center

*** EMAIL OUT 07/03/2013 05:10:45 PM OLSEND Action Type: Not Assigned
Send to:[DJablonski@pesystemscorp.com]
CC List:[ally.cole@adp.com]
Case Number: 026414389
Co. Code: 21Z
Co. Name: VIZANT TECH.LLC

Dear David,

I have updated your 07/15/2013 to 07/16/2013 and sent you a new Payroll Schedule to load. Please follow the steps below to load the file. Your input date remains at 07/10/2013 but that can be updated to 07/11/2013 if you like.

To load the new schedule file that includes the OOS Payroll:

1. On the home page, click A Payroll Schedule File Exists and Is Ready to Be Processed.
2. Select the line for the company with a file type of Payroll Schedule Load.
3. Click Start.
Result: After the screen refreshes, you should see that the file(s) were loaded successfully.
4. Select Payroll > Payroll Cycle Tasks > Edit Schedule to confirm the week number, payroll number, pay date and period ending dates

If for any reason you have further questions or would like us to revisit the case, please feel free to give us a call and reference your case number listed above.

Thank you,
Danelle
ADP Northwest Service Center


\*\*\* CASE CLOSE 07/03/2013 05:10:53 PM OLSEND

026710387      PAY      21Z      0076      P.E. SYSTEMS LLC

Jul 26 2013 12:31PM        Closed

Closed   21Z - Transmit date          Barbie   Edden   5097550621        OJINAGAM

*** PHONE LOG 07/26/2013 10:48:52 AM OJINAGAM
Barbie called in about transmit date.  Wants to know when the latest they can transmit by to pay
on 07/31/13.  They have a payroll scheduled transmit on 07/26/13  disperse on 07/29/13 and pay
on 07/31/13.  Explained today at 5:00pm is the latest they can transmit by to guarantee payment
by 07/31/13.  Explained is risking some direct deposits not paying on 07/31/13 if transmits on
Monday 07/29/13.  Barbie will explain options to her boss.


*** CASE CLOSE 07/26/2013 10:48:53 AM OJINAGAM

# Exhibit H



GEORGIA DEPARTMENT OF LABOR - APPEALS TRIBUNAL
148 Andrew Young Intl Blvd NE,Ste 525, Atlanta,GA 30303-1734
404-232-3900  Fax 404-232-3901
appeals@dol.state.ga.us

DECISION OF ADMINISTRATIVE HEARING OFFICER - DOCKET# 2045-14

| | | | |
|---|---|---|---|
| Appealing Party | Claimant | Decision Mailed | 02/25/2014 |
| Appeal Filed | 01/17/2014 | Appeal Rights Expire | 03/12/2014 |
| Hearing Date | 02/21/2014 | | |

Claimant
JULIE A WHITCHURCH

JULIE A WHITCHURCH
424 SYCAMORE TRAIL
WOODSTOCK GA 30189

Employer
VIZANT TECHNOLOGIES LLC


APPEARANCES: The hearing was held by telephone conference with the claimant representing herself. David Askinas, Vice President/General Counsel, represented the employer.

O.C.G.A. PROVISIONS AND ISSUES INVOLVED: OCGA Section 34-8-194(2) - Whether the discharge or suspension of the claimant was for failure to follow orders, rules or instructions or failure to perform the duties for which employed.

OCGA Section 34-8-157(b) - Whether the employer supplied written separation information to the Department of Labor in a timely manner.

FINDINGS OF FACT: The claimant worked for the named employer from August 15, 2011 through December 4, 2013 as a director of regional development. The employer discharged the claimant.

During the claimant's employment, the employer required the claimant to provide a monthly expense report. The claimant was required to provide the employer with travel authorizations. The claimant was required to provide the employer with a weekly business report.

Due to the required amount of travel, the claimant was unable to provide the employer a monthly expense report or travel authorizations. The claimant was able to provide the employer with weekly business reports. The claimant was often reminded of the need to provide the employer with the expense reports and travel authorizations. However, the claimant was not informed her job would be in jeopardy if she failed to provide the requested information.

In September of 2013, the claimant used another employee's credit card for travel. The claimant advised the employer she would be using another employee's credit card due to her credit card having reached its financial limit. The claimant was sent an email regarding the charges. However, the claimant was not informed she would be discharged.

**See reverse side**

JULIE A WHITCHURCH                        Docket# 2045-14
                                          Page 2


On December 4, 2013, the claimant reported the chief financial officer
and the chief executive officer to the board for gross and illegal
mismanagement. When the employer was informed of this complaint, the
claimant was discharged.

The employer furnished timely separation information to the Department
of Labor.

REASONS FOR DECISION: O.C.G.A. Section 34-8-194(2)(A) provides for a
disqualification if it is shown that an employee has been discharged
or suspended from his most recent employer for failure to obey rules,
orders, or instructions, or for failure to perform the duties for
which employed. This Section of the Law places the burden of proof on
the employer to show by weight of the evidence that the employee was
at fault by a deliberate, willing, and knowing action on his part.

In the instant case, the employer has not presented evidence to show
that the claimant's actions were deliberate or intentional as to
disregard the employer's interest and result in termination. The facts
presented show the claimant was discharged after reporting the
employer for gross and illegal mismanagement. In the absence of such
credible evidence to substantiate deliberate misconduct, the claimant
cannot be held at fault in causing her separation. As such, the
employer has failed to meet their burden of proof that the claimant
was at fault by a willing, knowing or deliberate act, and was
discharged for cause. Therefore, a disqualification is not required.

O.C.G.A. Section 34-8-157(b) provides that benefits paid shall be
charged to the account of the most recent employer. The amount charged
shall be the amount of benefits paid for the period of unemployment or
the amount of wages paid by the employer from the beginning date of
the base period of the claim whichever is less.

DECISION: The determination released by the Department January 3,
2014, disqualifying the claimant effective December 8, 2013, is
reversed. The claimant shall be entitled to unemployment insurance
benefits effective December 8,2013, under the provisions of O.C.G.A.
Section 34-8-194(2)(A). The claimant will be entitled to benefits for
all weeks that claimant has met all the reporting and eligibility
requirements as provided for under the provisions of O.C.G.A. Section
34-8-195(a)(3).

JULIE A WHITCHURCH                          Docket# 2045-14
                                            Page 3


The employer's tax account shall be charged for benefits paid for the
period of unemployment or the amount of wages paid during the period
beginning with the base period of the claim, whichever is less, in
accordance with O.C.G.A. Section 34-8-157(b).


                              *Donna R Ridgeway Mitchell*

                              DONNA MITCHELL
                              HEARING OFFICER

This is to certify that this decision was mailed on the above date by
the clerk of the Appeals Tribunal.

If you desire to appeal this decision, notify the office below in
writing.  Appeal rights expire 15 days afer the decision is mailed.
An appeal filed by mail is considered filed as of the postmark
shown on the envelope, or in the absence of a legible postmark, the
acutal date of receipt by the Department.  A postage meter date will
not be used to determine the date filed.  Appeals by fax are considered
filed on the date received.

Georgia Dept. of Labor-Board of Review  ·   Fax:404-232-3339
Suite 510, 148 Andrew Young International Blvd. NE
Atlanta, GA 30303


COPIES OF THIS DECISION WERE MAILED TO

JULIE A WHITCHURCH                      VIZANT TECHNOLOGIES LLC
424 SYCAMORE TRAIL                      ATTN  HR DEPT
WOODSTOCK GA 30189                      5 CHRISTY DR STE 202
                                        CHADDS FORD PA 19137



**GEORGIA DEPARTMENT OF LABOR - BOARD OF REVIEW**
Suite 510, 148 Andrew Young International Blvd. NE
Atlanta, GA 30303-1751
404-232-3325   Fax 404-232-3339
BoardofReview@dol.state.ga.us

Appealing Party  Claimant                    Docket# 1790B-14
                                              CC# 3600

Appeal Filed      03/05/2014


Claimant                                     JAMIE P DAVIS
JAMIE P DAVIS                                3024 WENDLOCK DR
                                             MARIETTA GA  30062

Employer
VIZANT TECHNOLOGIES LLC


DECISION: After notice to the parties, the Board of Review carefully
considered the record evidence and the contentions of the parties in
the above matter.

Upon careful consideration of the evidence in the record and the
contentions of the parties, the Board of Review finds the claimant was
employed for one year and seven months as a business development
manager. The employer discharged the claimant for violation of their
credit card use policy. The administrative hearing officer reversed
the initial determination in order to disqualify benefits under the
discharge provisions of O.C.G.A. Section 34-8-194(2)(A).

The employer prohibited employees from allowing anyone else to use
their company issued credit card. Violations were subject to
disciplinary action up to and including termination. The employer
notified the claimant of the policy. In September 2013, the claimant's
manager, who was also her sister, requested to use the claimant's
credit card to book business-related travel because she reached the
credit limit on her own card and was unable to get in touch with
anyone to have the limit raised. The claimant allowed her manager to
use her card.


See next page

JAMIE P DAVIS

Docket# 1790B-14
Page 2

Later in September 2013, the chief financial officer ("CFO") contacted the claimant to inquire about the charges. The claimant told him the charges were made by her manager. The CFO did not tell her she had done anything wrong, tell her to cease the practice, or take any disciplinary action. The claimant's manager used the claimant's card a total of six times during September and October 2013. The employer did not discuss the issue further with the claimant.

On December 4, 2013, the claimant's manager contacted the employer's Board of Directors with allegations the CFO and chief executive officer ("CEO") were engaging in financial fraud. The CEO discharged the claimant a few hours later. The following day the employer discharged the claimant as well. The employer contended the claimant was discharged for violation of the credit card policy back in September 2013.

The employer failed to meet the burden of persuasion as to the true reason for the discharge. The employer offered no reasonable or credible explanation why they waited so long to discharge the claimant if the true reason was for violation of the credit card policy. Rather, the record clearly shows they discharged the claimant in immediate retaliation for her sister's allegations of financial fraud. There was no showing the claimant had any involvement or bore any fault in relation to such events. As such, the employer failed to meet the burden of proof to show a just cause discharge as required by O.C.G.A. Section 34-8-194(2)(A). Therefore, disqualification is not required.

Accordingly, we REVERSE the decision of the administrative hearing officer in order to allow benefits, effective December 8, 2013, under the provisions of O.C.G.A. Section 34-8-194(2)(A). The claimant shall be entitled to benefits for all weeks she met the reporting and eligibility requirements of O.C.G.A. Section 34-8-195.

Released at Atlanta, Georgia on 04/17/14

THE BOARD OF REVIEW

*Ruth F. Claiborne*

RUTH F. CLAIBORNE
CHAIRPERSON

*Xernona C. Brady*

XERNONA C. BRADY
MEMBER

# Exhibit I



Julie Whitchurch <juliepwhitchurch@gmail.com>

## Re: How are things
1 message

**Julie Whitchurch** <whitchurchjfamily@gmail.com>                    Fri, Apr 11, 2014 at 10:25 AM
To: Julie Anne Whitchurch <juliepwhitchurch@gmail.com>

I know where you live.....How are the boys?  Safe and secure?


> On Thu, Apr 3, 2014 at 9:07 PM, Julie Anne Whitchurch <juliepwhitchurch@gmail.com> wrote:
> Good.  How are things with the whitchurch family?
>
>> On Thu, Apr 3, 2014 at 7:22 PM, Julie Whitchurch <whitchurchjfamily@gmail.com> wrote:
>> Just saying hello to you.!
>> Julie and Family

D1632



Julie Whitchurch <juliepwhitchurch@gmail.com>

## checking in
1 message

**Julie Whitchurch** <whitchurchjfamily@gmail.com>                    Fri, Apr 11, 2014 at 10:48 AM
To: Julie Anne Whitchurch <juliepwhitchurch@gmail.com>

How is your lawsuit against Vizant?
Did you find a job yet?
Are you still out of work?
Do you think they will give you a good reference?

What happens if they start web site about you?

Hmmm...must not be fun to be out of work with no money....

*D/*₤*3/*

# Exhibit J

A **web**.com Company

**Whois Server Version 2.0**
Domain names in the .com and .net domains can now be registered with many different competing registrars.

Go to http://www.internic.net for detailed information.

Domain Name: JULIEWHITCHURCH.COM
Registry Domain ID: 1854003373_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.enom.com
Registrar URL: www.enom.com
Updated Date: 2015-04-09T07:55:52.00Z
Creation Date: 2014-04-09T14:16:00.00Z
Registrar Registration Expiration Date: 2016-04-09T14:16:00.00Z
Registrar: ENOM, INC.
Registrar IANA ID: 48
Domain Status: clientTransferProhibited https://www.icann.org/epp#clientTransferProhibited
Registry Registrant ID:
Registrant Name: KEVIN DAVIS
Registrant Organization: VIZANT
Registrant Street: 5 CHRISTY DRIVE, SUITE 202
Registrant City: CHADDS FORD
Registrant State/Province: PA
Registrant Postal Code: 19317
Registrant Country: US
Registrant Phone: +1.6103581003
Registrant Phone Ext:
Registrant Fax:
Registrant Fax Ext:
Registrant Email: KDAVIS@VIZANT.COM
Registry Admin ID:
Admin Name: KEVIN DAVIS
Admin Organization: VIZANT
Admin Street: 5 CHRISTY DRIVE, SUITE 202
Admin City: CHADDS FORD
Admin State/Province: PA
Admin Postal Code: 19317
• Admin Country: US
Admin Phone: +1.6103581003
Admin Phone Ext:
Admin Fax:
Admin Fax Ext:
Admin Email: KDAVIS@VIZANT.COM
Registry Tech ID:
Tech Name: KEVIN DAVIS
Tech Organization: VIZANT
Tech Street: 5 CHRISTY DRIVE, SUITE 202
Tech City: CHADDS FORD
Tech State/Province: PA
Tech Postal Code: 19317
Tech Country: US
Tech Phone: +1.6103581003
Tech Phone Ext:
Tech Fax:
Tech Fax Ext:
Tech Email: KDAVIS@VIZANT.COM

P2761

# Exhibit K

Sincerely,

Jeffrey Martin
Vice President of Operations
Strike Force Protective Services
USI Services Group
Cell: 718-812-0209
Fax: 973-232-7371
Email:jmartin@strikeforceprotectiveservices.com
Website: www.strikeforceprotectiveservices.com
"MAKING LIVES SAFER"

———— Original message ————
From: Joseph Bizzarro
Date:01/21/2014 1:40 PM (GMT-05:00)
To: Jeffrey Martin
Cc: "JeffreyGross F. Forward"
Subject: Re: Strike Force

If that is what she wants. Pull the security from the home. Thanks

Joseph N Bizzarro
CEO
Vizant Technologies
484-319-5255
Sent from Mobile

On Jan 21, 2014, at 1:37 PM, "Jeffrey Martin" <jmartin@strikeforceprotectiveservices.com> wrote:

> Mr Bizzarro,
>
> The chairman's wife came out of the residence and informed our staff that they were no longer needed. I
> have instructed them to remain on site until I hear from you. I have left you voice messages as well. In
> addition the office at Blue Bell closed early and dismissed the staff.
>
> Please let me know how to proceed with the officers assigned to the residence. Thank you
>
>
> Sincerely,
>
> Jeffrey Martin
> Vice President of Operations
> Strike Force Protective Services
> USI Services Group
> Cell: 718-812-0209
> Fax: 973-232-7371
> Email:jmartin@strikeforceprotectiveservices.com
> Website: www.strikeforceprotectiveservices.com
> "MAKING LIVES SAFER"
>

**CONFIDENTIAL**

VIZANT002899

# Exhibit L



**Pennsylvania State Police**
**Bureau of Records & Identification**
**RIGHT-TO-KNOW OFFICE**
**1800 Elmerton Avenue**
**Harrisburg, Pennsylvania 17110**

Mailing Date: August 27, 2014

Julie P. Whitchurch
103 Gold Hills Drive
Woodstock, Georgia 30189

PSP/RTKL Request Nº 2014-0468

Dear Ms. Whitchurch

On July 21, 2014, the Pennsylvania State Police (PSP) received your request for information pursuant to Pennsylvania's Right-to-Know Law (RTKL), 65. PA. STAT. ANN. §§ 67.101-67.3104, wherein you stated:

> I am seeking any records/or complaints referencing me. On April 14th and 16th, 2014 Joseph N Bizzaro, testified in Georgia Superior Court, Marietta, GA. He stated that during the month of January and/or February 2014 Vizant Technologies filed a criminal report with the Pennsylvania State Police citing "harassment and a credible threat of violence" by me. He further testified that the PA State Police were dispatched and provided a 3 day, 24 hour surveillance at the private residence of Mr. and Mrs. Frank Seidman, 648 Church Road, Flourtown, PA 19422.
>
> Can you please confirm or deny that such a report and/or complaint was filed, as well can you please confirm or deny if any such surveillance was provided at any of the below locations? As well, can you please confirm or deny if any of the below individuals have filed a complaint, and if so, please provide me with a copy of said report.
>
> My address at the time, and up until May 2014 my home address was, 424 Sycamore Trail, Woodstock, GA 30189
>
> The complaint(s) would have been filed by the one or all of the following individuals:
>
> Joseph N. Bizzarro, CEO          Mr. Frank Seidman
> Vizant Techologies               Capital Solutions, Inc.
> 5 Christy Drive, Ste 202         910 Harvest Drive

Chadds Ford, PA 19317                    Blue Bell, PA 19422

Joseph N Bizzarro                        Mr. & Mrs. Frank Seidman
150 Stonegate Drive                      648 Church Road
Landenberg, PA 19350                     Flourtown, PA 19031

A copy of your request is enclosed.  By letter dated July 28, 2014, you were notified in accordance with RTKL section 67.902(b) and 1 PA. CONS. STAT. § 1908, that PSP required an additional thirty days to prepare this final response to your request.

Based on the information provided, the PSP determined it does not have any records in its possession, custody, or control that respond to your request. A supporting verification confirming this assertion accompanies this final response letter. Pursuant to the decision in *Jenkins vs. Pennsylvania Department of State*, "It is not a denial of access when an agency does not possess records and [there is no] legal obligation to obtain them (see, e.g. section 67.506 (d)(1)." *Jenkins vs. Pa. Dep't of State*, Docket No. AP 2009-065 (available at, http://openrecords.state.pa.us).  Our office conducted a diligent database search of PSP records, including a search of records at Troop J - Embreeville, Troop J - Avondale, Troop K - Media, and Troop K - Skippack utilizing the information you provided, however; we could not  locate any records responsive to your request.

To the extent that your request seeks or may be construed to seek records pertaining to covert law enforcement investigations, including, intelligence gathering and analysis, the PSP can neither confirm nor deny the existence of such records without risk of compromising investigations and imperiling individuals. Under No Circumstances, therefore, should this final response be interpreted as indicating otherwise. In all events, should such records exist, they are entirely exempt from public disclosure under the RTKL and Criminal History Record Information Act, 18 PA. CONS. STAT. §§ 9101-9183.

In closing, you have a right to appeal this response in writing to, Terry Mutchler, Executive Director, Office of Open Records, Commonwealth Keystone Building, 400 North Street, 4th Floor, Harrisburg, Pennsylvania 17120. The appropriate OOR appeal form is available for your use at, https://www.dced.state.pa.us/public/oor/appealformgeneral.pdf. If you choose to appeal, you must do so within 15 business days of the mailing date of this response, and send to the OOR: 1) this response; 2) your request; 3) the reason or reasons why you think PSP wrongfully denied your access to the requested records. (*a statement identifying any flaws in the reasons provided above as to why a requester is not subject to access the requested records under the RTKL*).

If you have any questions, please feel free to contact our office at the telephone number listed below.

Respectfully,

*Lissa M. Ferguson*

Lissa M. Ferguson



Deputy Agency Open Records Officer
Pennsylvania State Police
Bureau of Records & Identification
Right-to-Know Office
1800 Elmerton Avenue
Harrisburg, Pennsylvania 17110
1.877.785.7771 (Main); 717.525.5795 (Fax)

Enclosures:  PSP/ RTKL Request N° 2014-0468
             Ferguson Verification



PENNSYLVANIA STATE POLICE
BUREAU OF RECORDS & IDENTIFICATION
RIGHT-TO-KNOW OFFICE

VERIFICATION OF
LISSA M. FERGUSON
DEPUTY AGENCY OPEN RECORDS OFFICER

I, Lissa M. Ferguson, Deputy Agency Open Records Officer of the Pennsylvania State Police (PSP or Department), am authorized to prepare this verification on the Department's behalf in response to PSP/RTKL Request Nº 2014-0468. Accordingly, on this 27th day of August, 2014, I verify the following facts to be true and correct, to the best of my knowledge or information and belief:

1. I am familiar with PSP/RTKL Request Nº 2014-0468, which is attached to this verification.

2. Utilizing the information contained in the request, I searched all Department databases to which I have access for evidence of any PSP records that may respond to the request, including a database search for records at Troop J - Embreeville, Troop J - Avondale, Troop K - Media, and Troop K - Skippack.

3. Finding neither records nor any evidence that suggests PSP ever possessed the requested records, I have determined PSP does not have any records responsive to this RTKL request in its possession, custody, or control.

**I understand that false statements made in this verification are subject to penalties of 18 Pa. Cons. Stat. § 4904, relating to unsworn falsification to authorities.**

_Lissa M. Ferguson_

_____
Lissa M. Ferguson
Deputy Agency Open Records Officer
Pennsylvania State Police

# Exhibit M

IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| Vizant Technologies, LLC, a Delaware Limited Liability Company, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action File No.: 14-1-403-49 |
| v. | ) ) | |
| Julie P. Whitchurch and Jamie Davis, Individuals, | ) ) ) | |
| Defendants. | ) ) | |

## AFFIDAVIT OF JOE BIZZARRO

STATE OF PENNSYLVANIA

COUNTY OF CHESTER

Joe Bizzarro, being duly sworn, makes the following Affidavit:

1.

My name is Joe Bizzarro. I am a Caucasian male over 18 years old and am competent to testify to, and have personal knowledge of the matters set forth in this affidavit. I give this affidavit freely. All of the facts contained in this affidavit are based on my personal knowledge.

2.

I am currently employed as Chief Executive Officer of Vizant Technologies, Inc., and have held that position since *November 2010*.

3.

I am married to Lorraine David Bizzarro. Natalie C. Bizzarro is our daughter. Joseph Bizzarro, Jr. and Andrew J. Bizzarro are our sons.

4.

On or about September 16, 2014, I received a postcard at my home residence. The postcard contained a picture of me next to pictures of primates and contained the caption, "This is not over yet Joe Bizzarro. You are a monkey and a liar." A copy of the postcard is attached hereto as Exhibit A (my home address is redacted).

5.

The pictures on the postcard are the same as several on the website nocapitalsolutions.com.

6.

On or about September 14, 2014, my daughter, Natalie Bizzarro, received a Facebook "friend request" from Julie Whitchurch.

7.

On or about September 14, 2014, my wife, Lorraine Bizzarro, received a Facebook "friend request" from Jamie Davis.

8.

In August 2014, I went on vacation with my wife, daughter Natalie Bizzarro, sons Joseph Bizzarro, Jr. and Andrew Bizzarro as well as some family friends.

9.

A photo from my August 2014 vacation, including me, my wife, sons Joseph Jr. and Andrew, daughter Natalie, and our family friends, was posted on nocapitalsolutions.com sometime after the trip. The website included a list of the names of each of the individuals in the photo. The webpage further offers information about the age and dates of graduation of particular individuals in the photograph. A copy of the relevant webpage is attached as Exhibit B.

10.

I believe the foregoing conduct to have been for the purpose of harassing and threaten me and my family, and I felt harassed and threatened by this conduct following my testimony to the Court in April and the continuation of such conduct notwithstanding the Court's Order.

*[signature on next page.]*

Further, Affiant sayeth naught.

This ___ day of October, 2014.

Joe Bizzarro

Sworn to and subscribed
before me, this ___
day of October, 2014.

Notary Public

My commission expires: ~~7/8/13~~
April 6, 2015
(NOTARIAL SEAL)

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Tamara Ross, Notary Public
Uwchlan Twp., Chester County
My Commission Expires April 6, 2015
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES



5 Christy Drive
Ste 202
Chadds Ford, PA 19317

ATLANTA METRO 302

15 SEP 2014 PM 02 IB

Joe Bizzarro
150 Stonegate Drive
Landenberg, PA 19350

20160842365

*This is not over yet Joe Bizzarro. You are a monkey and liar.*





Lorraine Bizzarro< ldbizzarro@gmail.com>

## Jamie Davis wants to be friends on Facebook
1 message

Facebook < notification+o6cp6dgz@facebookmail.com>                    Wed, Sep 14, 2014 at 6:15 PM
Reply-To: noreply <noreply@facebookmail.com>
To: Lorraine David Bizzarro <ldbizzarro@gmail.com>

**Jamie Davis wants to be friends with you on Facebook.**

Marietta, Georgia

| Confirm Request |   | See All Requests |

This message was sent to ldbizzarro@gmail.com. If you don't want to receive these emails from Facebook in the
future, please unsubscribe.
Facebook Inc., Attention: Department 415, PO Box 10005, Palo Alto, CA 94303 ,





Natalie C Bizzarro <ncbizzarro@gmail.com>

---

## Julie Whitchurch wants to be friends on Facebook 2 messages

**Facebook** < notification+o91p7xgf@facebookmail.com>
Reply-To: noreply <noreply@facebookmail.com>
To: Natalie C Bizzarro <ncbizzarro@gmail.com>

Sun, Sep 14, 2014 at 8:06 PM

---

Julie Whitchurch wants to be friends with you on Facebook.

—

---

| Confirm Request |   | See All Requests |

---

This message was sent to ncbizzarro@gmail.com. If you don't want to receive these emails from Facebook in the future, please unsubscribe.
Facebook hc., Attention: Department 415, PO Box 10005, Palo Alto, CA 94303 ,

# Exhibit N

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VIZANT TECHNOLOGIES, LLC AND | ) | |
| JOSEPH BIZZARRO | ) | |
| Plaintiff | ) | CIVIL ACTION |
| v. | ) | NO. 2:15-cv-00431-HB |
| JULIE P. WHITCHURCH AND | ) | |
| JAMIE DAVIS | ) | |
| Defendants | ) | |

**DECLARATION OF Julie P. Whitchurch**

I, Julie P. Whitchurch, do hereby declare and state as follows:

1. I am more than eighteen (18) years of age and otherwise fully competent to give testimony in this matter. The facts set forth in this Affidavit are true and based upon my personal knowledge.

2. I have never sent a Facebook "friend request" to Eric Pullen, David Atlas, or Joseph Miller, as testified to by Aeron Sharp during the Preliminary Injunction Hearing in this matter.

3. I did not send a Facebook "friend request" to Natalie Bizzarro on September 14, 2014 as sworn, under the penalty of perjury, to by Joseph Bizzarro.

4. The Facebook "friend request" Mr. Joseph N. Bizzarro produced during these civil matters was not sent by me and did not originate from my Facebook account or my gmail account.

5. In 2013, while employed as the National Director of Business Development for Vizant Technologies, LLC, I received multiple and frequent calls from employees, vendors, and alliance partners inquiring and, at times, demanding payment for services rendered and/or commissions owed.

6. At the time of my termination, I was owed over $15,000 in earned commissions, back pay, and expenses. To this day, I am still owed over $15, 0000 in earned commissions, back pay, and expenses.

I declare under penalty of perjury that the foregoing is true and correct, submitted this 16th day of September 2015.


Julie P. Whitchurch

# Exhibit O

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VIZANT TECHNOLOGIES, LLC AND | ) | |
| JOSEPH BIZZARRO | ) | |
| Plaintiff | ) | CIVIL ACTION |
| v. | ) | NO. 2:15-cv-00431-HB |
| JULIE P. WHITCHURCH AND | ) | |
| JAMIE DAVIS | ) | |
| Defendants | ) | |

### DECLARATION OF Jamie Davis

I, Jamie Davis, do hereby declare and state as follows:

1. I am more than eighteen (18) years of age and otherwise fully competent to give testimony in this matter. The facts set forth in this Affidavit are true and based upon my personal knowledge.

2. I have never sent a Facebook "friend request" to Eric Pullen, David Atlas, or Joseph Miller, as testified to by Aeron Sharp during the Preliminary Injunction Hearing in this matter.

3. I did not send a Facebook "friend request" to Lorraine Bizzarro on September 14, 2014 as sworn, under the penalty of perjury, to by Joseph Bizzarro.

4. The Facebook "friend request" Mr. Joseph N. Bizzarro produced during these civil matters was not sent by me and did not originate from my Facebook account or my gmail account.

I declare under penalty of perjury that the foregoing is true and correct, submitted this 16th day of September 2015.

Jamie Davis